IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROTH, Calvin William Jr.          :     NO. CIVIL NO. 1:
            Petitioner            :     CV-00-1831
                                  :
                                  :     (Judge Rambo)
v.                                :
                                  :     *FILED*
                                  :     HARRISBURG, PA
                                  :
COMMONWEALTH OF PENNSYLVANIA, Et. Al. :   JUL 30 2001
            Respondents           :     MARY E. D'ANDREA, CLERK
                                        Per _____ Deputy Clerk

### RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

And now, to wit, this ____ day of July, 2001, I, Thomas H.
Kelley, First Assistant District Attorney, York County District
Attorney's Office, hereby file the following response to the
Petition for Writ of Habeas Corpus pursuant to Order of Court
dated October 16, 2000 and allege the following:

    1.   On July 21, 1993, the Petitioner, Calvin W. Roth,
following a jury trial, was convicted of Rape,
Terroristic threats and Escape, before the
Honorable John H. Chronister, York County Court of
Common Pleas. (Appendix A) The Petitioner was
sentenced on September 2, 1993 to an aggregate term
of eleven (11) to twenty-two (22) years
incarceration. (Appendix D)

    2.   On July 27, 1993, the petitioner filed a Motion
for New Trial alleging that the victim's emotional
testimony prejudiced the jury. (Appendix B) On
August 19, 1993, a hearing was held to review the
Motion for Mistrial. Upon conclusion of the
hearing, the Honorable John H. Chronister refused
the motion for mistrial stating that the trial

1

court was acting within its discretion when
deciding not to allow the mistrial. (Appendix C)

3.   On September 2, 1993, Sentencing proceedings were
held before the Honorable John H. Chronister.
(Appendix D)

4.   On September 10, 1993, the Petitioner then filed
a request for a reconsideration of sentence.
(Appendix E) By order of the Court of Common Pleas,
dated September 30, 1993, the Motion was refused
and dismissed. (Appendix F)

5.   On October 4, 1993, the Petitioner filed a pro se
"Motion for Judgment of Acquittal Not Withstanding
the Verdict of a New Trial" in the Superior Court
of Pennsylvania; this motion was considered the
petitioner's first request for relief under the
PCRA. (Appendix G) In the motion, the petitioner
alleged ineffective assistance of counsel and
requested that new counsel be appointed.   The
Superior Court granted the petitioner's request on
December 1, 1993, the Court of Common Pleas
appointed Frank Arcuri, Esq. to represent the
Petitioner. (Appendix J)

6.   The Court of Common Pleas, attempting to commence
a hearing to review the Petitioner's Post
Conviction Relief Act Petition, was forced to
postpone the proceeding twice (February 16, 1994 &
June 16, 1994) due to the petitioner's
unavailability. (Appendix K & L)

7.   On December 14, 1995, the Superior Court of
Pennsylvania issued an order affirming the trial

court's Judgment of Sentence dated September 2, 1993. (Appendix M)

8.   The Court of Common Pleas was finally able to hold a Post Conviction Relief Act Hearing January 30, 1996.  In its decision, the Court concluded that the Petitioner's counsel was not ineffective and denied the requested relief. (Appendix N)

9.   The Petitioner then filed a Petition for Allowance of Appeal with the Supreme Court of Pennsylvania. This appeal was in response to the Superior Court's affirmation of the judgement of sentence. Said appeal was denied in a Per Curiam decision on May 30, 1997. (Appendix O)

10.  On November 1, 1997, Petitioner filed a Petition for Writ of Habeas Corpus with the United States District Court for the Middle District of Pennsylvania. (Appendix P) The Honorable Judge Sylvia A. Rambo dismissed the petition on July 17, 1998. (Appendix Q) In the Court's Opinion, Judge Rambo indicated that the issue of the jury's constitutionality raised by the Petitioner had not been previously presented and therefore was not exhausted at the state level.  Moreover, the Court stated that habeas corpus petitions containing unexhausted claims are dismissed so that the petitioner can exhaust his state remedies and pursue another appeal. People v. Fulcomer, 882 F.2d 828, 832 (3d Cir. 1989)

11.  On December 7, 1998, Petitioner filed a second Post Conviction Relief Act petition. (Appendix R) On December 9, 1998, the Honorable John H.

3

Chronister dismissed the petition as untimely.
(Appendix S) In Commonwealth v. Hutchins, 760 A.2d
50(2000), the Superior Court concluded that a trial
court has no jurisdiction to entertain an untimely
petition for Relief under the Post Conviction
Relief Act.

12.   On February 18, 1999, Petitioner filed a pro se
Motion to Vacate Judgement or Set Aside Sentence –
the lower Court considered this motion as a third
PCRA petition. (Appendix T) In the Motion, the
Petitioner alleged ineffective assistance of
counsel, prejudicial testimony and the
unconstitutionality of his empanelled jury. On
March 2, 1999, this PCRA petition was denied by the
Court of Common Pleas on the basis that the issues
raised were either raised in direct appeal or
previous Post Conviction Relief Act Petitions or
were waived because of the failure to raise them in
the previous Post Conviction Relief Act. (Appendix
U)

13.   Thereafter, the Superior Court of Pennsylvania
affirmed the decision by the Court of Common Pleas
on February 8, 2000; however, the Superior Court
specifically stated that the petition was untimely
for failure to be filed within one year of the
judgment of sentence. (Appendix V)

14.   On March 6, 2000, the Petitioner filed a Petition
for Allowance of Appeal to the Supreme Court of
Pennsylvania. On July 25, 2000, the Supreme Court
entered a Per Curiam decision denying the Petition
for Allowance of Appeal and affirming the orders of

the Court of Common Pleas and the Pennsylvania
Superior Court. (Appendix W)

15.   On October 16, 2000, the Petitioner filed a
second Petition for Habeas Corpus. The Petition
claimed:

> a) Counsel was ineffective for failing to
>    contest the credibility of certain
>    jurors and allowing the jury to consist
>    of ten (10) woman and two (2) men and
>    therefore he was denied a jury of his
>    peers;
> b) that counsel was ineffective for failing
>    to honor the Petitioner's wishes and
>    failing to communicate how the trial was
>    being handled and failing to provide for
>    an in-Camera hearing;
> c) that trial counsel was ineffective for
>    failing to secure certain witnesses; and
> d) that the Petitioner's trial was
>    prejudiced by testimony made by
>    Commonwealth witnesses which was
>    contradicted by police reports and
>    testimony given at the preliminary
>    hearing.

## Argument

Absent a showing of cause and prejudice, federal habeas
corpus review is denied if the issue presented is barred by a
state procedural default[1]. Wainwright v. Sykes 433 U.S. 72, 53
L.Ed.2d 594 (1977). The Supreme Court's decision is based on the

---

[1] The Supreme Court in Wainwright v. Sykes limits its application of the rule to the untimely objection to
the admission of a confession; however, dicta indicates that the principle should be applied more broadly to
state procedural bars. 433 U.S. 72, 53 L.Ed.2d 594

concern the Court has in regard to the passage of time, erosion
of memory and dispersion of witnesses that would affect a
retrial. Engle v. Isaac 456 U.S. 107, 129, 102 S.Ct. 1558, 1572,
71 L.Ed.2d 783 (1982); Wainwright 433 U.S. 72 (1977). But the
primary concern is that by failing to abide by state procedural
guidelines, a Petitioner has denied the state courts an
opportunity to address the claims in the first instance.
Peterkin v. Horn 34 F.Supp2d 289 (E.D. Pa 1998)

Within the Commonwealth of Pennsylvania, the Pennsylvania
Post Conviction Relief Act 42 Pa.C.S. § 9541, et. Seq. (PCRA)
"provides for an action by which persons convicted of crimes that
they did not commit and persons serving illegal sentences may
obtain collateral relief." 42 Pa.C.S. § 9542. Breach of the
filing requirements of the Post Conviction Relief Act establishes
a procedural bar to Federal review. Harris v. Reed 489 U.S. 255,
263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). Commonwealth
v. Peterkin, __ Pa. __, 722 A.2d 638, 641 (1998).

On November 17, 1995, the Post Conviction Relief Act was
amended (effective in 60 days), and 42 Pa.C.S.A. § 9545(b)(1) now
provides:

**(b) Time for filing petition**

(1)   Any petition under this subchapter, including a second
      or subsequent petition, shall be filed within one year
      of the date the judgment becomes final, unless the
      petition alleges and the petitioner proves that:

      (i) the failure to raise the claim previously was
      the result of interference by government officials
      with the presentation of the claim in violation of the
      Constitution or laws of this Commonwealth or the
      Constitution or laws of the United States;

      (ii) the facts upon which the claim is predicated
      were unknown to the petitioner and could not have been
      ascertained by the exercise of due diligence; or

      (iii) the right asserted is a constitutional
      right that was recognized by the Supreme Court of the
      Untied States or the Supreme Court of Pennsylvania

6

after the time period provided in this section and has been held by that court to apply retroactively.

Originally, the Petitioner filed a direct appeal from his judgement of sentence, and the Superior Court affirmed the Lower Court on December 14, 1995. (Appendix M) Petitioner did not file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. Thus, Petitioner's judgment of sentence became final on January 13, 1996, upon expiration of the thirty-day period for filing a Petition for Allowance of Appeal. 42 Pa.C.S.A. § 9545(b)(3); Pa.R.C.P. 1113.

On February 18, 1999, the Petitioner filed a Motion to Set Aside Sentence that was considered his third petition for relief under the PCRA. (Appendix T)

Evaluating the petition, the Superior court found that because of the filing date of Petitioner's PCRA petition, sub judice, the PCRA, as amended on November 17, 1995 (effective in 60 days), applied. (Appendix V, pg. 4) The Superior court held that the Petitioner's third petition was untimely because it was filed well in excess of one year after his judgement of sentence became final on January 13, 1996. (Appendix V, pg. 4) The Court also held that the Petitioner's allegations did not fall within the exceptions to 42 Pa.C.S.A. § 9545 (b)(3). (Appendix V, pg. 5)

The issues first raised by the Petitioner in his second and third petitions are thus precluded from review by this Honorable Court. This is validated by the Superior Court's Order dated February 8, 2000, as the last state court rendering judgment on the petition, stating that the petition was denied for being untimely under 42 Pa.C.S.A. § 9545(b)(3). (Appendix W) The issues that are precluded from this Honorable Court's review are: (1) the jury was unconstitutionally selected and empanelled, and (2) Petitioner was denied effective assistance of counsel because counsel failed to honor the Petitioner's wishes or communicate how the trial should be handled.

7

The remaining issues presented under the current petition requesting federal habeas corpus review are: (1) Counsel was ineffective for failing to secure witnesses, and (2) Counsel was ineffective for allowing the Petitioner to be prejudiced by tainted and contradictory testimony. The Petitioner also incorporates a third issue, the prejudicial effect of the emotional outburst of the victim. These issues were implicated in the Petitioner's original application under the Post Conviction Relief Act and the first habeas corpus petition. (Appendix G, Appendix P)

First, the Commonwealth concedes that the Petitioner has appropriately preserved the third claim for relief for review and exhausted the issue within the Pennsylvania State Courts (Appendix G, Appendix N, Appendix O); however, the Respondent argues that the claim is meritless. Because the Petitioner fails to identify the witnesses in the current petition, Respondent is forced to conclude that the witnesses in question are the three (3) considered in the initial Post Conviction Relief proceeding. (Appendix N)

On January 30, 1996, the Court of Common Pleas held a proceeding to review the Petitioner's first PCRA petition. (Appendix N) The Honorable Judge Chronister concluded that Petitioner's counsel did in fact take appropriate measures in regard to each of the three (3) witnesses. Mr. Gladstone, one of the witnesses, was contacted, subpoenaed and testified at trial. (Appendix N, pg. 67; Appendix A, pg. 87) As the Court's opinion indicates, Petitioner's counsel did everything possible in obtaining testimony from this witness.

Petitioner's counsel also contacted the second witness, Ms. McPartland. Ms. McPartland provided a written letter to Mr. McVeigh (Petitioner's defense counsel) stating that she had no personal knowledge of the events which occurred specifically; furthermore, she did not want to participate in the trial.

8

(Appendix N, pg. 67) As a result, Mr. McVeigh made a strategic
decision not to call her as a witness.

Finally, Mr. McVeigh did issue a subpoena for the third
witness; however, the subpoena was issued in New York State and
not properly served. The Honorable John H. Chronister concluded
that Mr. McVeigh's decision to release the witness from the
subpoena was "of no significance."(Appendix N, pg. 67)

The Petitioner's allegation that counsel was ineffective
for failing to secure three witnesses is therefore faulty based
on the facts established at the post conviction relief hearing.
At the Petitioner's Post Conviction Relief Act hearing, the
Honorable John H. Chronister stated that the Petitioner's
"counsel was not ineffective in failing to have the three
witnesses present." (Appendix N, pg. 70) The claim is meritless
and should be dismissed.

Second, the Commonwealth argues that Petitioner has
presented an entirely new issue under the fourth claim for
relief, which renders the claim inappropriate for review. In his
initial PCRA petition, the Petitioner alleged that there were
"various inconsistencies in the testimony of the alleged victim."
(Appendix G) In contrast, the Petitioner's habeas petition
implies that "Commonwealth witnesses" provided the contradicted
testimony and was a result of ineffective assistance of counsel.
Under 42 Pa.C.S.A. § 9544(b), an issue is deemed waived if the
petitioner failed to raise it at trial, on appeal, or in a prior
post conviction proceeding. Commonwealth v. Appel, 547 Pa. 171,
689 A.2d 891 (1997). By failing to previously implicate other
individuals and his counsel in this allegation, the Petitioner
has waived his ability to contest any testimony other than that
of the alleged victim[2].

The Petitioner's final allegation states that his counsel
was ineffective for failing to object to the emotional outburst

---

[2] A Petitioner cannot obtain post conviction review of claims previously litigated on appeal by alleging
ineffective assistance of prior counsel and presenting new theories of relief to support previously litigated
claims. Commonwealth v. Peterkin 649 A.2d 121; 538 Pa 455 (1994).

of the witness. The Commonwealth concedes that this issue is ripe for review, but contends that it is meritless due to the facts of the case. The transcript from the trial proceedings indicates that the Petitioner's counsel did object to the outburst at trial by requesting a mistrial. (Appendix A, pg. 31). Furthermore, Petitioner's counsel filed a Motion for New Trial stating the outburst as cause. (Appendix B) Counsel having objected to the witness's outburst, preserving the issue and arguing it on appeal, acted reasonably. The claim of ineffective assistance of counsel is therefore meritless and should be dismissed.

Assuming arguendo that this Honorable Court decides to exercise its discretion to evaluate the Petitioner's first claim for relief (whether the jury was unconstitutionally selected and empanelled), the Commonwealth argues that this Honorable Court is still precluded from reviewing the issue because of the Petitioner's failure to appropriately challenge the jury. A state procedural bar should apply even where the error affects the truth-finding function of the state trial. Engle v. Isaac 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). Under the laws of the Commonwealth of Pennsylvania, a Petitioner's jury challenge must be presented within a specific time period and state an appropriate challenge.[3] 42 Pa.R.Cr.P. 630. Rule 630 states:

**(B) Challenge to the Array.**
   (1)   Unless opportunity did not exist prior thereto, a challenge to the array shall be made not later than 5 days before the first day of the week the case is listed for trial of criminal cases for which the jurors have been summoned and not thereafter, and shall be in writing,

---

[3] Nerison v. Solem 715 F.2d 415 (1983) (The court in concluded that the Petitioner's request for a new trial was prejudicially denied because he did not request a new judge in a timely fashion.); Wayne v. White 735 F.2d 324 (1984) (The Court dismissed the petition concluding that the Petitioner failed to previously raise the issue or show good cause as to why he did not.)

specifying the facts constituting the
ground for the challenge.
(2) A challenge to the array may be made
only on the ground that the jurors were
not selected, drawn, or summoned
substantially in accordance with law.
42 Pa.R.Cr.P. 630

A failure to timely challenge one's jury composition is a
waiver for future objections. Commonwealth v. Jackson 486 A.2d
431, 436 (1984). The Petitioner's objection to the jury
composition is untimely and was waived because he failed to raise
such argument until his second petition for Post Conviction
Relief was filed on December 12, 1998. (This petition was filed
after the Petitioner's initial application for habeas review was
denied, precluding the State Court from ruling on or waiving the
issue in the course of the previous Post Conviction Relief
petition.) Because the trial was held in July of 1993, the
Petitioner was well past the procedural five-day period specified
in Rule 630 for jury challenges within the Commonwealth of
Pennsylvania. Id at 436; Commonwealth v. Davis 267 Pa.Super. 370,
375, 406 A.2d 1087, 1089 (1979); United States v. Sharma 190 F.3d
220, 231 (1999).

In addition to being untimely, the Petitioner failed to
raise an appropriate jury challenge as required by the
Pennsylvania Rules of Criminal Procedure; a jury challenge may
only address the selection, empanelling or summoning of the jury.
42 Pa.Cr.P. 630. A Petitioner may not raise a jury challenge
based upon only the disproportionate representation of a certain
class of people on the jury panel.[4] Commonwealth v. Richbourg 260
Pa.Super. 438, 443, 394 A.2d 1007, 1009 (1978). A petitioner may,
however, raise a jury challenge on the grounds that the
prosecution systematically and deliberately excluded members of
his race, or gender, from the jury. Id. at 1009; Commonwealth v.

---

[4] The United States Supreme Court in J.E.B. v. Alabama extended the protection afforded by the Equal
Protection Clause forbidding peremptory challenges to the basis of gender as well as the basis of race. 511
U.S. 127, 130, 128 L.Ed.2d 89, 98 (1994).

Jackson 486 A.2d 431, 436 (1984); Commonwealth v. McIntosh 266
Pa.Super 425, 427, 405 A.2d 507, 508 (1979); Commonwealth v.
Davis 267 Pa.Super. 370, 375, 406 A.2d 1087, 1089 (1979). It is
the Petitioner's burden to prove a prima facie case of
discrimination. Richbourg 394 A.2d 1007, 1009. The Petitioner's
core complaint is that the composition of the jury was
unconstitutional because it consisted of ten (10) women and (2)
men. Although the Petitioner does allege ineffective counsel as
the cause for the jury imbalance, he merely cites inappropriate
use of peremptory challenges for support. Such an assertion,
presented without additional evidence, has been found to be
insufficient to uphold a claim against counsel. Commonwealth v.
Martin 336 A.2d 290, 293 (1975).

Finally, the Commonwealth argues that the Petitioner's
serial filing of PCRA petitions is vexatious and a waste of the
Court system's resources. As clearly stated by the Pennsylvania
Supreme Court in Commonwealth v. Peterkin, 554 Pa. 547, 557, 722
A.2d 638, 643 (1999): "At some point litigation must come to an
end. The purpose of law is not to provide convicted criminals
with the means to escape well-deserved sanctions, but to provide
a reasonable opportunity for those who have been wrongly
convicted to demonstrate the injustice of their conviction." By
continuing the Petitioner's appeal, the court system is providing
the Petitioner with means to manipulate the legal jargon of his
claims until he escapes his jury trial conviction.

The Petitioner has presented several issues in his Petition
for Post Conviction Relief; however, the issues presented are
either not preserved for review because the petitioner did not
file then in a timely fashion, or the issues are meritless.
Consequently, Petitioner's habeas corpus petition should be
dismissed.

## Appendix

**Appendix A** – July 20 & 21, 1993 Transcript of Appellant's Trial before John H. Chronister, Judge, York County Court of Common Pleas, Criminal Division.

**Appendix B** – July 27, 1993 Motion for a New Trial.

**Appendix C** – August 19, 1993 Transcript of the Proceedings on Appellant's Motion for a New Trial before John H. Chronister, Judge, York County Court of Common Pleas Criminal Court Division.

**Appendix D** – September 2, 1993 Transcript of Appellant's Sentencing Proceedings before John H. Chronister, Judge, York County Court of Common Pleas, Criminal Court Division.

**Appendix E** – September 10, 1993 Petition for Reconsideration of Sentence.

**Appendix F** – September 30, 1993 Transcript of the Proceedings on Appellant's Petition for Reconsideration of Sentence before John H. Chronister, Judge, York County Court of Common Pleas, Criminal Court Division. Motion was denied.

**Appendix G** – October 4, 1993 pro se Motion of Judgment of Acquittal Not Withstanding the Verdict of a New trial.

**Appendix H** – October 22, 1993 Petition to Remand to Court of Common Pleas, filed by Appellant's Trial Counsel, requesting appointment of new counsel for Appellant and further recommending that Appellant's pro se Motion, filed on September 30, 1993, be treated as a petition under the Post Conviction Relief Act.

**Appendix I** – November 5, 1993 Order of the Superior Court of Pennsylvania remanding Appellant's case to the Court of Common Pleas of York County for the appointment of new counsel.

**Appendix J** – December 1, 1993 Order of the Court of Common Pleas, Criminal Court Division, appointing Appellant new counsel.

**Appendix K** – February 16, 1994 Order of the Court of Common Pleas of York County rescheduling Appellant's Post Conviction Relief Act Hearing originally scheduled for March 28, 1994 to April 12, 1994, due to witness unavailability.

**Appendix L** – June 16, 1994 Order of the Court of Common Pleas of York County generally continuing appellant's Post Conviction Relief Act Hearing due to Appellant's incarceration in the State of Indiana.

**Appendix M** - December 14, 1995 Superior Court Memorandum affirming Appellant's Judgment of Sentence rendered by the Court of Common Pleas of York County on September 2, 1993 in response to Appellant's appeal.

**Appendix N** – January 30, 1996 Transcript for Post Conviction Relief Act Hearing before John H. Chronister, Judge, Court of Common Pleas of York County, Criminal Division. Motion was denied.

**Appendix O** – May 30, 1997 Order of the Pennsylvania Supreme Court denying Appellant's Petition for Allowance of Appeal.

**Appendix P** - Application for Habeas Corpus Review filed on November 1, 1997.

**Appendix Q** – July 17, 1998 Order of the United States District Court for the Middle District of Pennsylvania dismissing with prejudice Appellant's petition for writ of habeas corpus for failing to exhaust state remedies.

**Appendix R** – December 7, 1998 Appellant's second petition for post-conviction relief filed.

**Appendix S** – December 9, 1998 Order of the court of Common pleas, York County, John H. Chronister, Judge, denying Appellant's second petition for post-conviction relief.

**Appendix T** – February 18, 1999 Motion to Vacate Judgment or to Set Aside Sentence filed by Appellant.

**Appendix U** – March 2, 1999 Order of the Court of Common Pleas, York County, John H. Chronister, Judge, denying Appellant's motion to Vacate Judgement or to Set Aside Sentence and treating same as a third petition for post-conviction relief.

**Appendix V** – February 8, 2000 Order of the Superior Court of Pennsylvania, affirming the March 2, 1999 order of the Court of Common Pleas.

**Appendix W** – July 25, 2000 order of the Pennsylvania Supreme Court denying Appellant's Petition for allowance of appeal.

Respectfully submitted,

Date: 7/27/01

                      _____

William H. Graff, Esq.
Chief Deputy Prosecutor
Office of the District Attorney
York County Court House
28 East Market Street.
York, Pa. 17401
(717) 771-9600
I.D. #43663

## CERTIFICATE OF SERVICE

I hereby certify that on this          day of July 2001, I served the foregoing motion on the

following person by First Class Postage Prepaid:

**CALVIN WILLIAM ROTH, JR.**
**HOUTZDALE STATE CORRECTIONAL INSTITUTE**
**ROUTE 2007**
**P.O. BOX 1000**
**HOUTZDALE, PA   16698-1000**

_____
William H. Graff, Esquire
Chief Deputy Prosecutor
Office of the District Attorney
York County Court House
28 East Market Street
York, PA   17401

APPENDIX A

October 13, 1993

Thomas H. Kelley, Esquire
District Attorney's Office
28 East Market Street
York, PA  17401

J. David MacVeigh, Esquire
Public Defender's Office
28 East Market Street
York, PA 17401

      RE:  Commonwealth VS. Calvin W. Roth, Jr.
            No. 2341 C. A. 1992

Counsel:

      The transcript of the trial held on Tuesday
and Wednesday, July 20 & 21, 1993, before the
Honorable John H. Chronister, Judge, in the
above-captioned matter is finished.  The original has
been lodged with the Clerk of Court's Office.

      The transcript will be duly certified and
made a part of the record within five days from the
date of this notice unless objection is made thereto.

      Sincerely yours,

Debra S. Romesberg,
Official Court Reporter

cc:  Russell A. Myers, District Court Administrator
     Honorable John H. Chronister, Judge

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,
PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH | : | No. 2341 C. A. 1992 |
| | : | |
| VS | : | 1) Escape |
| | : | 2) Rape |
| CALVIN W. ROTH, JR. | : | 3) Terroristic Threats |

York, Pa., July 20 & 21, 1993

Before the Honorable John H. Chronister, Judge

and a Jury

APPEARANCES:

THOMAS H. KELLEY, Esquire
Assistant District Attorney
For the Commonwealth

J. DAVID MACVEIGH, Esquire
Assistant Public Defender
For the Defendant

TRANSCRIPT OF PROCEEDINGS

Reported by:

Debra S. Romesberg,
Official Court Reporter

1

<u>INDEX TO WITNESSES</u>

2                                 <u>DIRECT</u>   <u>CROSS</u>   <u>R-D</u>   <u>R-C</u>

3    <u>FOR THE COMMONWEALTH:</u>

4    Janet M. Hlafka              25        37       39     42

5    Marvin Lipscomb              43        50       51     52

6    George S. Chacona            57        65       --     --

7    James D. Ankrum              66        --       --     --

8    <u>FOR THE DEFENDANT:</u>

9    Jeffrey S. Snell             71        74       75     --

10   Calvin W. Roth, Jr.          75        82       --     --

11   Walter D. Gladstone          87        89       --     --

12   <u>IN REBUTTAL:</u>

13   Donald Overmoyer             92        94       --     --

14   George S. Chacona            95        96       97     --

15

<u>INDEX TO EXHIBITS</u>

16

17   <u>FOR THE COMMONWEALTH:</u>                        <u>MARKED</u>

     No.  1 - Results of analysis                 70
18   No.  2 - Results of analysis                 70

19

20   <u>FOR THE DEFENDANT:</u>

     No. 1 - Photograph                           37
21

22

23

24

25

1          (PROCEEDINGS HELD ON TUESDAY, JULY 20, 1993)

2                      * * *

3          (Whereupon, the following discussion

4  was held on the record at sidebar:)

5                      * * *

6          MR. KELLEY:  Dave, what I had said to

7  the Judge was you are willing to stipulate to the

8  analysis of the seminal fluid found within the

9  victim, that being the Defendant's, as well as on her

10  clothing.

11          MR. MACVEIGH:  Correct.

12          MR. KELLEY:  Okay.  So we will just --

13  without the necessity of bringing someone from the

14  Pennsylvania State Police down here to describe the

15  lab analysis, we would just move the analysis into

16  evidence.  So you wouldn't have any problem with it

17  being a business record because we don't have anyone

18  to lay the foundation?

19          MR. MACVEIGH:  No problem.  Are you

20  going to put on a doctor?

21          MR. KELLEY:  No.

22          MR. MACVEIGH:  Might then also get the

23  doctor's report that was done at the hospital, at

24  least a photocopy of it.  Any objection to that?

25          MR. KELLEY:  No.

1          MR. MACVEIGH:  Okay.  We'll also

2     stipulate that he was in lawful custody at the time

3     that he absconded himself.

4          MR. KELLEY:  From lawful custody.

5          MR. MACVEIGH:  Yeah.  I don't think --

6     they don't need to bring over his probation officer

7     to testify who testified at the preliminary hearing.

8          THE COURT:  What are the charges?

9          MR. KELLEY:  Escape, rape and

10    terroristic threats.

11         THE COURT:  And circumstances, factual

12    circumstances?

13         MR. KELLEY:  That the victim was

14    voluntarily a patient in a drug and alcohol

15    rehabilitation facility.  That the Defendant was

16    there pursuant to a probationary or parole sentence.

17    That the victim was asleep on her bed and was

18    awakened by the Defendant who was on top of her, was

19    holding her arms down with his knees, and who

20    proceeded to rape her, and then re-clothing himself

21    said, If you tell anyone, I'll kill you.  She went

22    downstairs, told another patient at the institution,

23    and then they went from there to the hospital, et

24    cetera.

25         THE COURT:  Where does escape come in?

1          MR. KELLEY:  He left after this all

2    occurred.  So we are going to be seeking a flight

3    instruction as well, Your Honor.  He was lawfully

4    incarcerated, and he left from Colonial House and was

5    finally a couple months later extradited from --

6    where was it, Indiana, where he was picked up there

7    for an aggravated assault.

8          THE COURT:  Maybe I'm missing

9    something, but how is his being in a halfway house--

10   not a halfway house?

11         MR. KELLEY:  It was a halfway house.

12   I mean he was on the tail end of his sentence in a

13   halfway.

14         MR. MACVEIGH:  He was serving a

15   sentence from Adams County, and he had a minimum date

16   for the sentence was June the 12th?

17         MR. KELLEY:  Yeah, he was in -- I said

18   parole, but that was incorrect.

19         MR. MACVEIGH:  And he had not yet been

20   paroled.  The tail end of his sentence was to be in

21   the rehab.

22         THE COURT:  Not parole?

23         MR. KELLEY:  That's my fault.  I

24   apologize for that.

25         THE COURT:  And this is an Adams

1    County sentence that he's escaping from?

2                MR. MACVEIGH:  Correct.

3                MR. KELLEY:  He was in York County at

4    the time though.

5                THE COURT:  Did I understand as part

6    of the stipulation that he was agreeing he was in

7    custody and left?

8                MR. MACVEIGH:  Essentially he's

9    pleading guilty to that.

10               THE COURT:  Would the jury -- if he

11   did plead guilty to that without the jurors

12   consideration, wouldn't that take an element of

13   prejudice out of the Commonwealth's case?  All the

14   jury would have to know is he is at a rehab facility

15   and what happened happened rather than being told

16   that he was in prison and this and that.

17               MR. MACVEIGH:  That's what I mean.  I

18   was willing to stipulate to that, but I'll talk with

19   him.

20               THE COURT:  If you are going to

21   stipulate, it seems in his interest to plead guilty

22   to it.  I assume the Commonwealth would agree any

23   sentence he would get would be concurrent with the

24   rape?

25               MR. KELLEY:  Yeah, we would agree do

1    that.

2            MR. MACVEIGH:  I'll talk to him.

3                    * * *

4            (Whereupon, the discussion held at

5    sidebar was concluded.)

6                    * * *

7            MR. MACVEIGH:  Do you want him to

8    execute a colloquy first?

9            THE COURT:  No, I don't believe it's

10   necessary.

11           MR. MACVEIGH:  Do you want to conduct

12   one with him now?

13           MR. KELLEY:  Shall I call the case,

14   Your Honor?

15           THE COURT:  Yes.

16           MR. KELLEY:  Your Honor, the

17   Commonwealth calls the case of Commonwealth versus

18   Calvin William Roth, Jr., 2341 Criminal Action of

19   1992.  Defendant is charged with escape, rape and

20   terroristic threats.  He is before you, Your Honor,

21   to plead guilty to the charge of escape.

22           THE COURT:  Mr. Roth, in discussing

23   the case with the attorneys in order to make some

24   pretrial rulings, your attorney advised me that there

25   was a stipulation that at the time this event

1  occurred that you were serving time in Adams County

2  for simple assault, and that you had been sent to the

3  Colonial halfway house here in York for the tail end

4  portion of that sentence, but that it was stipulated

5  that you were still legitimately in custody and that,

6  in fact, you admitted that you had left that

7  facility.

8         Therefore, it was my conclusion that

9  if you were serving a sentence and you were in

10  custody and you left, that in effect you were

11  pleading guilty to escape.  While he wasn't saying

12  that in so many words, the stipulation had the same

13  effect.

14         It also struck me that if that was the

15  case, that you might be better off simply pleading

16  guilty to that charge and removing it from the jury's

17  consideration because if you pled guilty to that

18  charge, the jury then would not necessarily know that

19  you had previously been convicted of another offense

20  and that you were incarcerated previously and simply

21  hear the details of the other offenses, the rape and

22  terroristic threats, and they would make a judgment

23  as to guilt or innocence solely on that testimony,

24  and they would not hear about your previous

25  incarceration.  I suggested to your attorney to talk

1    to you about that.  Has he done so?

2                    DEFENDANT ROTH:  Yes.

3                    THE COURT:  And have you had

4    sufficient time to talk to him about it?

5                    DEFENDANT ROTH:  Yeah.

6                    THE COURT:  And he now advises the

7    Court that you are willing to enter a plea of guilty

8    to the charge of escape, and that you still wish to

9    proceed to trial on the other charges?

10                    DEFENDANT ROTH:  Yes, I do.

11                    THE COURT:  All right.  And you

12    understand you don't have to plead guilty?  You have

13    a right to have a trial on the escape charge as well?

14                    DEFENDANT ROTH:  No, I plead guilty to

15    it.

16                    THE COURT:  I still have to give you

17    your rights before I can take the plea.

18                    And you understand that just like with

19    the other charges you have a right to have a jury

20    trial, that the jury would have to be convinced

21    beyond a reasonable doubt, that you would have the

22    right to help select the jury, that it would be a

23    jury of your peers, that you would be entitled to

24    challenge certain jurors just for no reason at all,

25    what we call challenge for cause, and that the

1    Commonwealth would have the burden of proving the

2    case against you.  They would have to bring in

3    witnesses to prove each and every element of the

4    crimes charged, and they would have to do so beyond a

5    reasonable doubt.  Do you understand those trial

6    rights?

7                    DEFENDANT ROTH:  Yes, I do.

8                    THE COURT:  And you understand by

9    pleading guilty to the escape charge, you are waiving

10   those rights?

11                   DEFENDANT ROTH:  Yeah.

12                   THE COURT:  All right.  This Court

13   will accept the guilty plea for the charge of escape,

14   and we direct that that matter not proceed to the

15   jury, and that the fact of the Defendant's prior

16   conviction and relating to the escape charge per se

17   not be part of the testimony in the case.

18                   MR. MACVEIGH:  Your Honor, one other

19   thing that was mentioned at sidebar which I've also

20   told my client about was that the Commonwealth had

21   agreed if my client is convicted of the other

22   charges, that any sentence he might receive for the

23   rape -- pardon me, for the escape charge would run

24   concurrent with either or both.

25                   THE COURT:  We'll note that plea

1    agreement for the record.  Okay.  We are ready to

2    proceed on the other charges.  I need you to sign

3    your name on the back of the information for the

4    escape, and we'll withhold any sentencing until the

5    conclusion of the trial.  Okay.  We'll proceed with

6    the trial.

7              THE COURT:  Swear the jury.

8                         *  *  *

9              (Whereupon, the prospective jury panel

10   was sworn.)

11                        *  *  *

12             MR. KELLEY:  Your Honor, in the matter

13   of Commonwealth versus Calvin W. Roth, Jr., 2341

14   Criminal Action of 1992, charges of rape and

15   terroristic threats, Commonwealth is ready to proceed

16   with voir dire, Your Honor.  Attorney MacVeigh.  Mr.

17   Roth.  Ladies and gentlemen, good afternoon.

18             THE PROSPECTIVE JURY PANEL:  Good

19   afternoon.

20             MR. KELLEY:  My name is Tom Kelley

21   from the District Attorney's office of York.  This is

22   the period within a trial in which counsel for the

23   Defendant and for the Commonwealth asks you as

24   potential jurors certain questions.  The reasoning

25   behind this is so that we can get a clear cross

1  section of the county because as I'm sure you all

2  know, no one commits a crime in this county until a

3  jury of twelve of that person's peers say they

4  committed a crime in this county.  So we are going to

5  ask you some questions.

6           First of all, please don't -- if

7  anything is asked of you that's too personal, please

8  don't take offense.  This doesn't reflect on your

9  abilities as jurors.  We are just trying to give the

10 Defendant here, Mr. Roth, the fairest trial possible.

11          So, first of all, I'm going to ask if

12 anyone recognizes anyone involved in this case.

13 First of all, I don't see any familiar faces.  Does

14 anyone recognize me?

15          The victim in this matter is Miss

16 Janet Velte.  She's over here.  Janet, could you

17 stand up for a second, please?  Does anyone recognize

18 her?  She's from Maryland so it's quite possible you

19 wouldn't.

20          Okay.  There's another witness the

21 Commonwealth will call.  His name is Donald

22 Overmoyer.  Sir, could you stand up, please?  Does

23 anyone recognize him?  He's from Adams County.  No.

24 Okay.

25          Marvin Lipscomb is another witness the

1    Commonwealth would probably call.  Does anyone

2    recognize him?  He runs the Colonial House.  Does

3    that name ring a bell with anyone?  Anyone have any

4    family that's ever been at the Colonial House?  No.

5    Okay.

6                There's some police officers involved

7    in this case.  We have a detective here, Detective

8    Snell.  He's from West Manchester Township.  Does

9    anyone recognize him?

10                Some other witness is  Mr. George

11   Chacona.  He's from northern New York.  Mr. Chacona,

12   could you stand up.  Does anyone recognize him?  He

13   spent some time in York County, however, it's quite

14   possible that no one would have met him.

15                Finally, another officer from West

16   Manchester police is Officer Ankrum.  Does anyone

17   recognize him?  No.  That would be the Commonwealth

18   witnesses, and I don't think anyone recognized any of

19   our witnesses.

20                How about the Defendant, Mr. Roth.

21   Does anyone recognize him?  His attorney is the First

22   Assistant Public Defender, David MacVeigh.  Does

23   anyone recognize him?  Great.  Thank you very much.

24                There's some other questions I'd like

25   to ask you.  First of all, although I work as a

1    prosecutor, my job is not prosecution.  I am here to

2    see that justice is done.  Therefore, I'm going ask

3    you some questions that are pertinent for the

4    Defendant.  The Defendant need not in this case take

5    the stand.  That's his constitutional right.  Would

6    anyone have a problem if the Defendant did not take

7    the stand?

8              THE COURT:  Mr. Kelley, I think it

9    would be appropriate to let Mr. MacVeigh ask the

10   defense questions.

11             MR. KELLEY:  Okay.  I have some

12   questions regarding whether any of you would have a

13   predisposition in this case.  The Defendant is

14   charged with rape.  You'll hear testimony by the

15   victim that she did not fight.  She did not incur any

16   injuries.  Would the fact that she did not fight her

17   assailant would that make you believe that a rape

18   could not have been committed?  Does anyone have an

19   answer they'd like to express?  No.  Okay.

20             Some other questions for you.  Anyone

21   here related to any police officers closely?  How

22   about guards for any of the county or state prisons?

23   Anyone related to any guards?  Okay.

24             Is anyone involved in any victim's

25   rights groups, advocates for victims which would

1    predispose you one way or the other in this type of

2    case?

3                    Finally, and I hope this doesn't get

4    too personal, has anyone ever been the victim of an

5    offensive touching or assault of any kind?  No.

6    That's a pretty broad statement, but has anyone been

7    the victim of that?  Anyone related to anyone who was

8    a victim in one of those types of cases?  Ma'am, your

9    name, please?

10                   JUROR NO. 26, JUDITH S. COUCH:  Judy

11   Couch.

12                   MR. KELLEY:  Judy Couch?

13                   JUROR NO. 26, JUDITH S. COUCH:  Yes.

14                   MR. KELLEY:  Are you related to

15   someone that was involved in one of those types of

16   cases?

17                   JUROR NO. 26, JUDITH S. COUCH:  Yes.

18                   MR. KELLEY:  Were you closely related

19   to them?

20                   JUROR NO. 26, JUDITH S. COUCH:  Yes.

21                   MR. KELLEY:  And they were a victim?

22                   JUROR NO. 26, JUDITH S. COUCH:  Yes.

23                   MR. KELLEY:  Did you ever speak to her

24   or him about this event?

25                   JUROR NO. 26, JUDITH S. COUCH:  Yes.

1          MR. KELLEY:  Would the fact that you

2     are aware of this -- I'm assuming you were close to

3     the person because you spoke to them about that.

4     Would that affect your ability to sit in this case

5     for the Defendant?

6                    JUROR NO. 26, JUDITH S. COUCH:  No.

7                    MR. KELLEY:  Another right to

8     defendants is as he stands before you he is presumed

9     innocent.

10                   THE COURT:  Mr. Kelley, I prefer you

11    let the defense ask the defense questions.

12                   MR. KELLEY:  Thank you, Your Honor.  I

13    don't think I have any other questions for you.  I

14    thank you all for your candor, especially you, ma'am.

15                   Does anyone have any information that

16    they think the Court should know from what you've

17    heard from the Commonwealth's point of view?  Okay.

18    Thank you very much, folks.

19                   MR. MACVEIGH:  If the Court, please.

20    Mr. Kelley.  Officer Snell.  Ladies and gentlemen,

21    other than perhaps one or two faces I saw here about

22    this time 24 hours ago when I was trying another

23    case, does anybody recognize me for any reason?  None

24    of you look familiar to me, but occasionally paths

25    cross.

1          As Mr. Kelley asked a number of

2     questions that I would have asked, and I will

3     probably keep them as general as well, we don't wish

4     to pry into any of your lives, and picking a jury in

5     some respects is the most difficult of trying cases.

6     So that if we can find out a little bit about you

7     without looking deep inside your soul, it helps us in

8     the judgment of whether or not we believe that a

9     person is someone we would want to have sit on that

10    jury or not.

11          I want all of you to realize though

12    that we are starting out with 26, and in American law

13    it's typically 12 jurors.  So that some will be

14    removed, but that is no reflection on you

15    individually as a group.  If you're not chosen, it

16    doesn't mean that we think you're bad people.  It's

17    what, Tuesday afternoon.  Some of you might have

18    already sat on juries this term.  Could I see a show

19    of hands those individuals who have been on juries?

20    So none of you have been.

21          Have any of you had prior jury

22    experience, particularly criminal trials, in the

23    past?  It's Miss Coker in the front.

24          JUROR NO. 39, JOSEPH E. ELINE:  You

25    only want criminal?  Mine was civil.

1          MR. MACVEIGH:  We'll cover civil.

2     Sir, I take it you've sat as a civil jurist?

3          JUROR NO. 39, JOSEPH E. ELINE:  Right.

4          MR. MACVEIGH:  In the back row, sir,

5     your name is Mr. Bair?

6          JUROR NO. 5, JAMES P. BAIR:  Yes.

7          MR. MACVEIGH:  And yours was criminal?

8          JUROR NO. 5, JAMES P. BAIR:  Yes.

9          MR. MACVEIGH:  Anyone else?

10         MR. MACVEIGH:  Yes, ma'am.  Your name

11    is?

12         JUROR NO. 142, ROSALIE M. SMITH:

13    Smith.

14

15         MR. MACVEIGH:  Civil or criminal?

16         JUROR NO. 142, ROSALIE M. SMITH:

      Civil.

17

18         MR. MACVEIGH:  Okay.  Anybody else?

      Yes, sir.  Your name would be?

19

20         JUROR NO. 54, JAMES R. GRAHAM:

      Graham.

21

22         MR. MACVEIGH:  Civil or criminal?

23         JUROR NO. 54, JAMES R. GRAHAM:  Civil.

      I was picked twice.  Never sat on a jury though.

24

25         MR. MACVEIGH:  Oh, I'm sorry.  Thank

      you, sir.  And your name, please?

1          JUROR NO. 27, LOWRIE C. CRAWFORD:

2   Crawford, civil.

3          MR. MACVEIGH:  Have any of you been

4   the victims or had family or close friends who have

5   been the victims of crimes involving -- Mr. Kelley

6   referred to it as offensive touching.  My client is

7   also charged with an offense called terroristic

8   threats which is basically a threat of harm that puts

9   somebody in fear, although that threat might not

10  necessarily be carried out.  Have you or any of your

11  family members been victims of that crime?  All

12  right.

13          The case here the most serious offense

14  my client is charged with is rape, and there are

15  essentially in the defense of rape cases one of two

16  defenses available.  Either, No. 1, the individual

17  didn't do it because he was elsewhere; or, No. 2,

18  there was intercourse but it was consensual.

19          Do any of you believe that a person

20  who, for example, is in an alcohol rehabilitation

21  program inpatient would be incapable of giving

22  consent to an act of sexual intercourse?  Okay.

23          My client, as Mr. Kelley pointed out,

24  is to be presumed innocent.  Do any of you have any

25  basic problem with the presumption of innocence,

1   which means that even though police have arrested

2   him, he's presumed innocent until they prove him

3   guilty, and right now he sits here innocent. Do any

4   of you have any difficulty with that? If you do,

5   please tell me.

6             Could we come to sidebar for a minute?

7             THE COURT: Yes.

8                       * * *

9             (Whereupon, a discussion was held off

10  the record at sidebar.)

11                      * * *

12            MR. MACVEIGH: That's all I have.

13  Just one other. Is there anybody here who for

14  whatever reason, and you don't have to tell us why,

15  just feel uncomfortable, feel sick, whatever, doesn't

16  want to sit on this jury? If so, tell me. Okay.

17  Thank you.

18            Oh, I do have one more witness, Mr.

19  Gladstone. Does anyone know this individual? His

20  name is Walter Gladstone. He may be testifying later

21  in the trial.

22            THE CLERK: Okay. Jury selection is

23  completed. As I call your name, will you please

24  proceed to the jury box. Laureen Clark, Kimberly

25  Bloom, Brenda Markley, Melissa Lovelace, Linda

1    Wagner, Melinda Streicker, Virginia Stough, John

2    Faust, Maria Lighty, Rosalie Smith, Vincent Williams,

3    and Jane Ware.

4                      THE COURT:  Rest of the jurors may

5    return to the Central Jury Room.  Swear the jury.

6                              *  *  *

7                      (Whereupon, the jury panel was

8    selected and sworn.)

9                              *  *  *

10                     THE COURT:  You may proceed.

11                     MR. KELLEY:  Thank you, Your Honor.

12    May it please the Court.  Attorney MacVeigh.

13                     MR. MACVEIGH:  Mr. Kelley.

14                     MR. KELLEY:  Mr. Roth.  Ladies and

15    gentlemen, this is what we call an opening statement.

16    In criminal proceedings this is where I outline and

17    highlight what we are going to prove in the

18    Commonwealth's case, what we'll prove through our

19    witnesses and their testimony.

20                     The Commonwealth is going to prove to

21    you through this victim that on May 25th, 1992, at

22    the Colonial House, which is a drug and alcohol

23    rehabilitation center, she was attending voluntary

24    treatments there.  That between the hours of 5 p.m.

25    and 7 p.m. that she was asleep after dinner.  She was

1    awakened.  She felt a force on her chest and on her

2    arm area pinning her down.

3            She'll tell you that when she

4    awakened, she saw a man who she knew at the Colonial

5    House, being the Defendant, on top of her.  The

6    Defendant made various remarks to her, held her down,

7    and proceeded to have sexual intercourse with the

8    victim.  The Defendant got up off the victim, and as

9    he was putting his clothes on said, If you tell

10   anyone about this, I'll kill you.

11           That's essentially the Commonwealth's

12   case, and the victim will tell you that.  She'll

13   relate it to you in detail.

14           The next witness the Commonwealth will

15   put on will be Mr. George Chacona.  Mr. Chacona will

16   tell you he was very familiar with the victim.   At

17   approximately 7, around that time, maybe a little

18   later, he saw the victim.  The victim's hair was wet,

19   was hanging in her face, and she was visibly shaken,

20   uncontrollably shaken.

21           He immediately went to her in an

22   attempt to help her and tried to question her to find

23   out what was going wrong.  He will tell you that he

24   couldn't even get her to speak for nearly an hour.

25   He will tell you that when he finally did get her to

1    speak, the words out of her mouth were, Rape.   He

2    will tell you he accompanied her up to the Colonial

3    House where he spoke to one of the counselors.

4              They then went to the victim's room

5    where the rape had occurred.   She couldn't even enter

6    into her room.   She merely said to Mr. Chacona,

7    That's the bag, pointed a bag out which contained

8    items of clothing, items of clothing which you'll

9    hear contained semen, semen of the Defendant.

10              We'll have some other additional

11    testimony.   It would be essentially what we call

12    corroborative testimony.   It will be testimony of

13    other officers who were able to view the victim.

14    They will tell you how she appeared and what she

15    said.

16              Finally, and I'd like to relate back

17    to the victim again, she will tell you that she never

18    gave consent to the Defendant for him to have sex

19    with her, that she feared for her life, that she was

20    frozen and unable to move, that she is not the

21    Defendant's wife, and that the intercourse was

22    unlawful.

23              That is what the Commonwealth will

24    prove, and to that end I will let my witnesses speak.

25    Thank you very much.

1              MR. MACVEIGH:  If the Court please.

2    Mr. Kelley.

3              MR. KELLEY:  Mr. MacVeigh.

4              MR. MACVEIGH:  Detective Snell.  Good

5    afternoon.  As all of us know, there are two sides to

6    every story.  Sometimes those stories will vary in

7    significant detail.  Sometimes they'll vary in minor

8    details, but we always know that there's two sides.

9              As my client sits in front of you, he

10   is presumed innocent, and you will maintain, I trust,

11   that presumption of innocence in the minds of each of

12   you until the Commonwealth, if it can, proves to you

13   his guilt beyond a reasonable doubt.

14              You will hear a different side of the

15   story.  You will hear Calvin Roth tell you, yes, he

16   had intercourse with this lady, but that it was under

17   circumstances of consent.  You will hear him describe

18   how he had been on pretty good terms with this lady

19   prior to this.  You will see a photograph that shows

20   these two people smiling.  They're side by side

21   smiling to the camera.

22              You will hear Walter Gladstone, who

23   was introduced to you, describe to you what he knows

24   of the relationship between Calvin Roth and Janet

25   Velte.  I may mispronounce her name.  If I do,

1    forgive me.

2         You will hear other testimony, ladies

3    and gentlemen, about what the rules are in the

4    Colonial House, what the consequences are of breaking

5    those rules, and you will then understand at the end

6    why some of the evidence was presented to you.

7         I hope that as you listen to the case

8    you give it your undivided attention.  I believe you

9    will.  I don't believe you would be here if you

10   wouldn't.  You would have told me you didn't want to

11   be here.  I hope I can trust that my trust is

12   properly placed in the twelve of you and in your

13   collective judgment.  Thank you.

14        THE COURT:  You may call your first

15   witness.

16        MR. KELLEY:  Thank you, Your Honor.

17   Your Honor, Commonwealth calls Janet Velte to the

18   stand.

19                  * * *

20             JANET M. HLAFKA,

21   called as a witness, having been duly sworn according

22   to law, testified as follows:

23              DIRECT EXAMINATION

24   BY MR. KELLEY:

25        Q    Janet, could you state your full name,

1   please, for the record.

2        A    Janet Marie Hlafka, H-l-a-f-k-a.

3                          * * *

4                THE COURT:  Okay.  Janet, could you

5   pull up a little closer to the microphone so we can

6   hear you.

7                          * * *

8   BY MR. KELLEY:

9        Q    Your name used to be Janet Velte, is that

10  correct?

11       A    Correct.

12       Q    What state do you live in now, Janet?

13       A    Maryland.

14       Q    Maryland.  Let me refer you to the date

15  May 25th, 1992, and ask you what state you lived in

16  on that date?

17       A    Maryland.

18       Q    Okay.  Were you spending any time in York

19  at that time, May 25th, 1992?

20       A    Yes.

21       Q    Where were you?

22                          * * *

23                THE COURT:  Can the jury hear all

24  right?

25                THE JURY:  Yes.

```
 1                              * * *

 2    BY MR. KELLEY:

 3         Q      Specifically, Janet where were you staying

 4    at that time?

 5         A      At the Colonial House.

 6         Q      Why were you staying at the Colonial

 7    House, Janet?

 8         A      Because I wanted to do something for

 9    myself, rehabilitation center for alcohol.

10         Q      You had an alcohol problem?

11         A      Yes, I did.

12         Q      Were you familiar with the Defendant when

13    you were there?

14         A      Yes.

15         Q      Were you friends with him?

16         A      I was friends with a lot of people there.

17         Q      Did you at least know the Defendant?

18         A      Yeah, that's about it.

19         Q      Were you familiar with him?

20         A      Yeah, everybody was.

21         Q      Did you ever do anything with the

22    Defendant, talk to him?

23         A      Sure I talked to him.  He talked to me.

24    Talked to a lot of people.  That's the interaction

25    that was suppose to be going on there.
```

1       Q    I want to refer you again to that date,

2   May 25th, 1992.  Around dinner time, right after

3   dinner where were you at that time?

4       A    I was sleeping.

5       Q    You were sleeping.  What time did you

6   finish dinner on that date?

7       A    Around 5, 5:30.

8       Q    And where were you sleeping?

9       A    In my room.

10      Q    You had a room there?

11      A    Assigned to me.

12      Q    Did you have any roommates while you were

13  there?

14      A    No.

15      Q    Anything unusual happen to you while you

16  were sleeping on July 25th?

17      A    Yes.

18      Q    Could you please describe for the jury

19  what was your first -- what is your first memory of

20  after being awakened from sleep on the 25th, please,

21  Janet?

22      A    I woke up to a knee in my gut and a hand

23  over my mouth.

24      Q    Okay.  What happened when you awakened

25  with a knee in your gut and a hand on your mouth?

1     Who did you see?

2          A    Calvin.

3          Q    You saw the Defendant right here?

4          A    Yes, I did.

5          Q    What happened when you opened your eyes,

6     Janet?  If you could tell the jury what happened when

7     you opened your eyes?

8          A    Calvin was on top of me.

9          Q    Okay.  What happened next, please?

10         A    Told me he was going to get me.

11         Q    I'm sorry?

12         A    He told me that he was going to get me.

13         Q    He told you he was going to get you?

14         A    Yeah, and not to say a word.

15         Q    What happened?  Please describe for the

16    jury what happened after he told you he was going to

17    get you?

18         A    He started to -- started to take -- take

19    my clothes off.

20         Q    What was the first item that he took off,

21    Janet?

22         A    My pants.

23         Q    Your pants, Janet, were you wearing

24    underwear on that day?

25         A    Yes.

1     Q    Did he do anything with your underwear?

2     A    No.

3     Q    He didn't pull your underwear down at all?

4     A    Yeah.

5     Q    After he pulled your pants and your

6  underwear down, what happened next, please?

7     A    He proceeded to have sex.

8     Q    You said he proceeded to have sex with

9  you.  What do you mean?  Could you please state for

10  the jury what exactly happened?

11     A    He put his penis in me and --

12     Q    Where did he put his penis, Janet?  Where

13  did he put his penis, Janet?

14     A    In my vagina.

15     Q    Did it enter your vagina?

16     A    Yes.

17     Q    What was he doing with his hands at that

18  point when he put his penis in your vagina?

19     A    Trying to hold my mouth.

20     Q    Hold your mouth?

21     A    Yeah.

22     Q    I want you to recall what he did with his

23  right hand and his left hand, Janet?

24     A    He had his right hand on my mouth, left

25  hand trying to move everything around.

1          Q     Was he on top of you at this time?

2                          * * *

3                  MR. MACVEIGH:  Judge, could we

4     approach the bench.

5                  THE COURT:  Yes.

6                          * * *

7                  (Whereupon, the following discussion

8     was held on the record at sidebar:)

9                  MR. MACVEIGH:  Judge, I suppose the

10    record will reflect that the witness is really now

11    sobbing rather heavily, and Mr. Kelley gave her a

12    glass of water.  That hasn't calmed her down much.

13    I'm going to have to ask for a recess.  In fact,

14    she's being helped out right now by the D.A. victim

15    witness coordinator.  I'd ask for a mistrial.

16                  THE COURT:  We'll take a brief recess

17    to have her compose herself.  We will oppose the

18    Defendant's request for mistrial.

19                  (Whereupon, the discussion held at

20    sidebar was concluded.)

21                          * * *

22                  THE COURT:  Ladies and gentlemen we

23    will take a brief recess to allow the witness to

24    compose herself.

25                          * * *

1              (Whereupon, a recess was taken.)

2                        * * *

3                      AFTER RECESS

4              THE COURT:  You may continue.

5              MR. KELLEY:  Thank you, Your Honor.

6                 DIRECT EXAMINATION (Cont'd)

7  BY MR. KELLEY:

8        Q      Janet, when the Defendant's penis was

9  inside of you, where were his hands?

10       A      His hands was on my shoulders.

11       Q      Okay.  Now, Janet, this question is going

12  to sound a little odd, but I need you to answer it

13  nonetheless.  Are you married to the Defendant?

14       A      No.

15       Q      Have you every been married to the

16  Defendant?

17       A      No.

18       Q      Did the Defendant prior to this ask you to

19  engage in intercourse with him?

20       A      No.

21       Q      Did you at any time give your consent to

22  intercourse with the Defendant prior to this?

23       A      No, sir.

24       Q      Janet, did he, the Defendant, inflict any

25  wounds on you to your body?

1      A      No, sir.

2      Q      Did he hit you?

3      A      No, sir.

4      Q      Did you fight back at all, Janet?

5      A      No, sir.

6      Q      Why didn't you fight back, Janet?

7      A      I was scared.

8      Q      What were you afraid of?

9      A      I was afraid of being killed or something.

10     Q      Did the Defendant threaten you at all

11  during the course of this?

12     A      Yes.

13     Q      What did he say in that respect?

14     A      He said he'll kill me.

15     Q      Did he say anything else?

16     A      He said if I said anything to anyone, he

17  would kill me.

18     Q      How long did this entire episode go on for

19  from start to -- from the time you first woke up

20  until it was over?

21     A      Fifteen minutes approximately.  Felt like

22  more.

23     Q      Then what happened after the act was over?

24  What happened?

25     A      He got up, went to the door.

1       Q     Did he say anything when he went to the

2  door?

3       A     Yes, he told me he'd kill me if I told

4  anyone.

5       Q     And then what happened?

6       A     Then he left.

7       Q     Where were your clothes at this time?

8       A     Down on my ankles.

9       Q     Okay.  Janet, I want you to take a deep

10  breath.  Okay.  What did you do after the Defendant

11  left?

12      A     I was in a whirlwind.  I tried to get

13  myself together.  I really tried.  Then I went --

14      Q     Do you recall what you did with your

15  clothing after this?

16      A     Yes.

17      Q     What did you do with it?

18      A     I took a shower and put my clothing in a

19  bag in the closet.

20      Q     What did you do after that?  Did you put

21  the bag in the closet?

22      A     I wanted to burn it all.

23      Q     Did you burn it?

24      A     No, sir.

25      Q     What did you do?

1     A     I wandered.  I wandered around.  I didn't

2  know where I was.  I didn't feel my feet walking.  I

3  was just walking around.  I couldn't tell you where I

4  went.

5     Q     Do you recall meeting up with George

6  Chacona?

7     A     At one point I can remember meeting up

8  with him, yes.

9     Q     Do you remember how much time had elapsed

10  between the time the Defendant left and the time --

11     A     It seemed like hours.

12     Q     You can't tell then how much time?

13     A     I would say a good four or five hours,

14  something like that.

15     Q     Janet, where is the point -- where exactly

16  did you meet up with George Chacona?  Do you recall?

17     A     I think it was -- I think I was in the

18  kitchen.  Yeah, it was in the kitchen in like the

19  little dining room area.

20     Q     Do you recall telling him what had

21  happened to you?

22     A     No.

23     Q     You don't?

24     A     I don't recall saying anything to him

25  about it.

1    Q    What's the next thing you recall in your

2  memory?  What's the next thing you can remember

3  between the time the Defendant left and that memory.

4  What is the next thing you remember?

5    A    I remember sitting down in the kitchen,

6  like little dining room area not knowing what to say,

7  if I should say anything, what to do.  Like as if I

8  just woke up down in the kitchen area as if I was --

9  just all that time had expired.

10    Q    Were you afraid?

11    A    Yeah, I was terrified.

12    Q    When this Defendant made that statement to

13  you before he left, were you afraid then?

14    A    Yes.

15    Q    What were you afraid of?

16    A    I was afraid of -- afraid of the

17  Defendant.  I was afraid of him killing me, strong

18  arming me, bullying me, killing me, yeah.

19    Q    Janet, do you recall going out to the York

20  Hospital for an examination?

21    A    Yes.

22    Q    Do you recall who accompanied you there?

23    A    George.

24    Q    Prior to going there, if you could think

25  in your mind backwards from that point.  Hopefully

1    this will help what you recall backwards from there

2    before you went to the hospital.  What happened

3    before that?

4         A    I was sitting in an office.  George was

5    there.

6         Q    Do you recall in whose office it was?

7         A    No.  I remember it was an office with

8    chairs.

9         Q    Do you remember ever going to your room

10   after that?

11        A    No.

12        Q    That evening at all with George do you

13   recall going to your room?

14        A    No.

15        Q    You had an examination at the hospital

16   when you got there?

17        A    Yes, sir.

18             MR. KELLEY:  Nothing further at this

19   time, Your Honor.

20             THE COURT:  Cross-examine.

21                  CROSS EXAMINATION

22   BY MR. MACVEIGH:

23        Q    When you say that you woke up, so to

24   speak, in the kitchen area and you also remember

25   being in an office, were you in the kitchen or the

1    office first?

2        A    The kitchen.

3                          * * *

4            (Whereupon, Defendant's Exhibit No. 1

5    was produced and marked for identification.)

6                          * * *

7        Q    I'm showing you a photograph that Mr.

8    Kelley has already seen.  It's marked as Defendant's

9    Exhibit 1, and can you tell me who's shown in that

10   photograph?

11       A    That's Calvin and I.

12       Q    Do you remember approximately when that

13   photograph was taken?

14       A    Yeah, it was in the evening.  There was a

15   lot of pictures taken that day, that evening.

16       Q    Okay.  This would have been before this

17   happened?  Obviously the photograph was taken before

18   this happened?

19       A    Yeah.

20       Q    Okay.  You were aware, I assume, of what

21   the rules were in the Colonial House?

22       A    Yes, sir.

23       Q    Men and women were to be kept separated.

24   There might not have been walls between, but men and

25   women weren't to have any one-on-one contact with one

1    another, is that correct?

2         A    If you mean giving hugs or something?

3         Q    No, I mean of a more intimate nature.

4         A    Oh, yes, yes.

5         Q    And there would be some kind of

6    consequence if you were to break those rules, is that

7    correct, be it that you would be removed from the

8    premises or asked to leave or something of that

9    nature, is that correct?

10        A    Maybe, maybe not.

11             MR. MACVEIGH:  That's all.

12             REDIRECT EXAMINATION

13   BY MR. KELLEY:

14        Q    Janet, did you ever hang out with Calvin

15   at all?

16        A    I didn't hang, no.

17        Q    Do you smoke?

18        A    Yes, sir.

19        Q    Do you remember whether Calvin smokes?

20        A    Yes.

21        Q    Did you ever say outside hang out and have

22   cigarettes with a bunch of other smokers?

23        A    Oh, sure.

24        Q    Calvin ever there?

25        A    Yeah, behind a tree or in the distance but

1    never actually -- once in a while he'd be up near the

2    door.

3                         * * *

4                    MR. MACVEIGH:  Judge, I'm sorry to

5    have to object as being beyond the scope of

6    cross-examination.

7                    THE COURT:  I think it's relevant in

8    light of your introduction of the picture.

9                    MR. MACVEIGH:  I'm interested in what

10   smoking has to do with any of this?

11                   THE COURT:  You got into their prior

12   relationship.  I think that's in that context.  I'll

13   permit it.

14                   MR. KELLEY:  Thank you.

15                        * * *

16   BY MR. KELLEY:

17        Q    Janet, the picture that Mr. MacVeigh

18   showed you, do you recall when that was taken

19   exactly?

20        A    No, not exactly.  It was a lot of pictures

21   taken there.

22        Q    Do you have any pictures from when you

23   were at Colonial House?

24        A    I don't, but I know people who do.

25        Q    Did you have your picture taken with

1    anyone else at Colonial House?

2        A    Yeah, I believe so.  Probably, yeah.

3        Q    Did you ever hug Mr. Chacona back here?

4        A    Sure.

5        Q    Did you hug him when you were at Colonial

6    House?

7        A    Um-hum.

8        Q    How many times did you hug Mr. Chacona at

9    Colonial House just if you could estimate?

10        A    Five times at most, I guess.  I don't

11    know.

12        Q    You were involved in rehabilitation with

13    an alcohol problem, is that correct?

14        A    Correct.

15        Q    Were you told to be quite open with the

16    other people that were going through alcohol

17    treatment?

18        A    Yes, sir.

19        Q    Did you have occasion to get up in front

20    of the people and talk about your problems?

21        A    Yes.

22        Q    After you would talk about that, would

23    you -- would anyone hug you afterwards?

24        A    Sure, needed support.

25        Q    Prior to the episode you just testified to

1    the jury about, would you consider Calvin an

2    acquaintance?

3        A    I wouldn't think of him as even a friend.

4        Q    Were you friendly -- at least on friendly

5    terms with him?

6        A    Said as little as I had to without making

7    him mad.

8            MR. KELLEY:  Nothing further at this

9    time, Your Honor.

10                RECROSS EXAMINATION

11   BY MR. MACVEIGH:

12       Q    Were you on a retiring, quiet basis with

13   most of the people there?  Did you keep to yourself

14   most of the time?

15       A    Pretty much.

16       Q    Not only just with Calvin but with most of

17   the other residents there?

18       A    Pretty much, yeah.  Sure, pretty much.

19           MR. MACVEIGH:  That's all.  Thank you.

20           THE COURT:  You may step down.  I

21   remind you that I'm going to stop for the day at

22   3:30.  Is there some witness that would be reasonably

23   short that can be presented between now and 3:30?

24           MR. KELLEY:  Your Honor, my next

25   witness would probably take quite sometime.  I don't

```
 1    believe I would be able to do it within 15 minutes.

 2                  THE COURT:  Is there some other

 3    witness you can call in his spot?

 4                  MR. KELLEY:  I could call Marvin

 5    Lipscomb to the stand.

 6                        *  *  *

 7                  MARVIN LIPSCOMB,

 8    called as a witness, having been duly sworn according

 9    to law, testified as follows:

10                  DIRECT EXAMINATION

11    BY MR. KELLEY:

12        Q    Mr. Lipscomb, your name and occupation,

13    please?

14        A    Marvin Lipscomb.  I'm executive director

15    of Colonial House.

16        Q    And how long have you been so employed,

17    sir?

18        A    About 11 and a half years.

19        Q    Can you describe what your duties are,

20    sir?

21        A    I'm responsible for the general running,

22    physical hiring of therapists, and just the overall

23    management.

24        Q    Regarding the Colonial House, do you have

25    any rules concerning interaction between males and
```

1    females who are under you?

2    A    Yes, we do.  Other than the therapeutic

3    hugs that was mentioned here earlier, there is to be

4    no sexual contacts whatsoever.  In fact, if we find

5    clients are getting a little too close to each other,

6    we put them on a blackout to try to give them a

7    cooling off period.  If that continues, then they're

8    discharged.

9    Q    What would you call -- you say other than

10    the hugs if there's any sexual contact, what sexual

11    contact?

12    A    Just any hand holding that would have

13    people get more familiar other than just the casual

14    relationships.  Any hand holding or even just pairing

15    off and talking, sticking with one person too much,

16    we would put them on blackout.

17    Q    Did you have a person under your

18    control -- or not under your control, excuse me,

19    within your program by the name of Calvin Roth?

20    A    Yes, we did.

21    Q    Did you also have someone in your program

22    Janet Velte?

23    A    Yes, we did.

24    Q    Sometime around the 25th did you receive

25    any information concerning the two of those

1    individuals?

2        A    Yes, I was called at home, and my manager

3    said that there had been an accusation made by Janet

4    Velte against Mr. Roth.

5        Q    Do you recall what time this was?

6        A    I think it was somewhere between 8:30 and

7    9 o'clock because I was up to the facility by about

8    20 after 9.

9        Q    Did you have occasion to speak to Miss

10   Velte at that time?

11       A    Yes, we did.

12       Q    Okay.  And you interviewed her?

13       A    As well as we could.

14       Q    You say as well as we could.  Could you

15   explain why you say that?

16       A    Well, she was very distraught, very upset,

17   and having a hard time getting control.

18       Q    How long did you attempt to talk to her

19   for?

20       A    Probable about 10 or 15 minutes, and

21   several of us tried.

22       Q    Can you describe how she appeared?

23       A    Very scared, very angry, just very

24   emotionally distraught.  Very, very emotionally

25   distraught, not making a whole lot of sense.  What's

1    the word I'm looking for.  Kind of wandering around.

2    Thoughts weren't in a pattern.  It was a whole lot of

3    different things going on.

4        Q    Because of the discussion you had with

5    Miss Velte did you have occasion to talk to Mr. Roth?

6        A    Yes, I did.

7        Q    When exactly was that?

8        A    We were waiting for them to return.  They

9    had been outside to a meeting, and when he returned,

10   I got Mr. Roth and I said that there's been an

11   accusation made.  I had him in my office, and I said,

12   I would like you to wait in the waiting room so I can

13   get -- I mean in the auditorium so I can get some

14   more information, and I took him over to the

15   auditorium, and I came back less than a minute later,

16   and I couldn't find him.

17       Q    Okay.  You couldn't find him?  Was the

18   Defendant's program with Colonial House up at that

19   point?

20       A    No, it was not.

21       Q    Do you know how many weeks were left on

22   his program?

23       A    Two, I think.  I'm not positive.

24       Q    Did he ever return to Colonial House after

25   that?

1          A      No, he did not.

2          Q      You testified at a preliminary hearing as

3   well, is that correct?

4          A      That's true.

5          Q      For this matter.  Prior to that time had

6   you seen the Defendant at all?

7          A      Prior to what time?

8          Q      The time of the preliminary hearing.  Did

9   he ever --

10         A      No, no, no.

11         Q      Did he voluntarily returned to the

12   Colonial House?

13         A      No, he did not.

14         Q      And when you sat him down, what exactly

15   did you say to him?

16         A      I said there has been some accusations

17   made against you, and I would like you to wait in the

18   auditorium until I can get some more information.

19         Q      Did he have any response to that when you

20   said that to him?

21         A      I think he just said, Okay, and we got up,

22   walked over, and I left him, and I think that's all

23   he did say was, Okay.

24         Q      Sir, do you remember talking to the

25   detective here when he interviewed you after this

1    occurrence?

2         A    Vaguely.  Lot going on.

3         Q    Do you recall saying to the detective that

4    when you made that statement to the Defendant, he

5    responded, She's been acting crazy all day long?

6         A    Yes, that's true.  I had forgotten about

7    that.

8         Q    Would you describe that, please, for the

9    jury?

10        A    That's the essence of it.  He said, She's

11   been acting crazy all day long.

12        Q    Did you say anything in response to that

13   statement by The defendant?

14        A    I don't think I did.

15        Q    Do you recall telling the detectives --

16                        * * *

17                   MR. MACVEIGH:  Well, Your Honor --

18                   THE COURT:  Objection sustained.

19                   MR. MACVEIGH:  Thank you.  That

20   doesn't mean you can't use it.  Just means it's not

21   the proper way to present it.

22                   MR. KELLEY:  Okay.

23                   THE COURT:  You can't impeach your own

24   witness.

25                   MR. KELLEY:  I'm not.  I'm trying to

1    refresh his memory.

2         THE COURT:  Well, then the proper way

3    to do that is to show the statement to the witness,

4    refresh his memory, and allow him to testify if he

5    can recall it.

6         MR. KELLEY:  Okay.  Thank you, Your

7    Honor.

8                           * * *

9    BY MR. KELLEY:

10        Q     Would you take a look at -- mark that for

11   you.  If you could read the highlighted portion

12   there, does that refresh your memory at all?

13        A     Yes.

14        Q     Okay.  Could you read that statements,

15   please.

16                          * * *

17        MR. MACVEIGH:  Well, which one is it?

18        THE COURT:  I don't know.

19        MR. MACVEIGH:  Judge, my objection is

20   if it refreshes his memory, then he can tell us what

21   his memory is; and if it's not, then he can't.

22        THE COURT:  Your objection is

23   sustained.

24                          * * *

25   BY MR. KELLEY:

1          Q     Could you testify from your memory about

2     that statement?

3          A     Yes, we -- when I said there's been an

4     accusation, he said, She's been crazy all day, and

5     that's when I did make the statement, I didn't even

6     tell you who it was.

7                    MR. KELLEY:  Thank you, sir.  Nothing

8     further at this time, Your Honor.

9                         CROSS-EXAMINATION

10    BY MR. MACVEIGH:

11         Q     Mr. Lipscomb, at that time you had already

12    told him that a female client had said that he had

13    raped her, is that correct?

14         A     I said there has been an accusation made

15    against you.

16         Q     Yeah, an accusation made against you?

17         A     Right.

18         Q     An accusation serious -- let me show you a

19    little bit more of the report made by Detective

20    Snell, and I'm going to read from it.  He stated that

21    he told Calvin, this is referring to you, that a

22    female client made -- I'm sorry, himself and manager

23    Al Heagy confronted Calvin.  He stated that he told

24    Calvin that a female client made a serious accusation

25    against him, and that this client claimed that he had

1    raped her.  Mr. Lipscomb stated that Calvin

2    immediately stated that, she's been accounting crazy

3    all day long.  So at that point is that so far

4    correct?  Is that what you told Detective Snell?

5         A    If he's got it, counsel, there it's a long

6    time.  If that's what I said, I said it.

7         Q    It's a year ago.  Fine.

8         A    Yeah.

9         Q    Do you know whether at the time Calvin

10   said, She's been acting crazy all day long, you or

11   your manager Al Heagy had already told Calvin that a

12   female client there had accused him of raping her?

13        A    I don't know if we had already said that.

14             MR. MACVEIGH:  Okay.  That's all.

15             THE COURT:  You may step down.

16             MR. KELLEY:  Your Honor, point of

17   redirect, sir.

18                   REDIRECT EXAMINATION

19   BY MR. KELLEY:

20        Q    Sir, you never told the Defendant who had

21   made the accusation against him?

22        A    No.

23        Q    When you said to the Defendant, Someone

24   has made an accusation, what did he say in response?

25   When you said to the Defendant, Someone has made an

1    accusation against you that you raped them, what did

2    he say in response to that?

3        A    All right.  I never said to him someone

4    made an accusation that you raped them.  I said

5    someone made a serious accusation against you, and

6    then he said, She's been acting crazy all day.

7        Q    She's been acting crazy all day.  At that

8    point you had never named anyone, had you?

9        A    No, I had not.

10            MR. KELLEY:  Thank you.  No further

11   questions.

12                    RECROSS EXAMINATION

13   BY MR. MACVEIGH:

14       Q    Well, do you recall approximately how long

15   after this event that you were interviewed by

16   Detective Snell?

17       A    No, I don't.

18       Q    Do you think that it was fairly soon

19   thereafter?

20       A    I have no idea.

21            MR. MACVEIGH:  Okay.

22            THE COURT:  You may step down.

23            I believe there were certain

24   stipulations that you had indicated could be put in

25   the record.  Maybe this would be an appropriate time

1    to put them on the record.

2    MR. KELLEY: Yes, Your Honor. Your

3    Honor, the Defendant through counsel will stipulate

4    that a rape kit was done on the victim, and that that

5    rape kit produced evidence of semen on the clothing

6    that the victim alleges she wore when she was raped

7    as well as the clothing she put on after she took the

8    shower, and there's a stipulation that that, in fact,

9    is the Defendant's spermatazoa and the stains are

10   from the Defendant.

11   THE COURT: Okay. Perhaps you can

12   modify the stipulation unless the jury understands,

13   No. 1, what a rape kit is. Perhaps you ought to

14   explain that. And you gave the fact of the test

15   results, but you haven't indicated the tests were

16   part of that rape kit. So clarify it a bit.

17   MR. KELLEY: Folks, the Defendant is

18   willing to stipulate that there was evidence

19   collected by a doctor from within the victim, that

20   being some residual sperm. Also that there was

21   spermatazoa stains on her clothing, within her

22   clothing that she wore when the rape was alleged to

23   have occurred. She also put on clothing after that

24   after she took the shower, and there were stains on

25   that that had spermatazoa on them. The Defendant is

1    agreeing that the sperm in both those, from within

2    the victim as well as on the articles of clothing,

3    were his sperm, it was his sperm.

4            THE COURT:  Your indicating that there

5    were laboratory tests of those items of clothing?

6            MR. KELLEY:  Yes.

7            THE COURT:  Seminal stains were found?

8            MR. KELLEY:  Um-hum.

9            THE COURT:  And that tests were made

10   to determine whether they matched that of the

11   Defendant, and that they, in fact, did match?

12           MR. KELLEY:  Yes, Your Honor.  And we

13   have a lab report, and he's stipulating to that lab

14   report that came back having his sperm on them.

15           THE COURT:  Is that a correct

16   stipulation, Mr. MacVeigh.

17           MR. MACVEIGH:  As submitted by the

18   Court, yes, it is.

19           THE COURT:  All right.  Ladies and

20   gentlemen, you'll take that as evidence in the case

21   just as the other evidence by witnesses on the stand

22   that give testimony.  What we are saying both sides

23   agree that is what the doctor would say.  Doctors are

24   busy people.  Instead of calling him and have him

25   come in and give it, they agree he would come in and

1    say it and that is correct information, and you may

2    consider that along with the other evidence in the

3    case.  Okay.  Any further stipulations?   I believe

4    that covered everything.

5              MR. MACVEIGH:  I think so.

6              THE COURT:  All right.  We are going

7    to stop at this point, ladies and gentlemen.

8    Normally we proceed till 4:30, but I have some other

9    matters which will not permit me to do that today.

10   So we are going to stop.

11             We'll resume tomorrow morning at 9:30.

12   You should report to the jury room across the hall

13   here.  I believe you may have been in there earlier

14   today, and try and be here by 9:15.  Hopefully we'll

15   get started right at 9:30, and we'll bring you over.

16   Every now and then I have other proceedings I have to

17   attend to, but we'll start as soon as possible.

18             Please keep in mind that you should

19   not make up your mind as to the verdict in the case

20   until the very end.  Obviously you have heard only

21   Commonwealth testimony, but you should keep an open

22   mind about the case until you've heard all the

23   testimony, closing arguments from counsel, and

24   instructions from the Court as to the law that you

25   will apply in this matter.

1          Also keep in mind that you should make

2  your verdict from only evidence that was presented

3  here in the courtroom supervised by the Court and

4  counsel.  So, for example, if you were to hear

5  something about this case on the radio or T.V, a news

6  report, for example, or if there is a newspaper

7  article sometime tomorrow, you should avoid that,

8  turn the radio off, don't read the paper, whatever so

9  that you do not receive any improper information.

10         Nor should you contact anybody

11  involved in the case, have discussions with them, and

12  try to find things out.  You should not talk to

13  counsel.  You should not talk to the police officers,

14  to the witnesses, to the Defendant, to anybody.  Get

15  your information here solely in the courtroom.

16         With those cautions, you are now

17  dismissed until tomorrow morning.

18              * * *

19         (Whereupon, Court was adjourned.)

20              * * *

21

22

23

24

25

1       (PROCEEDINGS HELD ON WEDNESDAY, JULY 21, 1993)

2

3               THE COURT:  My apologies for the late

4   start, ladies and gentlemen.  I have a civil matter

5   which we are going to trial in two weeks involving

6   several doctors, and the only time I could meet with

7   them was this morning at 9 o'clock.  I thought I'd be

8   finished by 9:30.  Don't blame people involved with

9   this trial.  They had nothing to do with it.  You may

10  proceed.

11              MR. KELLEY:  Thank you, Your Honor.

12  Your Honor, the Commonwealth calls Mr. George Chacona

13  to the stand.

14              * * *

15              GEORGE S. CHACONA,

16  called as a witness, having been duly sworn according

17  to law, testified as follows:

18              DIRECT EXAMINATION

19  BY MR. KELLEY:

20      Q    Mr. Chacona, your full name for the

21  record, please?

22      A    George S. Chacona.

23      Q    What city do you live in, sir?

24      A    Syracuse, New York.

25      Q    I'm going to refer you to the date May

1    25th, 1992, and ask you what city you lived in on

2    that date?

3         A    York, Pennsylvania.

4         Q    And specifically where were you staying at

5    that time?

6         A    At the Colonial House on Market Street.

7         Q    What was the reason of your stay there?

8         A    Alcohol rehab.

9         Q    You know Janet Hlafka, is that correct, or

10   you knew her as Janet Velte, is that correct?

11        A    Correct.

12        Q    Was she a patient there at the time you

13   were there?

14        A    Yes, she was.

15        Q    Were you friends with her?

16        A    Yes, I was.

17        Q    Would you consider yourself close friends?

18        A    Yes.

19        Q    Do you know the Defendant as well?

20        A    Yes.

21        Q    He was also staying there while you were

22   staying there?

23        A    Correct.

24        Q    Referring to that date again, the 25th of

25   May, 1992, approximately between say seven and nine

1    did you have occasion to see Janet?

2        A    Yes, I did.

3        Q    And do you remember or recall specifically

4    what time it was?

5        A    It was approximately 7:30, quarter of 8 in

6    the dining room.

7        Q    Do you recall how she appeared at that

8    time?

9        A    Her hair was soaken wet, and she was

10   shaking.  She was trembling.  She was not in good

11   condition at all.

12       Q    Seeing Janet, did you do anything?  Did

13   you approach her or talk to her?

14       A    Yes, I did.

15       Q    What happened after you approached her?

16       A    She wouldn't relate anything to me, and I

17   just kept talking to her and saying, Well, let's --

18   we went outside.  Actually I said, Let's get out of

19   here, and we'll go outside, get some fresh air, and

20   we just -- I just stayed with her cause I didn't feel

21   that she should have been alone at that time whatever

22   had happened.

23       Q    So you went outside with Janet.  Did you

24   ask her what had made her upset?

25       A    Repeatedly.

1    Q    Okay.  Did she answer you ultimately?

2    A    No, she didn't.  Ultimately she did, yes.

3    Q    Okay.  You say you repeatedly asked her?

4    A    This took quite a while, half hour, 45

5    minutes until she answered.  I actually had to say,

6    Did someone hurt you?  I asked a question first, Are

7    you pregnant?  She said, No.

8         Well, what's wrong?  She said, I'm --

9    she didn't respond.  I said did anyone hurt you?  She

10   finally said, Yes, to that.

11   Q    All right.  What did you ask her, if

12   anything?

13   A    I asked her again, How did they hurt her?

14   And she blurted out the word, Rape.

15   Q    Did you ask her who, in fact, had raped

16   her?

17   A    Yes, I mentioned several clients' names at

18   Colonial House, and when I mentioned Calvin's name,

19   she said it was Calvin.

20   Q    Did you ask her whether she was afraid?

21   A    I didn't have to ask her because she at

22   that point started fearing saying that he was going

23   to kill her.  She was afraid for her life.  He would

24   stalk her down, find her wherever she was if she told

25   anyone, and I was not to tell anyone that she had

1    confided this in me, and she was deathly afraid.  I

2    mean she was trembling, you know.  Her body was just

3    in tremors.

4         Q     From the point you first saw Janet till

5    the time she made these statements to you, how much

6    time had elapsed?

7         A     Forty-five minutes to an hour.

8         Q     After hearing these statements, what did

9    you do?

10        A     We sat there.  I thought it would be good

11   to get staff involved, and she was very, very

12   reluctant about that, and that took about another 20

13   minutes to convince her to go inside and get staff

14   involved.

15        Q     Did you ever take her to an office?

16        A     Yes, I did.

17        Q     And whose office was that?

18        A     Lynn Spores, the night manager.

19        Q     And did she at all relate what had

20   happened to her to that manager?

21        A     Again that took a tremendous amount of

22   time, but she finally did.  That took another half

23   hour, 45 minutes of sitting there and talking to her

24   and having it come out.  She kept repeating, I can't

25   say because he's going to kill me.  He's going to

1    kill me.  He's going to kill me.  That's what she

2    related the most.

3        Q     What, if anything, happened after you

4    spoke to the night manager?

5        A     After the night manager, he called Marvin

6    and Al.  They came down, and they talked to her.

7        Q     By Marvin you mean Mr. Lipscomb?

8        A     Mr. Lipscomb, yes.

9        Q     And they talked to her?

10       A     And they talked to her, and it was decided

11   that she go to the hospital at that time.  I think

12   the other clients came back from the A.A. meeting.

13   It was not a mandatory A.A. meeting so not all people

14   went.  That's why there was still people at the

15   house.

16       Q     Did you take her to the hospital?

17       A     Yes, I did.

18       Q     You specifically?

19       A     I specifically took her because at that

20   point she wasn't trusting anyone.  She wouldn't talk

21   to anyone or trust anybody that was there, and it was

22   a house rule that no one -- a male and a female could

23   not be together in a car or spend specific time, but

24   they broke that rule and allowed me to take her to

25   the hospital.

1    Q    Prior to going to the hospital did you

2  ever go up to her room?

3    A    Yes, we went up to her room to -- she

4  wanted to take clothes with her, and we went up to

5  her room, and she would not enter her room.  She got

6  within three or four feet of the door, and she

7  stopped, and she wouldn't go in.  Lynn Spoor was with

8  me, the night manager, because we weren't allowed to

9  go into another client's room, and she told us where

10  the clothes was and --

11    Q    The clothes.  What do you mean by the

12  clothes?

13    A    The clothes that she had on when this rape

14  occurred.

15    Q    Okay.  Did she actually point them out?

16    A    Yes, they were in a bag in her closet.

17    Q    Did she say anything when she pointed them

18  out to you?

19    A    She wanted to burn them.

20    Q    Did you actually grab those clothes?

21    A    Yes, I did.

22    Q    What did you do with them?

23    A    I took them to the hospital with me.

24    Q    Did you give them to anyone that night?

25    A    I gave them to a police officer.

1      Q      Do you see anyone in the room right now

2   the person you gave them to?

3      A      Yes, over there.

4      Q      Would that be Officer Ankrum over here?

5      A      Yes.

6      Q      You took her to the hospital, and how did

7   she appear when she arrived at the hospital?

8      A      She was still hysterical and shaken.

9      Q      Sir, I want to show you Defendant's

10  Exhibit 1 and ask you if you recognize the people

11  portrayed in that photograph?

12     A      Yes, that's Calvin and Janet.

13     Q      Okay.  Regarding the Colonial House, were

14  there a lot of hugs in the Colonial House?

15     A      Lots of hugs at Colonial House.

16     Q      At your A.A. meetings were there a lot of

17  hugs?

18     A      Not necessarily at the A.A. meetings, but

19  at the Colonial House it was.  They promoted it.

20     Q      Did you ever hug Janet while you were

21  there?

22     A      Much.

23     Q      How much?

24     A      Depending on a given situation, how bad

25  she was feeling or how good she was feeling, could

1   have been five times, ten times in an hour, you know,

2   depending on the situation.

3        Q    Did you ever -- were any photographs ever

4   taken of you hugging other people?

5        A    Yes.

6        Q    Was that something that occurred quite

7   frequently?

8        A    Yes.  And I need to say men hug men too

9   there.

10       Q    There's certainly nothing wrong with that.

11            Sir, were you ever able to observe

12   Janet and the Defendant interacting together?

13       A    I saw them talking, smoking a cigarette

14   together outside because we were not allowed to smoke

15   inside.

16       Q    Would you have considered them close?

17       A    No.

18       Q    Were you close with Janet?

19       A    Yes, I was.

20            MR. KELLEY:  Nothing further at this

21   time, Your Honor.

22            THE COURT:  You may cross-examine.

23            CROSS EXAMINATION

24   BY MR. MACVEIGH:

25       Q    Was she close with very many people?

1      A      I think she was close with Kenny, and she

2    was also close with Maureen.

3      Q      You were there at about the same -- for

4    the same duration as she was?

5      A      I was there prior to her getting there.

6      Q      When did you arrive there roughly

7      A      April, late March.

8              MR. MACVEIGH:  That's all.

9              THE COURT:  You may step down.

10             MR. KELLEY:  Your Honor, the

11   Commonwealth calls officer Ankrum to the stand.

12                         * * *

13               JAMES D. ANKRUM,

14   called as a witness, having been duly sworn according

15   to law, testified as follows:

16               DIRECT EXAMINATION

17   BY MR. KELLEY:

18      Q      Officer Ankrum, your full name, please,

19   for the record?

20      A      James D. Ankrum.

21      Q      What is your occupation?

22      A      Police officer with West Manchester

23   Township.

24      Q      And, sir, how long have you been so

25   employed?

```
1         A      Since January of '80.

2         Q      Were you involved in the investigation of

3    this --

4         A      Yes, I was.

5         Q      -- allegation.  And referring to May 25th,

6    1992, did you respond to the hospital?

7         A      Yes, I did.

8         Q      Okay.  What hospital was that?

9         A      York Hospital.

10        Q      Okay.  And did you have occasion to meet

11   with the victim in this matter, Janet Velte?

12        A      Yes, I did.

13        Q      Okay.  Could you describe for the jury,

14   please, her demeanor when you met with her?

15        A      When I responded to the hospital, I first

16   met with Mr. Chacona who advised me of the situation,

17   and I then went into the room where she was being

18   treated, and obviously it was a touchy situation.  So

19   I sat down, told her who I was, and that I had to ask

20   her certain questions, and that we could take all the

21   time that was necessary.

22               I tried to slowly get into talking to

23   her about generalities and then work to the

24   specifics, but there was just -- she wouldn't respond

25   to anything.  I was able to get her name, which I
```

1    could barely understand.  When I tried to get to the

2    specifics of the incident, she just repeated several

3    times, He'll kill me.

4              So with that I went back out into the

5    hallway and talked with Mr. Chacona again, and he

6    told me that he had more of a rapport with her.  So I

7    took him into the room with me, but again she just

8    wouldn't discuss it at all.

9        Q     Physically how did she appear, if you

10   could describe that?

11       A     A basket case.  She was sitting there with

12   her head hanging down, hair a mess.  She was just

13   shaking terrible.

14       Q     Was there a rape kit done on the victim?

15       A     That was done, I believe, at a later time.

16   I contacted Detective Snell, and then shortly -- I

17   was informed by the hospital that one would be done,

18   and in speaking with Detective Snell.  Then after I

19   could not obtain any information from her concerning

20   the specifics, I obtained further information from

21   Mr. Chacona, and then I left.

22       Q     Okay.  Specifically, one moment -- strike

23   that.

24              Sir, did you receive any evidence from

25   Mr. Chacona when you were there at the hospital?

1      A   Yes, I did.  It was a white plastic

2   garbage bag type bag with the top tied in a knot, and

3   he informed me that those were the clothes that she

4   had said she had on when the incident took place.

5      Q   Did you review the contents of that bag?

6      A   No, I didn't.

7      Q   You didn't?

8      A   I kept it as it was with the knot tied in

9   the top.

10      Q   What did you do with that?

11      A   When I returned to the office, I entered

12   it into the evidence locker, filling out a property

13   sheet and entering it.

14      Q   Okay.  And that was ultimately sent up to

15   the Pennsylvania State Police, is that correct, for

16   analysis?

17      A   Yes, as far as I know.

18      MR. KELLEY:  The results of which

19   would be the stipulation, Your Honor.  Nothing

20   further at this time.

21      MR. MACVEIGH:  I have no questions.

22      THE COURT:  You may step down.

23      MR. MACVEIGH:  Your Honor, I have no

24   objection to this witness or any of the other

25   Commonwealth witnesses being excused if they wish to

1    leave.

2                  THE COURT:  Very well.

3                        * * *

4                  (Whereupon, Commonwealth Exhibits No.

5    1 and 2 were produced and marked for identification.)

6                        * * *

7                  MR. KELLEY:  One moment, Your Honor.

8    Your Honor, I reviewed Commonwealth Exhibit 1 and 2,

9    those being the results of the analysis of fluids on

10   the victim, and the Defendant has no objection in

11   that he's conceding that his sperm was found on and

12   about the victim, of having these entered into

13   evidence without having actually laid a foundation

14   for them.

15                  THE COURT:  Very well.

16                  MR. KELLEY:  With that, Your Honor,

17   the Commonwealth would rest.

18                  THE COURT:  Ready to proceed with the

19   defense?

20                  MR. MACVEIGH:  Your Honor, if I could

21   have a brief recess?

22                  THE COURT:  I assume you're moving for

23   the admission of the various exhibits?

24                  MR. KELLEY:  Yes, Your Honor.

25                  THE COURT:  Any objection?

1              MR. MACVEIGH:  No, no objection.

2              THE COURT:  They may be admitted.

3              MR. MACVEIGH:  Five minutes.  I'd like

4    to have five minutes, please.

5              THE COURT:  All right.  If you'll go

6    out to the jury room, we'll bring you back in as soon

7    as we are ready.

8                        * * *

9              (Whereupon, a recess was taken.)

10                       * * *

11             MR. MACVEIGH:  Your Honor, defense

12   calls Detective Snell.

13                       * * *

14             Jeffrey S. Snell,

15   called as a witness, having been duly sworn according

16   to law, testified as follows:

17                  DIRECT EXAMINATION

18   BY MR. MACVEIGH:

19        Q    Detective, you are the arresting officer

20   in the case?

21        A    Yes, I was.

22        Q    You've been employed by West Manchester

23   Township Police for how long, sir?

24        A    Fourteen years.

25        Q    Employed by any other police departments?

1    A    No, sir.

2    Q    How long have you been a detective?

3    A    Seven years.

4    Q    Detective, you took extensive reports from

5    several witnesses in this case, is that correct, sir?

6    A    Yes, I did.

7    Q    And you have a copy of the report that you

8    made in this case prior to obtaining the arrest

9    warrant for Calvin Roth, correct?

10    A    That's correct.

11    Q    Would you direct your attention to the

12    page that has looks like what I have is a copy of

13    Page 9 and a fax phone number at the top, and it's

14    the paragraph entitled, Interview with Marvin

15    Lipscomb, probably couple of misspellings in there.

16         You were present yesterday during the

17    testimony of Mr. Lipscomb, correct?

18    A    Yes, I was.

19    Q    Do you recall my cross-examination of Mr.

20    Lipscomb?

21    A    Yes, I do.

22    Q    There was some question about whether or

23    not Mr. Lipscomb told Mr. Roth when he confronted him

24    whether or not he had told Mr. Roth in advance that a

25    female client had accused Mr. Roth of rape?

1      A      That's correct.  I recall that.

2      Q      When you take down a report, particularly

3   in a serious allegation such as this, do you go to

4   pains to record it as accurately as you can from any

5   witness?

6      A      I try the best I can, yes.

7      Q      Do you believe that your report in this

8   case is accurate?

9      A      I have no reason not to believe it's not

10  accurate.

11     Q      Okay.  Would you read to the jury your --

12  did you prepare this report yourself?

13     A      Yes, I did.

14     Q      Type it or dictate it?

15     A      I dictate it.

16     Q      Would you read down about the seventh or

17  eighth line where the sentence begins with the word

18  subsequently?

19     A      Yes, Subsequently he stated that --

20     Q      Perhaps we should clarify about whom

21  you're reporting at this point?

22     A      Okay.  This is an interview with Marvin

23  Lipscomb, the director of the Colonial House.  The

24  date of the interview was May 26, 1992.

25     Q      That would have been one day after the

1    incident?

2        A    That's correct, sir.

3        Q    Thank you.

4        A    Subsequently he stated that himself and a

5    manager, Al Heagy, confronted Calvin on this

6    incident.  He stated that he told Calvin that a

7    female client made a serious accusation against him,

8    and this client claimed that he had raped her.

9        Q    Okay.  That's all.

10            And you believe that that report which

11   was made how soon after your interview with Mr.

12   Lipscomb?

13       A    Almost immediately I dictate it to my

14   secretary.

15       Q    Okay.  And you believe that that's what

16   Mr. Lipscomb told you at the time?

17       A    That's what my report reflects.

18            MR. MACVEIGH:  Thank you.  That's all.

19                    CROSS EXAMINATION

20   BY MR. KELLEY:

21       Q    Detective, could you read -- could you

22   continue on from where you left off for Attorney

23   MacVeigh's question?

24       A    Yes, I can.  Mr. Lipscomb stated that

25   Calvin immediately stated that, She's been acting

1    crazy all day long, which Mr. Lipscomb stated that he

2    replied by saying, Calvin, we didn't even tell you

3    who it was.  Mr. Lipscomb went on to state that

4    Calvin's response was, Someone told me Janet flipped

5    out so I assumed it was her.

6              MR. KELLEY:  Thank you very much,

7    Detective.

8                   REDIRECT EXAMINATION

9    BY MR. MACVEIGH:

10       Q    Detective, wouldn't it make sense that it

11   would be a female who would make an allegation of

12   rape as opposed to a male?

13       A    Yes.

14             MR. MACVEIGH:  That's all.

15             THE COURT:  You may step down.

16             MR. MACVEIGH:  Okay.

17                      * * *

18             CALVIN W. ROTH, JR.,

19   called as a witness, having been duly sworn according

20   to law, testified as follows:

21                   DIRECT EXAMINATION

22   BY MR. MACVEIGH:

23       Q    Tell the Judge and members of the jury

24   your name, please.

25       A    Calvin W. Roth, Jr.

1      Q    Mr. Roth, how old are you?

2      A    Thirty.

3      Q    Mr. Roth, in Adams County court have you

4 been convicted of forgery and theft and receiving?

5      A    Yes, I have.

6      Q    Okay.  How long ago was that?

7      A    It's been over -- I was convicted on that

8 it's been about a year, year and a half now, two

9 years.

10     Q    Okay.  You were sentenced on that offense?

11     A    Yes, I was.

12     Q    Okay.  Calvin, you've heard the testimony

13 of Janet Velte, and you know Miss Velte?

14     A    Yes, I do.

15     Q    You knew her from the Colonial House?

16     A    Yes, I did.

17     Q    Tell us about what your relationship with

18 her was like prior to May the 25th?

19     A    Well, it was just like any other day.  I

20 mean usually she comes downstairs same as everybody

21 else for breakfast.  We had our meetings, group

22 meetings cause we had sessions where everybody got

23 together and said a prayer for everybody and, you

24 know, talked and said good morning to everybody and

25 hugged each other.  It was a lot of hugging.

1          And prior to that day I mean it was

2   like any other day, you know, but I mean Janet --

3   Janet flips out -- flipped out a lot, you know, and

4   when she first got there, we did a lot of talking,

5   you know, and I mean I was told already --

6          Q     When you say we did a lot of talking, are

7   you referring to the two of you or are you referring

8   to the residents as a group?

9          A     No, I'm referring to me.  I'm referring to

10  George, Christian, Bill, Walter back there, all of

11  us.

12         Q     Were you -- how would you describe your

13  relationship with Janet Velte as opposed to your

14  relationship with other residents of Colonial House?

15         A     I got along with everybody there, even

16  her.  I mean when she first got there, I mean she

17  didn't seem like she didn't want to be close to

18  anybody, nobody when she first got there.  I mean she

19  didn't -- she just didn't want to be there.  I mean

20  she told that to a lot of people she didn't want to

21  be there.

22         She'd flip out, run off somewhere, you

23  know, wouldn't do what people told her to do.  So

24  she'd just go hide somewhere.  So the relationship

25  with me and her -- I mean afterwards, after all -- I

1    mean we actually started talking, you know, me and

2    her got closer than anybody in the rehab.  I mean I

3    was closer to her than anybody.

4         Q    How long have you been at the rehab?

5         A    I was there -- I was there -- I had 17

6    days to go till the program was finished.  I was

7    there about, I guess, two months and a half, almost

8    three months.

9         Q    What were the rules that you were aware of

10    concerning contact that clients were allowed to have

11    with members of the opposite sex?

12         A    We was allowed to talk to them, you know,

13    and hug them in a meeting, but we wasn't allowed to

14    actually be alone with them or we wasn't allowed to

15    have no kind of relationship with a woman in the

16    program because the rules if you're there for 90

17    days, your suppose to be there, not the -- no

18    relationship with a women after you leave the

19    program, even while your there.  We are not allowed

20    the have no sex, nothing like that.

21         Q    Okay.  Directing your attention then to

22    the evening in question -- oh, let me back up a

23    minute.  I'm going to show you what's already been

24    marked as Defense Exhibit 1.  Can you identify that?

25         A    Yes, that's me and Janet.

1        Q     It's a photograph of you and Janet?

2        A     Yes.

3        Q     Do you now who took that photograph?

4        A     Yes, Walter Gladstone.

5        Q     You've heard Janet testify that you had

6 intercourse with her, is that correct?

7        A     Yes, it is.

8        Q     You did, in fact, have intercourse with

9 her?

10       A     Yes, I did.

11       Q     You've heard her testify that you

12 threatened to kill her?

13       A     I never said nothing like that to her.

14       Q     Did you hold your hand over her mouth?

15       A     No, I did not.

16       Q     Pin her arms?

17       A     I mean if you look at the picture, I mean,

18 at that time --

19       Q     Answer my question.

20       A     No, I didn't.

21       Q     Did you put your knee in her gut?

22       A     No, I did not.

23       Q     Ever threaten to get her?

24       A     No, I did not.

25       Q     Ever put your hands on her shoulders and

1    pin her down?

2        A    No, I did not.

3        Q    Did you, in fact, have intercourse with

4    her?

5        A    Yes, I did by her own consent.

6        Q    Tell us about that?

7        A    I mean -- I mean could you rephrase the

8    question beyond what part?

9        Q    First of all, where did it take place?

10       A    It took place upstairs in the hall -- I

11   mean second room going down -- first room going down

12   in the girls section of the hallway.

13       Q    Do you know whether that was her room?

14       A    Yes, it was her room.

15       Q    Were you breaking a house rule by going

16   there?

17       A    Yes, I was.

18       Q    You were also breaking a house rule by

19   having intercourse with her, is that correct?

20       A    Yes, I was.

21       Q    You would have been discharged according

22   to the rules if you had been found out for that, is

23   that correct?

24       A    Yes.

25       Q    You admit, do you not, then leaving after

1    Mr. Lipscomb told to you stay, is that correct?

2         A       Yes, I did leave.

3         Q       That was for breaking the house rules?

4         A       Yeah, that was for breaking the house

5    rules.

6         Q       Okay.  Approximately how long did the

7    intercourse last?

8         A       About maybe 15 to a half an hour.

9         Q       Fifteen minutes?

10        A       To about half an hour, yes.

11        Q       After that, what did you do?

12        A       After the intercourse was over, she stood

13   up.  I stood up.  She put her pants back on.  She

14   pulled her pants up from her ankles because she had

15   cowboy boots on, weren't real long cowboy boots, and

16   she just pulled her pants back up.

17               Then after it was all over, I turned

18   around and said, You have to check out the hallway,

19   make sure there ain't nobody seeing.  She went over,

20   looked out the hallway.  She said, Go ahead.  She

21   kissed me, and I snuck out of the room, went to my

22   room.

23        Q       Okay.  Now, when was it that you had

24   learned that she had claimed you had raped her?

25        A       I come back from the A.A. meeting.  That's

1  when I found out after I was in the hallway.  After

2  we found out that she flipped out, Marvin Lipscomb

3  come out of the office, and first thing I said to him

4  said is, How's Janet?  Is she okay?

5      Q    How had you heard she had flipped out?

6      A    On the way back we seen Marvin's car

7  sitting there, and it's unusual for Marvin's car to

8  be there.  And they said -- well, the driver of the

9  van, the driver, that's what they call him, that

10  brought us back and forth from the A.A. meeting said

11  Janet flipped out.

12      Q    You had been in a van with other people to

13  an A.A. meeting that evening?

14      A    Yes.

15      Q    Then returned?

16      A    Yes.

17          MR. MACVEIGH:  That's all.  Your

18  witness.

19                   CROSS EXAMINATION

20  BY MR. KELLEY:

21      Q    Mr. Roth, knowing that fraternization

22  between yourself and Janet was against the rules, you

23  went to her room and had intercourse with her, is

24  that correct?

25      A    Yes, on her own consent.

1   Q  Under her own consent?

2   A  Yes.

3   Q  You did so, and she never took her pants

4 off nor did she ever take her boots off, is that

5 correct?

6   A  I didn't even take mine off.

7   Q  When you left her, she actually acted as a

8 lookout for you to get out of the room, is that

9 correct?

10   A  Yes, she did.

11   Q  When approached by Mr. Lipscomb, he said

12 there was a serious allegation made against you, and

13 your response to him was --

14       * * *

15     MR. MACVEIGH:  Your Honor, I think

16 that the record at least in question is that there

17 was an allegation of rape made against him and not

18 just an allegation that was serious.

19     MR. KELLEY:  All right.  He said to

20 you -- I don't think there's any question to that,

21 Dave.  We agree to that.

22       * * *

23 BY MR. KELLEY:

24   Q  He said to you, Someone has made an

25 allegation against you that you raped Janet?

1          A      Mr. Lipscomb stood in the hallway and said

2    Calvin.  I said, Yeah.  He said, I want you to come

3    to my office.  He says, exact words he says, There's

4    been an allegation of you raping one of the clients,

5    and first thing -- the only person that was there

6    that flipped out was Janet.  So first thing I knew it

7    had to be Janet.

8          Q      And Mr. Lipscomb said to you, I want you

9    to stay here.  I'll be back to talk to you, is that

10   correct?

11         A      No.

12         Q      What did he say?

13         A      That's not correct.  He turned around and

14   took me to his office right after that, right after

15   he said that to me.  We got in the office.  He asked

16   me, he said, Did you have sex with Janet?  He did not

17   say -- he did not say this or that.  He just turned

18   around and said, Did you have sex with Janet, but he

19   said it in a vulgar way.  I'm not going to say it

20   like that.  He said, Did you have blank sex with

21   Janet, and I said, No.  I said, You're crazy.  I

22   don't know what your talking about.

23         Q      Did he at some point during your

24   discussion leave you in the office?

25         A      No, he did not.

1    Q    Okay.  At some point did he leave you?

2    A    No.

3    Q    He stayed with you until today?

4    A    No.

5    Q    That's what I'm asking you.

6    A    Yeah, he left.

7    Q    Okay.  And you left Colonial House after

8    he left, is that correct?

9    A    Yes.

10   Q    And you went to Indiana, is that correct?

11   A    Yes.

12   Q    And you left at Colonial House all your

13   clothing, is that correct?

14   A    Yes.

15   Q    You left a check, a welfare check of yours

16   at Colonial House, is that also correct?

17   A    Well --

18   Q    You didn't take anything with you?

19   A    No, I didn't take nothing with me.

20   Q    You just left and went to Indiana, is that

21   correct?

22   A    Yes.

23   Q    Okay.  You say -- Attorney MacVeigh -- and

24   this is relevant -- Attorney MacVeigh says you've

25   been convicted of forgery, theft, and receiving

1    stolen property.  Is that also true?

2         A     Yes, I have.

3         Q     You said it's been a year and a half?

4         A     It's been about a year, two years now

5    since I had -- a year's been over with.

6         Q     There were actually three separate

7    offenses.  They're not one offense.  They happened at

8    different times, did they not?

9         A     Yeah, and they was all put together.  I

10   pleaded guilty to it and did my time.

11        Q     You also testified under direct

12   examination that you were very, very good friends

13   with Janet?

14        A     Yes, I was.

15        Q     You were friends with pretty much

16   everyone?

17        A     Yeah, there was two people in the Colonial

18   House I was closer with than anybody.  That was

19   Walter Gladstone and Janet.

20               MR. KELLEY:  Nothing further, Your

21   Honor, at this time.

22               MR. MACVEIGH:  No redirect.

23               THE COURT:  You may step down.

24               MR. MACVEIGH:  Mr. Gladstone.

25                          * * *

```
 1                    WALTER D. GLADSTONE,

 2   called as a witness, having been duly sworn according

 3   to law, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. MACVEIGH:

 6        Q     Mr. Gladstone, tell us your name and age,

 7   please?

 8        A     My name is Walter Donald Gladstone.  I'm

 9   21 years old.

10        Q     Where do you live?

11        A     I live at 417 West Market Street, York,

12   Pennsylvania.

13        Q     Okay.  Mr. Gladstone, do you know Janet

14   Velte?  She's now known as Janet Hlafka but had been

15   Velte?

16        A     Yes.

17        Q     And do you know my client, Calvin Roth?

18        A     Yes, I do.

19        Q     Do you know both of these individuals from

20   the Colonial House, correct?

21        A     That's correct.

22        Q     Where you were a client last year?

23        A     Correct.

24        Q     Last May.  Showing you Defense Exhibit 1,

25   a photograph.  Can you tell me what that's a
```

1    photograph of?

2        A        Yeah, that's a photograph of Calvin and

3    Janet.

4        Q        Who took that photograph?

5        A        I did.

6        Q        Did you later on give that photograph to

7    Calvin?

8        A        Yes, I did.

9        Q        Were you there for the entire time that

10    the other people that were, referring to Calvin and

11    Janet, there?

12        A        Yeah.

13        Q        How would you describe the rapport, the

14    relationship that existed between Calvin and Janet?

15        A        They seemed to get along fine, you know.

16    I didn't get too wrapped up into other people's

17    business, you know.  They used to pair off, go and

18    talk outside, and I really tried not to get too

19    involved in anything, you know what I mean.

20        Q        You didn't hear their conversation?

21        A        I never heard their conversations, no.

22        Q        Did it appear to you that their

23    relationship was closer than say average?

24        A        Yeah, I've been through a lot of treatment

25    for my drug and alcohol abuse, and I've seen a lot of

1    relationships in treatment, and that it's the same

2    old thing, you know what I mean.  A male and female

3    pairing off and talking, and that's how it starts,

4    you know.  I've seen a lot of that.  So that's

5    just -- I assumed that's what was going on, and I

6    just stayed out of it, you know.

7         Q    Did you see this going on over a longer

8    period of time than just a day or two?

9         A    Yeah.

10        Q    Could you estimate how long?

11        A    I don't know, week and a half.  I'm not

12   really sure how long it was.  That was a long time

13   ago.

14            MR. MACVEIGH:  Okay.  That's all.

15   Your witness.

16            CROSS EXAMINATION

17   BY MR. KELLEY:

18        Q    Do you know how long Janet was there in

19   the program?

20        A    She came after I was there, and --

21        Q    Two weeks be about correct time?

22        A    What, that she was there?

23        Q    Yeah.

24        A    I guess.  I'm not really sure.

25        Q    Did you ever see her hugging George

1    Chacona?

2       A    Sure.

3       Q    She hug him a lot?

4       A    I really don't know.

5       Q    Do you think she and George were closer

6    than most people would be?

7       A    I really don't know.  I was close with

8    George also.  I didn't really pay attention too much

9    to what other people were doing.

10      Q    You were very close.  Were you as close

11   with George as Janet was with George?

12      A    I really don't know how close Janet was to

13   George, but I know I was close to George.  At least I

14   think I was.

15      Q    Pretty open program, isn't it?  You're

16   asked to kind of unveil the problems from your soul

17   and talk about your problems a lot?

18      A    Um-hum.

19      Q    Lots of discussion going on between

20   people, is that correct?

21      A    That's true.

22      Q    Lots of hugging going on?

23      A    Um-hum.

24      Q    Lots of telling of secrets that have been

25   locked inside the body for a long time, is that

1    correct?

2         A     Well, that's suppose to happen, you know.

3    That doesn't necessarily happen, but that's what they

4    say.

5         Q     During the hours 7 p.m. to 9 p.m. or

6    around that time on May 25th were you with the

7    Defendant and Janet?

8         A     I was with the Defendant.  I was with

9    Calvin.

10        Q     At the A.A. meeting?

11        A     Yes.

12        Q     Prior to that time were you with the

13   victim and the Defendant in their room?

14        A     No, I wasn't in the room.

15        Q     So you can't testify what happened in that

16   room can you?

17        A     No.

18                  MR. KELLEY:  Thank you very much.

19                  MR. MACVEIGH:  No redirect.

20                  THE COURT:  You may step down.

21                  MR. MACVEIGH:  Your Honor, we'll move

22   the admission of Defense Exhibit 1 and rest.

23                  MR. KELLEY:  No problem, Your Honor.

24                  THE COURT:  It may be admitted.

25   Rebuttal?

91

1              MR. KELLEY:  Your Honor, may we take a

2    brief recess?

3              THE COURT:  I guess since I did it for

4    the defense.

5              MR. KELLEY:  Thank you very much.

6                        * * *

7              (Whereupon, a recess was taken.)

8                        * * *

9              THE COURT:  You may proceed.

10             MR. KELLEY:  Your Honor, Commonwealth

11   calls Don Overmyer for rebuttal.

12                       * * *

13             DONALD W. OVERMOYER,

14   called as a witness, having been duly sworn according

15   to law, testified as follows:

16                  DIRECT EXAMINATION

17   BY MR. KELLEY:

18        Q    Mr. Overmoyer, your full name, please.

19        A    Donald W. Overmoyer.

20        Q    Mr. Overmoyer, do you know the Defendant?

21        A    Yes, I do.

22        Q    I'm going to refer you to -- wait.  Let me

23   take a second here.  Have you talked to the Defendant

24   at some length in your past?

25        A    Yes, I have.

1      Q    Have you ever talked to the Defendant on

2  the telephone?

3      A    Yes, I have.

4      Q    Okay.  Approximately how many times?

5      A    Only once that I'm sure of.

6      Q    Prior to talking to him on the telephone

7  had you talked to him in person?

8      A    Yes.

9      Q    Would you recognize his voice?

10     A    Yes, I would.

11     Q    Are you sure of that?

12     A    Yes.

13     Q    Refer you to the 26th, May 26th.  Ask you

14  if you received a phone call with a voice that

15  sounded like the Defendant?

16     A    Yes, I did.

17     Q    Did the person who was talking to you

18  identify himself?

19     A    Yes, I believe he did.

20     Q    And what was the name he identified

21  himself by?

22     A    As Calvin.

23     Q    Okay.  Did you recognize the voice as

24  Calvin's?

25     A    I did.

1      Q      Did Calvin make any mention during the

2  course of that conversation of the rape which he was

3  alleged to have committed?

4      A      He didn't mention it by the name of rape,

5  no.

6      Q      Did he mention the incident?

7      A      He mentioned an incident.

8      Q      Okay.  Did he indicate to you whether or

9  not anyone else had been involved?

10      A      He asked me real briefly, Did they find

11  anything else about the other guy.

12      Q      He said the other guy?

13      A      The other, generalizing the other person.

14      Q      What did you take that to mean?

15                           * * *

16             MR. MACVEIGH:  We'll object to that.

17             THE COURT:  I'll sustain that

18  objection.

19                           * * *

20  BY MR. KELLEY:

21      Q      This was the day after the incident on the

22  25th?

23      A      Yeah, it was 11 a.m. on the 26th of May.

24             MR. KELLEY:  Your witness.

25                    CROSS EXAMINATION

94

1    BY MR. MACVEIGH:

2        Q    Did you make a note in any kind of written

3    form about that?  I mean, how do you know it was 11

4    o'clock?

5        A    I wrote an incident report.

6                        *  *  *

7             MR. MACVEIGH:  That's all.

8             THE COURT:  You may step down.

9             MR. KELLEY:  Your Honor, finally the

10   Commonwealth would recall George Chacona to the stand

11   for rebuttal.

12                       *  *  *

13                  GEORGE CHACONA,

14   called as a witness, having been duly sworn according

15   to law, testified in rebuttal as follows:

16                  DIRECT EXAMINATION

17   BY MR. KELLEY:

18       Q    Mr. Chacona, do you recall when Janet

19   Velte arrived at the Colonial House?

20       A    Yes, I do.

21       Q    Okay.  Approximately how long was she

22   there prior to this incident?

23       A    Three, four weeks.

24       Q    Referring to her initial stay there the

25   first days or the first weeks, do you recall whether

1    her relationship was somewhat close to the Defendant?

2         A    Her initial stay she was totally withdrawn

3    from everyone, everyone.  She had nothing to do with

4    anyone except staff.

5         Q    Did she establish a friendship with the

6    Defendant?

7         A    No more than with the other clients

8    involved at Colonial House.

9         Q    Would you say she was on friendly terms

10   with the Defendant?

11        A    When they first got together, they were on

12   friendly terms.  After that she told me she was

13   frightened of him.

14        Q    Do you recall if this was before the rape

15   or after the rape -- the alleged rape?

16        A    Before the rape.

17        Q    Do you recall how long before it was?

18        A    Week, two weeks, three weeks.  That's

19   difficult to do.

20        Q    Would you say that their relationship had,

21   however, changed?

22        A    Yes.

23             MR. KELLEY:  Thank you.

24                 CROSS EXAMINATION

25   BY MR. MACVEIGH:

1       Q       Did you report that to anybody?

2       A       There was no one to report that to.

3       Q       How many staff members are there, Mr.

4    Chacona?

5       A       At nighttime, one.

6       Q       How many during the day?

7       A       Four or five.

8       Q       Several therapists?

9       A       Yes.

10      Q       Counselors?

11      A       Yes.

12      Q       And you didn't report that to anybody?

13      A       It wasn't my obligation to report that to

14   anyone.

15              MR. MACVEIGH:   Okay.

16              MR. KELLEY:   Your Honor, might I ask a

17   few more questions.

18              THE COURT:   Yes.

19                  REDIRECT EXAMINATION

20   BY MR. KELLEY:

21      Q       Sir, did you ever report to any staff

22   member a change in two people's relationships?

23      A       No, I did not.

24      Q       Did your relationship during the course of

25   your stay there ever change with certain people?

1      A      Yes, it did.

2      Q      Did you report that to any staff members?

3      A      No, I did not.

4      Q      Approximately how many females were there

5  during the course of your stay?

6      A      At any given time there was three, four,

7  sometimes up to five, but they came and went.  Some

8  stayed for a week, some stayed for a day, and they

9  left.

10      Q      Do you recall how many were there at the

11  time Janet was there?

12      A      There were three other females there when

13  Janet came.

14                  MR. KELLEY:  Okay.  Thank you.

15                  MR. MACVEIGH:  Nothing else.

16                  THE COURT:  You may step down.

17                  MR. KELLEY:  No further witnesses,

18  Your Honor.

19                  THE COURT:  Anything further, Mr.

20  MacVeigh.

21                  MR. MACVEIGH:  No, Your Honor.

22                  THE COURT:  Prepared to go to the

23  jury?

24                  MR. MACVEIGH:  I am.  If the Court

25  please.  Mr. Kelley.  Detective Snell.  Officer

1    Ankrum.  Ladies and gentlemen, when we chose you

2    yesterday, as I said, sometimes I have a very

3    difficult decision in the jury selection.  Our system

4    requires us to pull strangers who don't know, don't

5    know anybody, don't know anything about the case who

6    will do their level best to listen to both sides of

7    the story and then make an informed judgment on that,

8    and so we've chosen the twelve of you to do a job

9    that I have no doubt will be difficult.

10          My job is just about over, and yours

11   is just now beginning.  It started by paying

12   attention, but now the hard part comes, and I don't

13   envy you, the position that you're in.

14          The case here is obviously one in

15   which emotions run high.  With Miss Velte, Mrs.

16   Hlafka, they were bottled up.  With Mr. Roth they

17   were bottled up.  So they are high on both sides.

18          Judge Chronister will tell you, and he

19   tells you this for very good reason, that my client

20   is presumed innocent just as any of the twelve of you

21   would be if you were charged with anything from say a

22   parking ticket to mass murder.  The question here is

23   whether or not the State -- I tend to say State or

24   Commonwealth, but it is the same -- whether they've

25   proven to you beyond a reasonable doubt that Calvin

1  Roth is guilty of the offenses of terroristic threats

2  and of rape.

3  Judge Chronister will lay out for you

4  what the elements of those offenses are, what parts

5  of the checklist the Commonwealth has to prove, and

6  then you have to consider whether the Commonwealth

7  has proved those elements, and not only just prove

8  them, prove them to you beyond a reasonable doubt.

9  In fact, there's a difference between

10  that you can think about.  You may not be able to

11  quantify, you can't put a ruler on it or put it on a

12  scale, but you can recognize I trust all being

13  adults, all being intelligent, all being

14  understanding, you can recognize a difference between

15  guilty and not guilty as opposed to guilty and

16  innocence.

17  Calvin Roth never has to demonstrate

18  his innocence.  The State of Pennsylvania always has

19  to demonstrate his guilt to you.  Until they've done

20  that, you might not like what he's charged with, you

21  might not like his appearance, you might not like the

22  way he looked on the stand, but until they've proven

23  him guilty beyond a reasonable doubt, he's innocent.

24  If he did this offense, then it's

25  obviously horrible, but I point out to you that the

100

1  offense is quite clear.  It's quite clear that he had

2  sexual intercourse.  We've admitted that.  State's

3  exhibits over there are the lab reports demonstrating

4  that his body fluids were found on her clothing.  I

5  believe perhaps taken from her body as well.  That's

6  demonstrated.  That's not the issue here.

7          The issue here is clearly consent.

8  Has the State proven it to you beyond a reasonable

9  doubt?  Well, reasonable doubt.  I won't belabor the

10  issue.  If you have a second thought about it, if you

11  pause a little bit, that's a reasonable doubt.  If

12  you would do in a matter of some serious importance

13  in your own life, maybe where to send your child to

14  school, maybe where to move, something of that

15  nature, if you think about it a second time, that's

16  pausing, that's hesitating, and even though you think

17  he's guilty, if he hasn't been proven guilty beyond a

18  reasonable doubt, then you find him not guilty.  That

19  may be to you somewhat distasteful.  That, ladies and

20  gentlemen, is why I don't envy the position that

21  you're in.

22          Sometimes there are jobs that must be

23  done.  We don't like to do them.  They may, in fact,

24  hurt us that we may loose sleep over at night.

25  Nonetheless, sometimes those jobs have to be done.

1          The evidence actually in this case is

2     not terribly complex.  So I won't belabor it.  Did my

3     client leave the facility, and was that against the

4     facility's rules?  Yes and yes.  Why did he do it?

5     The answer is obvious.  He was going to be kicked

6     out.  Did he flee to Indiana?  Yes.  Will Judge

7     Chronister tell you that flight is evidence of

8     consciousness of guilt?  Yes.

9          Now, ladies and gentlemen, the

10    critical question.  Guilt about what?  Well, guilt

11    about leaving and the consequences -- pardon me,

12    guilt about having broken the laws and the

13    consequences that would be incident with that or

14    guilt because there was an act committed upon this

15    person.

16         Ladies and gentlemen, we've heard two

17    sides of this story, and that's where, of course, the

18    story diverges.  That's why I'm glad I'm not in your

19    shoes because I won't have to make that decision.

20         I sometimes think that the burden that

21    the criminal justice system imposes on people such as

22    yourselves having done nothing other than to register

23    to vote, and then all of a sudden they are called in

24    to make this terribly important decision, it's

25    somewhat unfair.  Your name happened to be pulled out

1    of the hat.  We thought that you would give us a fair

2    shake.  We ask that you be on a jury, and here you

3    are, and all you did was sign up to vote four years

4    ago.  It doesn't seem right.  You're here

5    nonetheless.

6            There are two different sides to the

7    story.  I've repeated that.  I think you know what

8    issues are here.  I won't belabor it.  Sure we've got

9    a picture showing the two of them, I think, with one

10   arm around the other smiling at the camera, and

11   there's a discrepancy between whether or not they

12   were friendly or not friendly, whether or not she was

13   friendly with other people, he was friendly with

14   other people.  There's a lot of hugging going on

15   apparently at a facility such as Colonial House.

16           The bottom line, folks, is you've got

17   a tough choice to make.  When you do that, when you

18   go back and talk among yourselves, take all the time

19   you'd like.  Consider the evidence that you heard,

20   but Judge Chronister will tell you that fear of an

21   individual, sympathy for an individual, dislike of an

22   attorney, of an individual, is not something that you

23   may consider.  It's the question of whether or not

24   the State has met the very difficult burden it has.

25           The theory, folks, is that it's better

1    that a person arguably guilty go free than an

2    innocent person be convicted.  That's the theory.

3    Thank you.

4              MR. KELLEY:  Your Honor, may it please

5    the Court.  Attorney MacVeigh.

6              MR. MACVEIGH:  Attorney Kelley.

7              MR. KELLEY:  Ladies and gentlemen,

8    first of all, in executing your duty as jurors, I

9    certainly hope that each and every one of you will,

10   indeed, pause.  Pause.  Consider all of the evidence

11   that was presented.  If you hesitate, consider more.

12   Consider all the evidence.

13              A reasonable doubt is not a

14   hesitation.  You have a very difficult decision ahead

15   of you.  There certainly will be hesitation.  A

16   reasonable doubt is when you consider all the

17   evidence in total if then you don't know what

18   happened, then you've got reasonable doubt.  I'll

19   explain some more about reasonable doubt later on.

20              Folks, the evidence we have today and

21   yesterday was the testimony of the victim that she

22   had, in fact, been awakened from a sound sleep, that

23   the Defendant had his knee in her gut, that he had

24   his hand over her mouth, and that he proceeded to rip

25   the victim's clothing down, which ended up around her

104

1     ankles.

2            Now, the Defendant agrees that at the

3     end of the intercourse the clothing was around her

4     ankles.  The victim says that's what happened.  The

5     distinguishing thing is the Defendant says there was

6     consent all along, and we've heard a lot of testimony

7     today specifically about how they were friends, and

8     we've seen this picture here of them, the Defendant

9     with his arm around the victim, and this he says

10    shows the victim and he were friends.

11           From this we are to infer that there

12    was consent, but you've also heard the testimony of

13    the Commonwealth witness, and I don't think there's a

14    discrepancy.  They were initially friends.  Somewhere

15    along the line they went different ways.  The victim

16    became afraid of the Defendant.  There's never been

17    any testimony when this photograph was taken.  We

18    don't know.  Could have been her first day there when

19    they were becoming friends.  We do know there was a

20    lot of hugging.

21           This is not an incredible picture.

22    This is something that happened every single day.  As

23    Mr. Chacona testified, this is something that

24    happened between himself and the victim probably

25    sometimes five times an hour.  This is nothing.

105

1          Folks, what you have to consider is

2     the demeanor and the motivation of each witness you

3     heard testify.  The victim she's trying to be painted

4     kind of as someone who falls apart all the time.  I

5     suggest to you that's not true.  She got up there and

6     she fell apart.  She was reliving the event, and she

7     did fall a part.  She went out and came back, and she

8     didn't fall apart.  Her demeanor was this was an

9     incredible experience for her.  She couldn't handle

10    it, but she got it together.  She is a strong person,

11    and she exhibited that strength on the stand.  She

12    certainly was affected by something there, and you

13    heard the testimony of the other Commonwealth

14    witnesses.

15         Now, they, of course, were not there,,

16    but the very nature of this type of crime is such

17    that there aren't witnesses to this type of crime.

18    It happens between a victim and an assaulter, but we

19    do know that afterwards she doesn't remember a thing.

20    She was walking around in a daze.  She thought it was

21    three hours which had passed.  We know that from Mr.

22    Chacona it probably wasn't three hours.

23         She showered immediately afterwards,

24    bagged the clothing, and stated to Mr. Chacona, I

25    want it burned.  Either she is an extremely good

106

1    actress or something deeply affected her on that day

2    as it did yesterday when she took the stand.  Mr.

3    Chacona said it took him nearly an hour to find out

4    just the word rape.  She wouldn't say who did it so

5    he had to read off names, and immediately when he

6    said the Defendant's name, the victim broke down and

7    said, He's gonna kill me.  He's gonna kill me.

8              She doesn't remember whose office she

9    was in.  Mr. Chacona says they went to the office of

10   the night manager.  She just says she remembers

11   seats.  Something deeply affected her, and you should

12   consider that because her demeanor is relevant.  The

13   Defendant's demeanor also is relevant, and I want you

14   to consider that, and the Judge will instruct you on

15   that.

16             The Judge will also instruct you about

17   his plea or convictions in that you should weigh them

18   when you consider the truthfulness of his testimony.

19   He'll also instruct you that a Defendant has a

20   motivation to testify.  Certainly the outcome is very

21   important to the Defendant.  So you should consider

22   that when you weigh whether there's a reasonable

23   doubt here.

24             I want to suggest a few things to you

25   also regarding the Defendant's state of mind, which

1    is linked to his demeanor while testifying.   His

2    state of mind immediately after he was told that a

3    rape -- someone had accused him of a rape was to

4    leave Pennsylvania, York County, to go to Indiana, to

5    leave his clothing in Pennsylvania, to leave his

6    welfare check in Pennsylvania, to leave everything

7    after his couple months stay at the Colonial House,

8    and go to Indiana.

9             The Judge will instruct you that

10   flight to Indiana goes to his state of mind, and you

11   can consider that he had a guilty state of mind.  He

12   also had guilty state of mind the next day when he

13   called one of the Commonwealth witnesses and said,

14   Well, did they catch the other guy?  The other guy,

15   did they get him?  So the day after the offense the

16   Defendant's story was that some other guy had sex

17   with the victim.   Today he testifies it was consent.

18             You must consider those facts when you

19   weigh whether there's a reasonable doubt, and again a

20   reasonable doubt is something when you consider all

21   of the evidence, you don't know what happened here.

22   I suggest to you that the Commonwealth has proven

23   beyond a reasonable doubt, not beyond all doubt, and

24   we don't have to do that.   Every time someone has a

25   statement which counters somebody else there's at

108

1   least some bit of doubt, but you have to decide when

2   you consider that testimony was it reasonable.  Did

3   it mesh with everything else I heard.  It if wasn't

4   reasonable, your duty is to convict the Defendant of

5   the crimes if we have proven every element of the

6   crime.

7              Rape, as the Judge will instruct you,

8   is unlawful intercourse with a person not your spouse

9   by forcible compulsion or by a threat of forcible

10  compulsion.  The victim testified that when the

11  Defendant got on top of her, he had his hand over her

12  mouth and said, You tell anyone, I'm going to kill

13  you.  That is at the very least, I suggest, a threat

14  of forcible compulsion.

15             She also testified that she froze.

16  She could not move, and she froze on the stand

17  yesterday when she was reliving it.  That is unlawful

18  intercourse with a person not your spouse by a threat

19  of forcible compulsion.  She also testified that he

20  held her down.  He had his hands on her shoulder

21  during the act.  Earlier he had his hand on the

22  shoulder and was doing something else.  One point he

23  had a hand on the shoulder and hand on the mouth,

24  hand on the mouth and pulling down the pants and the

25  panties.

1          That is forcible compulsion, not just

2    the threat thereof.  That, I suggest to you, the

3    Commonwealth has proven beyond a reasonable doubt.

4          Terroristic threats is essentially a

5    threat to do a crime of violence.  The threat in this

6    case was the threat at least made twice, I believe,

7    by the Defendant, If you tell anyone, I am going to

8    kill you.  And she couldn't tell anyone.  She

9    couldn't tell her best friend at Colonial House.  He

10   had to drag it out of her.  It took him 45 minutes.

11   She was just shaking.  That was a threat of violence.

12   That was terroristic threats.

13          Folks, as I just stated to you the

14   elements of the crimes, in closing I'd like to say if

15   you find that, indeed, the Commonwealth has proved

16   that which we have just argued to you, and my

17   arguments aren't evidence, they are just argument,

18   then you must come back with a guilty verdict of rape

19   and terroristic threats because I suggest to you that

20   Janet was raped.  Thank you very much.

21          THE COURT:  Ladies and gentlemen, this

22   is the point at which this Court will give you

23   instructions on the law.  It is going to take me

24   somewhere between 50, 55 minutes to give the

25   instruction, and at this point that would run us till

1   about 20 after 12.  Normally I would just go ahead

2   and do that, but there is a judicial conference

3   scheduled at 12 o'clock today, and if I'm late for

4   that, I hold up seven other judges.  So I think I'm

5   going to wait till 1:30.

6              I also potentially could bring you

7   back at 1 o'clock and start early, but I think the

8   conference will run later than that, and we seem to

9   have wasted time all morning on one thing or another,

10  but I don't really see I have any choice.

11             So I'm going to let you be back at

12  1:15 at the jury room across the hall, and we'll

13  attempt to start at 1:30.  The judicial conferences

14  sometimes even run past 1:30.  So whenever we get

15  finished, we'll come up and we'll start.

16             Keep in mind the cautions that I gave

17  you yesterday.  You still should not make up your

18  mind because even though you've heard all the

19  testimony and the arguments, you still haven't heard

20  the law.  So keep an open mind on the ultimate

21  conclusion.

22             Also even at this point you still

23  should not be getting any information from any other

24  source.  At this point you have all the information

25  you should get.  The testimony is complete.  So do

1    not have any contact with anybody involved in the

2    case or obtain any information from any outside

3    source.  With those cautions, you are now excused

4    until 1:30.

                              * * *

6                   (Whereupon, a recess was taken.)

                              * * *

8                      CHARGE OF COURT

9               It is now the Court's function to

10   advise the jury of the law to apply in this matter.

11   We start with the fundamental principle of our system

12   of criminal law that a Defendant is presumed to be

13   innocent, and the mere fact that he is arrested and

14   accused of a crime is not any evidence against him.

15   Furthermore, the Defendant is presumed innocent

16   throughout the trial and unless and until you

17   conclude based on careful and impartial consideration

18   of the evidence that the Commonwealth has proven him

19   guilty beyond a reasonable doubt, and I will define

20   that for you in a moment.

21               It is not the Defendant's burden to

22   prove that he is not guilty.  Instead, it is the

23   Commonwealth that has that burden of proving each and

24   every element of the crime charged and that the

25   Defendant is guilty of that crime beyond a reasonable

1   doubt.

2           A person accused of a crime is not

3   required to present evidence or to prove anything in

4   his own defense.  If the Commonwealth's evidence

5   fails to meet its burden, then your verdict must be

6   not guilty.  On the other hand, if the Commonwealth's

7   evidence does prove beyond a reasonable doubt that

8   the Defendant is guilty, then your verdict should be

9   guilty.

10          Although the Commonwealth has the

11  burden of proving that the Defendant is guilty, this

12  does not mean the Commonwealth must prove its case

13  beyond all doubt or to a mathematical certainty nor

14  must it demonstrate the complete impossibility of

15  innocence.

16          A reasonable doubt is a doubt that

17  would cause a reasonably careful and sensible person

18  to hesitate before acting upon a matter of importance

19  in his or her own affairs.  A reasonable doubt must

20  fairly arise out of the evidence that was presented

21  or out of the lack of evidence presented with respect

22  to some elements of the crime.

23          Now, that is a little bit dry legal

24  language.  I found that if I give an example, that is

25  a little bit easier to understand.  Typically one

1    thing that would be important to each and every one

2    of you in your lives is the purchase of a house, and

3    what is the thought process you go through when you

4    are thinking of buying a house.

5            First thing you try and do is assemble

6    all the information you get. Go out and look at

7    houses and find a particular one that might be

8    suitable, and you sit down with a realtor and you

9    offer to purchase the house.

10            You get to the point where you are

11    going to sign your name on the signature line, and at

12    that point you start thinking, Well, gee, this is a

13    real nice house. The price is good. The

14    neighborhood is good. The house is well maintained.

15    There is good financing available, all the various

16    factors that might enter into it. And if after

17    considering all that you say, Yes, I'm going to do it

18    and you sign your name as to that decision about

19    buying a house, you have been convinced beyond a

20    reasonable doubt.

21            If it is an important matter, you have

22    thought about it carefully, you have gotten all the

23    information together, you have considered it, you

24    have reached a decision, and you were prepared to

25    proceed forward based on that decision. So as you

114

1   can see, this is not something that is simply

2   applicable to the legal system.  It is something that

3   you do all the time, and we are simply asking you to

4   take that same thought process and apply it to this

5   case.

6            Recognize that it is a serious and

7   important matter.  Search all the information that

8   you have been presented.  Compare notes about it and

9   decide, Am I convinced that I am ready to sign my

10  name on the dotted line.  In this case say the

11  Defendant has been proven guilty beyond a reasonable

12  doubt.  If you are that sure that you would proceed,

13  then you may convict the Defendant.

14           Instead, if you still have

15  hesitations, if you still have doubts; for example,

16  in the home situation suppose when they present you

17  with the contract you said, Now, wait a minute.

18  There is some water in the basement.  I want to get

19  that checked out or there is some holes up there I

20  think they may have termites.  I want to get a

21  termite inspection or whatever it might be.  So you

22  are not prepared to proceed you still need more

23  information.

24           Here you are not going to get any more

25  information.  You have all the information you are

1    going to get, but if you are still hesitating, if you

2    are still thinking, Well, gee, I wish I had more

3    information because I am not sure, then what you say

4    is not guilty.  That is what would be required.

5              So to summarize that, you may not find

6    the Defendant guilty based on the mere suspicion of

7    guilt.  The Commonwealth has the burden of proving

8    the Defendant guilty beyond a reasonable doubt.  If

9    it met that burden, then the Defendant is no longer

10   presumed innocent, and you should find him guilty.

11   On the other hand, if the Commonwealth does not meet

12   its burden, then you must find him not guilty.

13             Now, your role in the case is to be

14   the Judge of the facts.  You collectively as a jury

15   are the Judge of the facts.  I am the Judge of the

16   law.  You must accept the law as I am now giving it

17   to you, but the facts and the credibility decisions

18   as regard those facts are entirely up to you.  This

19   means you must judge the truthfulness and the

20   accuracy of each witnesses testimony and decide

21   whether to believe all, part, or none of that

22   testimony.

23             Now, in making that decision, again

24   this is one of those things you do every day in your

25   own life.  Every day you are involved in something

1   involving your family or your business or whatever it

2   might be you, listen to people, you evaluate what

3   they tell you, and you make a decision.  Do I believe

4   them, do I not believe them, am I going to act on the

5   basis of what they told me or not.

6        So the final decision in regard to

7   those matters depends on what you believe is

8   important.  I'm going to give you certain factors

9   that I think will be appropriate for you to consider,

10  but it is your final considered judgment.

11       Consider whether this witness was able

12  to see, hear or know things about what she testified.

13  Consider how well the witness remembered and

14  described the things about which he testified.

15  Consider whether the witness testified in a

16  convincing manner.  That is, how did he look, act,

17  and speak while testifying?  Was his testimony

18  uncertain, confused, self-contradicted or evasive?

19  And when I say he, obviously that means he or she as

20  the case may be.  Did the witness have any interest

21  in the outcome of the case any bias, prejudice, or

22  other motive that might have affected the Defendant.

23       Finally, consider how the testimony of

24  the witness squares with other evidence in the case,

25  including the testimony of other witnesses.  That is,

117

1    was it contradicted or supported by the other

2    testimony and the physical evidence.  Does it all

3    make sense when considered together.

4              If you do believe some part of the

5    testimony of a witness to be inaccurate, then you may

6    consider whether that inaccuracy casts doubts upon

7    the rest of that witness's testimony, and this may

8    depend on whether this witness has been inaccurate in

9    an important matter or merely a minor detail and

10   whether or not there has been an explanation.

11             For example, did the witness make an

12   honest mistake, did he simply forget, or did he

13   deliberately testify falsely.

14             Now, those rules apply to each witness

15   separately, but you cannot really look just at each

16   witness separately.  You have to look at them in

17   conjunction with the other witnesses testimony as

18   well, and when you do that, you may find that there

19   is a clear conflict

20             One person says something is black.

21   The other person says something is white.  They

22   cannot both be right.  You then have to resolve that

23   conflict.  That is part of your function as jurors.

24             The first thing you should try to do

25   is fit together, that is, to reconcile the conflicts

1  if you can fairly do so. If you can't, then you

2  should remember that discrepancies and conflicts

3  between the testimony of different witnesses can

4  cause you to disbelieve some or all of their

5  testimony. However, remember that two or more

6  persons witnessing an incident may see or hear it

7  differently. It is not uncommon for an innocent

8  mistake on his recollection of how something

9  happened.

10  If you cannot reconcile the conflict,

11  then it is up to you to decide which testimony, if

12  any, to believe and which to reject as untrue or

13  inaccurate.

14  Keep in mind that in deciding this

15  question you should not necessarily be swayed by the

16  number of witnesses on either side. It is not a

17  question of who had the most witnesses, but how good

18  those witnesses are.

19  Finally, look at whether this conflict

20  involves a matter of importance or merely some minor

21  detail, and whether this conflict is brought about by

22  an innocent mistake or intentional falsehood.

23  In this case, as in all cases, there

24  are two types of evidence, direct evidence and

25  circumstantial evidence. Direct evidence is

1   testimony by a witness from his own personal

2   knowledge such as something that he saw or heard

3   himself, and I think that is self-explanatory.

4          The other type of evidence is what we

5   call circumstantial evidence, and that is testimony

6   about facts which then point to the existence of

7   other facts which are in question.  Whether or not

8   circumstantial evidence is proof of the other facts

9   in question depends in part on the application of

10  common sense and human experience.

11         What we are saying is that you can

12  take one fact and say from that I infer that this

13  other fact must also be true because it would

14  automatically follow because this fact is true, then

15  this other fact also has to be true.  There is no

16  other explanation or no other way to account for it

17  other than the other fact is also true.

18         Again perhaps an example will make

19  this easier.  Example I normally use is that you and

20  a friend are going to the movies.  It is a bright

21  sunny day when you go in.  You come back out, and the

22  street is all wet.  You probably turn to your friend

23  and say, Gee, it must have rained when we were in the

24  movie.  Now, you did not see it raining.  You were

25  not there when this water was coming down, and yet

1    you have drawn a conclusion.  You have looked at the

2    fact that the street is wet, and you said it did

3    rain.  That is circumstantial evidence that it

4    rained.

5              Now, the catch is that you cannot do

6    this unless that is the only possible explanation.

7    If there is some other explanation, for example, in

8    my example that would explain how the street got wet,

9    then obviously you would not assume that it rained

10   because you would have an alternative explanation of

11   how the street got wet.

12             Perhaps there is a street cleaner just

13   went by or perhaps they had a fire down the corner, a

14   fire hydrant is being used to fight a fire, and the

15   hose came off and the water ran out of the hydrant

16   and the street got all wet.  You have to be satisfied

17   that there is no other possible explanation.

18             However, you want to look at all the

19   facts so if the street is wet, but in addition you

20   notice that there is some black clouds going off in

21   the distance, and that the cars that are going by

22   still have their windshield wipers going, and the man

23   down at the corner with his umbrella is shaking the

24   water off putting it away, and you are standing at a

25   tree and there is water dripping off the branches,

1    and not only is the street wet but the sidewalk is

2    wet and the lawn is wet and everything around you is

3    wet, now from all of those facts clearly you would

4    conclude that it did rain.  There is no other way

5    that all those things could be true other than the

6    fact that it rained.

7            Again we are suggesting that you can

8    take that same thought process and apply it to this

9    case.  If you can state that there is one fact in

10   this case that leads to the existence of another

11   fact, that is the only possible explanation for

12   having occurred that way, then you may treat that as

13   proof of the second fact.

14           Now, there is two keys.  One is that

15   the one fact does inescapably lead to the other is

16   also true and also that the first fact, the one that

17   you are making the inference from, be accepted by you

18   as being a true statement.  When a witness gives

19   testimony, you do not necessarily have to believe it.

20   So you may say, Well, no, I do not believe that.

21   Then obviously you would not draw any inference from

22   it.

23           Whatever type of evidence you use, it

24   can be direct testimony alone, it can be

25   circumstantial evidence alone, or it can be some

1    combination of the two, you must be convinced by all

2    of the evidence as to each and every element of the

3    crime charged that the Defendant is guilty beyond a

4    reasonable doubt before you can convict; and if you

5    are not convinced beyond a reasonable doubt as to

6    each and every element, then you must find the

7    Defendant not guilty.

8            Now, there is several other general

9    rules that apply here.  One, you heard testimony that

10   the Defendant had previously been convicted of

11   several offenses up in Adams County, I believe.  That

12   information was permitted into testimony for a very

13   limited purpose.  Specifically, it was not to show

14   that the Defendant is a bad person and, therefore, it

15   is more likely that he committed this crime.  That

16   would be inappropriate for to you consider it in that

17   fashion, and I instruct you not to do so.

18           However it is permissible in the sense

19   that it is what we call crimens falsi.  That is the

20   actions for which this Defendant was convicted

21   involve crimes of dishonesty or falseness, and as I

22   told you earlier, if you find that somebody has lied

23   to you in the past, that can be a factor in your

24   decision as to whether you believe them now.  So you

25   can treat that as if the Defendant had told a lie in

123

1    the past.  He has admitted the conduct that was

2    similar to telling a lie, conduct involving

3    dishonesty and being false.

4            Now, obviously, that does not

5    automatically mean he is lying today.  A person can

6    lie to you sometime in the past and be telling you

7    the truth today.  It is just a factor for you to

8    consider in determining the Defendant's credibility,

9    but make sure you understand that it is limited

10   solely to that purpose, that is, determining

11   credibility, and you cannot look at the overall

12   picture and say, Well, gee, he committed crimes.  He

13   is a bad guy.  He is more likely to be guilty.  You

14   cannot do that.  You can only use it for credibility.

15           There was evidence which tended to

16   show that the Defendant fled at the time that he was

17   advised that a crime had been committed or whatever

18   it is that he was advised of.  There was some dispute

19   about that.  Counsel went back and forth a couple

20   times on exactly what the Defendant was told.

21           Generally speaking, when a crime has

22   been committed and a person thinks he is or may be

23   accused of committing it, and he then flees or

24   conceals himself, such flight or concealment is a

25   circumstance tending to prove that the person is

124

1    conscious of guilt.  However, such flight or

2    concealment does not necessarily show consciousness

3    of guilt in every case.  A person may flee or hide

4    for some other motive and may do so although

5    innocent.

6            Whether this evidence of flight or

7    concealment in this case should be looked at as

8    tending to prove guilt depends upon the facts and

9    circumstances of this case and especially upon

10   motives which may have prompted the flight or

11   concealment.

12           Of course, the Defendant says, Well,

13   yeah, I did leave the jurisdiction, but it was

14   because I knew I did something wrong; that is, I had

15   consensual sex.  That in itself is a violation of the

16   rules of the halfway house, and I was going to get

17   thrown out anyway.  I knew I was going to get in

18   trouble, so I just went ahead and left.  If you

19   accept that, then obviously that would not

20   necessarily show that he was guilty of the crime of

21   rape.  He is leaving, and he is showing consciousness

22   of doing something wrong, but it is something

23   different wrong, and it is a minor violation rather

24   than rape.

25           The weight of that is up to you to

1    decide taking all the factors and circumstances into

2    account and as you evaluate them.

3              Now, we will turn to the actual

4    elements of the crimes that are involved.  There are

5    two crimes.  One is rape by forcible compulsion or

6    the threat of forcible compulsion, and the other is

7    terroristic threats.  So you will have two verdicts

8    to announce when you come back to the courtroom.

9    Guilty or not guilty of rape, and guilty or not

10   guilty of terroristic threats, and you will have to

11   have verdicts for both of those charges.

12             I will take rape first.  A man commits

13   rape if he has sexual intercourse with a female who

14   is not his spouse either by forcible compulsion or by

15   the threat of forcible compulsion that would prevent

16   resistance by a reasonably resolute female.  The

17   force used or threatened by the man can be physical

18   force or violence, but it does not have to be.  It is

19   legally possible for a man to commit rape by using or

20   threatening psychological, moral or intellectual

21   force.

22             Now, in this particular case I believe

23   there has only been direct testimony of physical

24   force.  However, that is the law.  You are to look at

25   the circumstances.  You are to decide what the threat

126

1    or what force was involved, and as with all matters

2    this is within your province to decide.

3              In order to find the Defendant guilty

4    of rape, you must be satisfied that the following

5    three elements have been proven beyond a reasonable

6    doubt.  First, that the Defendant compelled the

7    victim to have sexual intercourse with him against

8    her will; second, that he did so by force or by

9    threat of force, threat being the kind of threat

10   which would have prevented a reasonably resolute

11   female from resisting if she were in the same

12   situation as the victim; and, third, that the victim

13   was not the Defendant's spouse, that is, not his

14   wife.

15              Now, I used the term sexual

16   intercourse.  That has a special meaning in the law

17   of rape.  A man has sexual intercourse with a female

18   if he penetrates her female sexual organ with his

19   penis to the slightest degree.  He does not have to

20   emit any semen.  As I said before, the force used or

21   threatened can be, but does not have to be, physical

22   force or violence.  A man can commit rape either by

23   using or threatening psychological, moral, or

24   intellectual force.

25              Now, I am speaking about something

1    very different from the sort of argument, persuasion

2    or seduction that might induce a female voluntarily

3    to consent to intercourse.  A man's words or conduct

4    towards a female cannot amount to the use of

5    psychological, moral, or intellectual force unless

6    they wrongfully impair her freedom of will and her

7    ability to chose whether to have sex with the man.

8              Note that in defining these legal

9    requirements of rape, I have not indicated any

10   requirement that the woman put up a fight or resist

11   nor that the man employ or threaten force likely to

12   cause serious bodily injury.  However, you should

13   consider those factors, consider the kind of evidence

14   and the amount of force and the extent of the

15   resistance along with the evidence of all the other

16   relevant facts and circumstances when deciding

17   whether you are satisfied that the Defendant

18   compelled the victim to have sexual intercourse with

19   him against her will and that the Defendant did so

20   either by force or threat of force which is

21   sufficient for rape.

22             Now, that sounds a little bit

23   wishy-washy to a certain extent, and there is a

24   reason for that.  In explaining to you, I cannot

25   refer to specific facts because I do not yet know

1    what the facts will be as you find them.  So I must

2    give you all the various alternatives.  You need

3    first to decide what the facts are, and then having

4    decided what the facts are, focus on the specific

5    elements of the charge that applies to that.

6            I indicated to you you had two

7    decisions to make.  One is with regard to rape, the

8    other with regard to terroristic threats.

9            Within the rape charge itself there

10   are two sub-decisions to make.  One, did the

11   Defendant commit the crime of rape by using force,

12   that is, his conduct was such that by his physical

13   actions he forced the victim to submit to this, and

14   that would be sufficient to be convicted of the

15   charge of rape; or even if you find there was no

16   actual force, if you found that there was the threat

17   of force, that also could be sufficient if that

18   threat of force was in itself so overwhelming as to

19   be the equivalent of actual force in your minds as to

20   her ability to resist it.

21           So if you find that, for example, as

22   was testified to that he threatened to kill her and

23   that to her that was just as overwhelming as if he

24   had simply held her down and done it against her

25   wishes and that a reasonably resolute person would

1    have reacted the same as she did, then under the

2    circumstances, thinking he might really carry it out,

3    she, therefore, put up no resistance, those facts

4    could be sufficient for you to find the Defendant

5    guilty.

6            However, just because I am explaining

7    these various examples to you does not mean that I am

8    implying that is what you are suppose to do.  I am

9    not trying to tell you to do anything.  Do not try to

10   read between the lines what I am saying.  That is

11   your job, and you have to determine from all the

12   facts and circumstances here whether or not these

13   definitions have been met.

14           Let us turn to the elements of the

15   second offense, which is terroristic threats, and to

16   a certain extent, obviously, this is interrelated.

17   The Defendant has been charged with the crime of

18   terroristic threats.  In order to find the Defendant

19   guilty of that crime you must find that each of the

20   elements of the crime has been satisfactorily

21   established beyond a reasonable doubt.

22           There are two elements.  One, that the

23   Defendant threatened to commit a crime of violence.

24   In this case I am referring to the testimony that the

25   Defendant threatened to kill the victim.  And,

1    second, that the Defendant acted with the intent to

2    terrorize another person.

3              A person acts with intent if it is his

4    conscious object or purpose to engage in particular

5    conduct or to cause a particular result.  In this

6    case the particular result we are talking about is

7    that by his threats he attempted to prevent her from

8    telling anybody about what had occurred.  So you have

9    to find that he did threaten to kill her, and that

10   his intent was to cause that particular action, that

11   is, to cause her not to tell anybody about it.

12             If after considering all the evidence

13   you find the Commonwealth has established beyond a

14   reasonable doubt both of those elements, then you

15   should find the Defendant guilty of terroristic

16   threats.  Otherwise, you must find the Defendant not

17   guilty.

18             Now, you will note that in among your

19   options was not an option of, well, gee, I think he

20   is guilty, but I am not sure, or I think he is

21   innocent.  There is only two options.  One, you are

22   so convinced beyond a reasonable doubt that he is

23   guilty or else you say not guilty, and that includes

24   all the other available options such as, well, I

25   think he is guilty or I am pretty sure he is guilty

1  or I think he is innocent, whatever it might be.  It

2  either rises to the level of a conviction, or it does

3  not and you say not guilty.

4          It is your responsibility to accept

5  these instructions I have given you as to the law.

6  However, you collectively are the judge of the facts.

7  It is your responsibility to consider the evidence,

8  to find the facts, and to apply the law to the facts

9  as you find them and decide whether this Defendant

10  has been proven guilty beyond a reasonable doubt.

11          Your decision in this case is

12  obviously a matter of considerable importance.

13  Remember it is your responsibility as jurors to

14  perform your duties and to reach a verdict based upon

15  the evidence as it was presented during the trial.

16  However, in deciding the facts, you must properly

17  apply common sense and draw upon your every day

18  practical knowledge of life as each of you has

19  experienced it.

20          You should keep your deliberations

21  free of any bias or prejudice.  Both the Commonwealth

22  and the Defendant have a right to expect you to

23  consider the evidence conscientiously and to apply

24  the law as I have outlined it to you.

25          You will note that in reviewing the

1    case I did not go into an extensive review of the

2    facts.  This was a fairly short case.  I am sure you

3    have all the testimony fresh in your memory.  To the

4    extent I have commented on the facts to make a point

5    as to the law involved, as I have indicated, I have

6    not indicated anything in regard to how you should

7    decide.  My reference to the facts was merely to use

8    examples for the purposes of explaining the law to

9    you.  It is your responsibility to decide the facts,

10   and that is entirely up to you.

11           In arriving at your verdict, you

12   should not concern yourself with any possible future

13   consequences of your verdict.  If you find the

14   Defendant guilty, then it will be up to the Court at

15   a later time to determine what his sentence might be.

16   The Court would be presented a presentence

17   investigation, further background information about

18   the Defendant, before coming to any decision.  So at

19   this point even I do not know what it might be, but

20   you just do not worry about that.  You do not have

21   anything to do about that.

22           Your function is merely to say guilty

23   or not guilty.  Of course, if you say not guilty,

24   there would be no sentences.  So that again would not

25   be part of your consideration.

1    Upon retiring to deliberate, the first

2    thing you should do is select one of you to be the

3    foreperson, and that person will be the one to

4    announce your verdict when you come back into the

5    courtroom.  That person also would conduct your

6    deliberations, recognize whose turn it is to speak,

7    perhaps conduct a ballot to see if you arrived at a

8    verdict or not.  However, the foreperson has only one

9    vote just like everybody else.

10    Your verdict must be unanimous.  That

11    means all twelve of you must agree to that verdict.

12    However, you do have a duty to consult with each

13    other and to deliberate with a view towards reaching

14    an agreement if that can be done without doing any

15    violence to your own individual judgment.  Each of

16    you must decide the case for him or herself but only

17    after there has been impartial consideration with

18    your fellow jurors.

19    In the course of deliberations each

20    juror should not hesitate to re-examine his or her

21    own views and change his or her opinion if convinced

22    it is erroneous.  However, no juror should surrender

23    an honest conviction as to the weight or effect of

24    the evidence solely because of the opinion of his or

25    her fellow jurors or for the mere purpose of

1    returning a verdict.

2              Do counsel have any suggested changes

3    or additions to the charge?  If so, please approach

4    sidebar.

5              MR. MACVEIGH:  Could we, please?

6              THE COURT:  Sure.

7                     * * *

8              (Whereupon, the following discussion

9    was held on the record at sidebar:)

10             MR. MACVEIGH:  I'm just thinking out

11   loud right now, Judge.  I don't know whether you gave

12   the standard instruction about fear or favor,

13   sympathy, and prejudice, but given that she had a

14   breakdown here yesterday, I wish you would.

15             THE COURT:  I think I read that part.

16             MR. MACVEIGH:  Do you know?

17             MR. KELLEY:  Yeah, he did.

18             MR. MACVEIGH:  Okay.

19             THE COURT:  I'll just save -- I'll

20   mention it.  Just to be safe, I'll mention it.

21             (Whereupon, the discussion held at

22   sidebar was concluded.)

23                     * * *

24             THE COURT:  Counsel has asked if I had

25   given that portion of the charge about keeping your

1    deliberations free of any bias or prejudice.  I think

2    I read that part, but just in case I skipped over it,

3    I'll mention it again and, for example, would make

4    reference to the fact that the victim broke down

5    during the course of the proceedings.

6            Your sympathy for her would not be

7    appropriate in reaching a verdict.  It is proper for

8    you to consider her demeanor and the way she reacted

9    in determining whether she is telling the truth or

10   not, but mere sympathy for her position would not be

11   an appropriate matter.

12           With that additional instruction, I

13   will conclude.  It is now ten after two.  We will be

14   here awaiting your verdict.  If you arrive at a

15   verdict quickly, come back and tell us what your

16   verdict is.  If it takes you a couple hours, we will

17   wait.  However long it takes you to deliberate, that

18   is how long it is appropriate to deliberate.

19           I would call your attention to the

20   fact that it is possible to communicate with the

21   Court if you have some question about the matters of

22   law that I just explained to you.  It is not easy,

23   but it is possible.  I only mention that because it

24   is fairly time consuming.  If you would need to ask a

25   question, you have to write it down on a piece of

1    paper, have it signed by the foreperson, knock on the

2    door, and give it to the tipstaff.  He brings it to

3    me.  I call the attorneys in.  We talk about what the

4    appropriate answer is.  We then bring you back in the

5    courtroom, and we go through the same process we are

6    going through now.  Obviously that takes 20, 25

7    minutes to do.  So please don't do it lightly.

8         Before you do it, the first thing you

9    should do if you don't remember something is talk to

10   your fellow jurors.  Maybe somebody else remembers

11   exactly what was said, and between the group of you

12   you can resolve it satisfactorily.  But if after you

13   have all discussed it you all arrive at the point

14   where you say, Well, gee, we are not sure about this,

15   we want to ask the Judge, that procedure is

16   available.

17        The case is now with you.  We'll be

18   awaiting your verdict.  You may retire to the jury

19   room.

20                        * * *

21        (Whereupon, the jury retired to

22   deliberate upon a verdict.)

23                        * * *

24        THE COURT:  Let the record show that

25   the Defendant and counsel are present in the

1  courtroom, and that the jury has announced a verdict.

2  You may take the verdict, please.

3            THE CLERK:  Will you please stand.

4  Ladies and gentlemen of the jury, have you agreed

5  upon a verdict?

6            THE JURY:  Yes.

7            THE COURT:  Who shall speak for you?

8            THE FORELADY:  I will.

9            THE CLERK:  What say you in the issue

10  joined between the Commonwealth of Pennsylvania and

11  the Defendant, Calvin Roth?  Do you find the

12  Defendant guilty or not guilty of rape?

13            THE FORELADY:  Guilty.

14            THE CLERK:  Guilty or not guilty of

15  terroristic threats?

15            THE FORELADY:  Guilty.

17            THE CLERK:  Ladies and gentlemen of

18  the jury, hear your verdict as the court has recorded

19  it.  You find the Defendant guilty of rape, guilty of

20  terroristic threats, and so say you all?

21            THE JURY:  Yes.

22            THE COURT:  All right, ladies and

23  gentlemen, that concludes your service in the case.

24  We thank you for your efforts.  You may return to the

25  Central Jury Room.

1          Mr. Roth, even though the jury has

2   found you guilty, you still have certain rights

3   including specifically the right to appeal their

4   decision.  If you find that legal mistakes were made

5   in the course of the trial, you may file a motion for

6   a new trial or in arrest of judgment.  Any matter

7   that you do not raise in those motions would be

8   considered waived.  Motions must be filed within 10

9   days of today's date.

10          You are entitled to have counsel for

11   that purpose.  Mr. MacVeigh will continue to

12   represent you, and you should consult with him as to

13   whether you should appeal or not and what possible

14   grounds there may be to appeal.  Do you have any

15   questions about any of those matters?

16          DEFENDANT ROTH:  No.

17          THE COURT:  All right.  Do you wish on

18   the record to advise Mr. MacVeigh at this point of

19   your desire to appeal?

20          DEFENDANT ROTH:  Yeah, I want to

21   appeal it.

22          THE COURT:  Very well.  We'll note

23   that for the record.  Mr. MacVeigh can act

24   accordingly.

25          We direct that there be a presentence

1    investigation.  Defendant to return for sentencing on

2    September 2nd, 1993, at 9:30 a.m.  Should any motions

3    be filed, argument of those motions will be August

4    19th, 1993, at 9:30 a.m.

5                    Okay.  Any questions?

6                    DEFENDANT ROTH:  Yeah.  If I appeal

7    this case, right, I want -- I mean does it have to be

8    in this county?

9                 THE COURT:  Yes.

10                   DEFENDANT ROTH:  It's got to be?  I

11   can't take t out of this county and take it to

12   another county?

13                   THE COURT:  No, you can't take it to

14   another county, but after you file motions here, if

15   they are refused, then you would have the right to

16   appeal again to the Superior Court.

17                   DEFENDANT ROTH:  Well, that's what I'm

18   talking, Superior Court.

19                   THE COURT:  But you have to file them

20   here first in order to preserve the issues for the

21   record of a ruling made by the lower court as to

22   those matters of error that you are raising, and then

23   it is those matters that you would be allowed to

24   appeal further.  So you have to make the record down

25   here first.

1        DEFENDANT ROTH:  Okay.

2        THE COURT:  Defendant is remanded to

3   jail.  Does he have bail at the present time?

4        DEFENDANT ROTH:  No, I don't have no

5   bail.

6        THE COURT:  Is there any bail set at

7   all?

8        MR. KELLEY:  I think he was returned

9   as a fugitive from Indiana.

10        THE COURT:  Let me say for the record

11   to the extent that any bail exists it is hereby

12   revoked, and the Defendant is remanded to the York

13   County Jail without bail pending any appeal.

14                    * * *

15              (END OF PROCEEDINGS)

16                    * * *

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3          I hereby certify that the proceedings

4    and evidence and Charge are contained fully and

5    accurately in the notes taken by me on the trial of

6    the above cause, and that this copy is a correct

7    transcript of the same.

8

9

10

11                        _Debra S. Romesberg_

12                        Debra S. Romesberg,
                          Official Court Reporter

13

14

15

16          The foregoing record of the proceedings

17    upon the trial of the above cause is hereby approved

18    and directed to be filed.

19

20

21                        _____

22                        John H. Chronister,
                          Judge

23

24

25

**APPENDIX B**

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

Criminal Division

COMMONWEALTH OF PENNSYLVANIA : No. 2341 CA 1992
                                          :
            vs.                           :
                                          :
Calvin W. Roth, Jr.                       : Rape
                                          : Escape
                                          : Terroristic Threats

### MOTION FOR NEW TRIAL

And now, this 27th day of July, 1993, the above named
defendant, by his attorney, J. David MacVeigh, moves the Court for a
new trial in the above captioned matter for the following reasons:

1.  That the defendant was convicted on July 21, 1993, after a
jury trial before Judge John H. Chronister.

2.  That during dirct examination the victim broke down weeping
and sobbing.

3.  That the court recessed the trial, but the victim's sobs
were even louder while she was outside the courtroom than while she
was on the stand.

4.  That this took place within the view and hearing of the
jury.

5.  That the court erred in denying the defendant's motion for
mistrial after the incident described above took place.

Respectfully submitted,

*J. David MacVeigh*

J. David MacVeigh
Assistant Public Defender

APPENDIX C

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

COMMONWEALTH           :  No. 2341 C. A. 1992
                       :
        VS             :  1) Escape
                       :  2) Rape
CALVIN WILLIAM ROTH, JR.  :  3) Terroristic Threats

                          (Argument)


        York, Pa., Thursday, August 19, 1993

    Before the Honorable John H. Chronister, Judge


APPEARANCES:

        THOMAS H. KELLEY, Esquire
        Assistant District Attorney
        For the Commonwealth

        J. DAVID MacVEIGH, Esquire
        Assistant Public Defender
        For the Defendant

                    * * *

        MR. KELLEY:  Your Honor, the
Commonwealth calls the case of Calvin William Roth,
Jr., 2341 Criminal Action of 1992.  The Defendant is
charged with escape, rape, terroristic threats.
Trial was held before Your Honor 21st of last month
in which the Defendant was convicted of all charges.

        Actually, he had earlier pled guilty
to the escape charge.

        We are here on the Defendant's
post-trial motions for a new trial.

        MR. MacVEIGH:  Your Honor, in
reviewing the record established at trial, the issue
that arose to my mind was the Court's failure to

declare a mistrial despite my request. I have to
admit, however, that my research has disclosed no
cases that overturned or that held it an abuse of
discretion when the Trial Court failed to declare a
mistrial particularly where a cautionary instruction
had been given. Now, the nature of the cautionary
instruction in the research was never delineated.

A long story short, I can't find at
this point any authority to support the proposition
I'm putting to the Court, but I would hope that the
Court would recognize that the interest here lies not
only in obtaining conviction but in obtaining a
conviction properly.

THE COURT: Mr. Roth, is there
anything you wish to add to that? We're talking
about legal mistakes made at trial at this point. I
recognize that Mr. MacVeigh is the legal person here
and you're not, but anything you want to to say, I'll
be happy to hear.

THE DEFENDANT: This is my --

THE COURT: This is not sentencing.
This is just in regard to mistakes made at trial, if
any, and any reason why you should be given a new
trial. Is there anything that you think that was
done wrong --

THE DEFENDANT: Yeah, because --

THE COURT: -- that Mr. MacVeigh
didn't raise?

THE DEFENDANT: Yes. He did what he
was supposed to do. I mean, to my knowledge he has
done okay. I think he did his job but what I seen
there was a couple things that shouldn't -- that
wasn't even brought up. I mean, there was things
that I wanted; people to be there that wasn't here,
and plus there was things that I wanted here. I
mean, like I said, people that wasn't here. I mean,
I wanted people here. Like the doctor should have
been here.

There was no evidence shown through
the State of the box -- the stuff that they said that
they had. I never seen nothing in trial. Okay.

There was things said and I didn't even get a chance to say what I really wanted to say on that stand because I was cut off, and it was a lot that wasn't said. I mean, that's all I can say. There was a lot that wasn't said. A lot of people that wasn't here --

THE COURT: Very well.

THE DEFENDANT: -- that should have been here.

THE COURT: Those are matters that would come up more correctly in regard to a motion for a new trial on the basis of after-discovered evidence or for ineffective assistance of counsel or something like that. They don't really apply to errors made at the actual trial, and you'll have to discuss those matters with Mr. MacVeigh. And if he believes it appropriate, he can try to follow-up on those matters, but they're not in front of me this morning.

All right.

As to the motion for a new trial that was filed, the Court finds that the Defendant was not entitled to a mistrial based on the fact that the victim broke down weeping and sobbing during the course of the trial. It was well within the Court's discretion to instead take a brief recess, allow the victim to compose herself and return to the witness stand and allow testimony to resume.

Therefore, the Defendant's motion for a new trial is hereby refused, and the case will proceed for sentencing on the previously scheduled date.

MR. MacVEIGH: Was the previously scheduled date September the 2nd?

THE CLERK: Yes.

* * *

sji

APPENDIX D

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH | : | No. 2341 C. A. 1992 |
| | : | |
| VS | : | 1)  Escape |
| | : | 2)  Rape |
| CALVIN W. ROTH, JR. | : | 3)  Terroristic Threats |

[SENTENCE]

York, Pa., Thursday, September 2, 1993

Before Honorable John H. Chronister, Judge

APPEARANCES:

THOMAS H. KELLEY, Esquire
Assistant District Attorney
For the Commonwealth.

J. DAVID MACVEIGH, Esquire
Assistant Public Defender
For the Defendant.

* * *

MR. GRAFF:  Good morning, Your Honor.
The first matter before you is the matter of the
Commonwealth versus Calvin William Roth, Jr.
It is No. 2341 Criminal Action of 1992.  Mr. Roth is
charged with escape, rape, and terroristic
threats.

After a trial on July 21, 1993,
the Defendant was found guilty of rape and
terroristic threats and had pled guilty to the escape
charge.  He's before you today for sentencing
purposes.

Does Your Honor have a copy of the
pre-sentence investigation?

MR. MACVEIGH:  Mr. Roth has read the

pre-sentence report and tells me it's essentially accurate.

During the trial the victim does not testify to having been felt very sore.  I recall that she did testify that his hands were on his shoulders but there were no wounds.

Your Honor, we are, of course, bound by the jury's decision here.  My client nonetheless maintains his innocence and it's for that reason that he would not feel any sense of remorse.

To sentence in the upper -- I shouldn't even call it upper ends of the aggravated range.  To sentence to the maximum possible, I just don't see a reason for it.

I would point out that the victim was not injured physically to the extent that she needed any kind of medical treatment as far as I'm aware.

There have been, and I'm sure this Court has tried cases in which the victims were far more seriously injured than was this victim; and as a result of that, Your Honor, I would hope that you would see fit to sentence Mr. Roth in the standard range or at least not at the maximum that the law permits.

Of course, he had pled guilty to the escape and I think the Court should take into consideration that a person's admission of guilt is considered in I suppose mitigating the effects of the sentence.

Mr. Roth, you can tell Judge Chronister anything you'd like to say.

THE DEFENDANT:  I ain't got nothin' to say.

THE COURT:  Very well.

MR. KELLEY:  Your Honor, I would just like to state for the Court that the Defendant was at the time of this offense incarcerated for a simple assault which occurred in Adams County.

He was receiving drug and alcohol treatment at the time he committed the offense. After having committed the offense, he left the jurisdiction of Pennsylvania and went to Indiana.

The amount of time he was gone from Pennsylvania escapes me but while he was in Indiana he committed another offense for which he received a sentence of, I believe, 5 to 12 years.

The Commonwealth's position is that this particular Defendant, the gravity and the seriousness of his crimes, has continued to escalate from the time he was a juvenile to the instant offense.

I think based upon the fact that he was incarcerated at the time and the fact that something was, indeed, taken from the victim, although she was not seriously injured at the time, I think that there was sufficient testimony to put this into the aggravated range and, therefore, we stand by the recommendation of the probation and parole department and ask that you sentence in the aggravated range.

THE COURT:  Is there some reason why the pre-sentence report does not contain a recommendation in regard to the terroristic threats?

MR. KELLEY:  No.  I don't have an excuse for that omission, Your Honor.

THE COURT:  Do you agree, Mr. MacVeigh, it's appropriate to impose terroristic threats as well as the other offenses?

MR. MACVEIGH:  I have no objection to that.  I would say it's all part and parcel of the same incident.

* * *

O R D E R

The Court has had the benefit of a pre-sentence investigation, which we incorporate by reference into the sentencing colloquy.

The Court agrees with the pre-sentence report that the Defendant does not appear to be amenable to treatment or rehabilitation as evidenced by his past behavior.

The Court believes it appropriate to impose maximum sentences because of the Defendant's extensive prior record because of the fact that the crime was committed at a time when the Defendant was incarcerated. Although he was in a halfway house program, it still was incarceration.

The Court also takes into consideration the fact that when the Defendant left the state, which was an escape from incarceration, that he committed another offense in another state of a very serious offense.

We also take into account the effect this has had on the life of the victim. To say that serious injuries were not imposed on this victim then that is to belittle the serious nature of the injuries.

Be they psychic or physical, the Court believes they are still very serious. This is going to have a tremendous impact on this victim's life and we believe that perhaps the psychic nature of the injuries are worse than the physical injuries may have been.

We also take into account the Defendant's threat to the victim to kill her if she reported the incident or called it to the attention of the authorities.

The Court considers all of those matters aggravating factors which call for a imposition of a maximum sentence. Therefore, in the rape case, the Defendant is sentenced to 10 to 20 years in the state penitentiary.

On the terroristic threats, the Defendant is sentenced to one to two years consecutive to the rape sentence.

And in regard to the escape, the Court believes that as escapes go this was not the most horrible of escapes. Clearly, the Defendant was in a

halfway house and in which he could easily leave.
But it is not a situation where he broke out of jail,
so to speak; and, therefore, on the escape, we will
not impose the maximum sentence.

We impose a sentence of 3 to 6 years
in the state penitentiary.

The Defendant is also directed to pay
the costs of prosecution, all of these sentences to
be consecutive to each other and to be consecutive to
any other sentence that the Defendant is now serving
in this or any other state.

The Defendant shall receive credit for
time served.

\* \* \*

THE COURT:  Mr. Roth, you are now
advised that you have the right to appeal this
sentence; and if you wish to appeal, you have the
right to have an attorney and Mr. MacVeigh will
continue to represent you.

You have the right to represent
yourself if you don't want Mr. MacVeigh.  If you wish
to appeal, the appeal must be filed to the Appellate
Court within 30 days of today's date.  Failure to do
so will waive your right to appeal.

THE DEFENDANT:  I don't want David
MacVeigh as my lawyer.  I want another lawyer.  I'm
asking the Court for another lawyer.

THE COURT:  I acknowledge your
request.  The Public Defender's Office will continue
to represent you.  As to which public defender it may
be is an option of the Public Defender's Office.

If they wish to continue you with
Mr. MacVeigh, that is up to them and not to the
Court.

If you feel that Mr. MacVeigh has done
something improper and that is the basis that he was
ineffective in his representation, then you would
have to file a petition under the Post Conviction
Relief Act and set forth in that petition the bases

that you have of why you believe that Mr. MacVeigh
did not do what he was supposed to do; however, that
will not stop your time running on your right to file
an appeal.

If you want an appeal filed whether
you continue with Mr. MacVeigh, you should instruct
him that you want an appeal.

THE DEFENDANT:  I want an
appeal.

THE COURT:  We note for the record
that you do want an appeal filed and instruct
Mr. MacVeigh to file it.

After it's filed if you want to pursue
the matter of another counsel, you have to do it by
written petition and the mere fact that you say you
want a different lawyer is not good enough.

You have to show specific reasons that
Mr. MacVeigh did something wrong and why and that
whatever he did wrong affected the trial, in which
case there would be a possibility of a new lawyer;
but it would only be after hearing and there is an
opportunity for Mr. MacVeigh to explain whatever it
is you are accusing him of doing improper and what
his reasons were for doing what he did.

So at this point he's still your
attorney and I'm instructing Mr. MacVeigh to file the
appeal.  And if he believes the appeal is not valid,
he can take whatever the appropriate step is.  At
this point if you don't want him, you can file a
petition.

THE DEFENDANT:  I'm filing one because
I don't want him.

MR. MACVEIGH:  Consecutive to one
another?

THE COURT:  To any other sentence.

MR. MACVEIGH:  And consecutive to each
other?

THE COURT:  Yes.

MR. MACVEIGH:   So the total sentence
is 14 years as a minimum.

THE DEFENDANT:   Wait a minute.

THE COURT:   The sentence is 14 to 28
years.

THE DEFENDANT:   You said three and six
for escape.  That is consecutive too.  I thought that
was being run concurrent with the time.  I signed the
paper for that in Court.  I signed the paper to plead
guilty and that would be run concurrent with any
sentence.

MR. MACVEIGH:   I think he may have.

MR. KELLEY:   The agreement was that he
plead guilty to that and it run concurrent with any
charge.

THE COURT:   If that was the agreement,
then the escape is to run concurrent.

MR. KELLEY:   The effect would be 11 to
22.

THE COURT:   If that was the deal, that
was the deal.

* * *

O R D E R (Cont'd.)

We amend the order so that the
sentence on the escape charge is to run concurrent
and not consecutive to all of the other sentences
imposed.

* * *

THE DEFENDANT:   I want to know if
there is anyway I can have a copy of the my
pre-sentence investigation and I copy of the Court
Order of my sentence.

THE COURT:   A copy of the
sentencing colloquy will be provided to your counsel.
and I'll instruct Mr. MacVeigh to make a copy and
give it to you as well.  You have the pre-sentence as

well.

     MR. MACVEIGH:  I do, Your Honor.  If you direct I'll be happy to give him a copy but beyond that the rules of criminal procedure forbid that.

     THE COURT:  I direct that you provide him a copy of that.

* * *

kmb

APPENDIX E

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

Criminal Division

COMMONWEALTH OF PENNSYLVANIA : No. 2341 Criminal Action 1992
                           :
            vs.            :
                           : Escape, Rape, Terroristic
Calvin W. Roth, Jr.        :   Threats

PETITION FOR RECONSIDERATION OF SENTENCE

To the Honorable, the Judges of the said Court:

And Now comes, Calvin W. Roth, Jr., petitioner and defendant in the above matter by his attorney, J. David MacVeigh, and respectfully represents:

1.  That the petitioner was sentenced on September 2, 1993, by the Court to undergo imprisonment in a state correctional institution for not less than 10 nor more than 20 years on the charge of Rape, not less than 1 nor more than 2 years on the charge of Terroristic Threats, and not less than 3 nor more than 6 years on the charge of Escape.  The sentence on the Rape and Terroristic Threats charges were ordered to be served consecutively and the Escape charge was ordered to be served concurrently to the Rape and Terroristic Threats sentences.

2.  That the sentence imposed by the Court violates Section 9721(b) of the sentencing code in that the sentence on the Rape charge is the upper limit of the aggravated range and also the maximum sentence for this offense and it was imposed without justification or explanation.

3.   That the Court did not state sufficient legitimate reasons for imposing the maximum sentence on the Rape charge and for ordering that the Terroristic Threats sentence be served consecutively to the Rape sentence.

Wherefore, the defendant requests that the lower Court grant his request for reconsideration of sentence.

Respectfully submitted,

*J. David MacVeigh*
J. David MacVeigh
Assistant Public Defender

APPENDIX F

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

COMMONWEALTH                    : No. 2341 CA 1992
                                :
        VS                      :
                                :
CALVIN ROTH                     :[RECONSID. SENTENCE]

        York, Pa., Thursday, September 30, 1993

    Before The Honorable John H. Chronister, Judge


APPEARANCES:

        WILLIAM H. GRAFF, Esquire
        Assistant District Attorney
        For the Commonwealth

        J. DAVID MACVEIGH, Esquire
        Assistant Public Defender
        For the Defendant

                    * * *

        MR. GRAFF:  This is Commonwealth of
Pennsylvania versus Calvin Roth, 2341 of '92, charge
is rape and terroristic threats.  This is the time
and date scheduled for a motion on reconsideration of
sentence since the Court refused Mr. Kelley's motion
for continuance this morning.
            THE COURT:  Mr. MacVeigh.
            MR. MACVEIGH:  Your Honor, just so the
record is clear, the last -- last time Mr. Roth
appeared at sentencing, I was directed to provide him
a copy of the pre-sentence report.  I copied my copy
of that this morning and gave it to him.  I think I
was also directed to give him a copy of the colloquy
conducted when he pled guilty I think just prior to
trial to the offense of escape; and as far as I know,
at least I don't have a copy of that colloquy.  I
don't think it's been transcribed, so I cannot give
him that.

            Your Honor, I filed this at Mr.
Roth's direction.  Just minutes ago I suggested to
him that I myself am a little bit reluctant to pursue
it; but he wanted me to, so I'll let him address the

Court.

THE COURT:  Very well.

MR. MACVEIGH:  Say anything you want, Calvin.

THE DEFENDANT:  I don't know what to say.

THE COURT:  Sorry.  I can't hear you.

THE DEFENDANT:  I'm thinking what I want to say.  I don't got noting to say.  He don't -- he not telling me anything right.  I don't know.  He's the one that filed it for me.  I asked him -- because I asked to have it filed.

I mean I got sentenced 10 to 20 years for something I still didn't even do; and I ain't going to change my agreement on that but I'm just saying.

THE COURT:  For purposes of the motion and for this argument --

THE DEFENDANT:  Yeah.

THE COURT:  You can't discuss whether you're guilty or not.

THE DEFENDANT:  Okay, well --

THE COURT:  The question today assuming you are guilty, what would an appropriate sentence be?  Now as far as disputing whether you're guilty or not, you still have the right to appeal the jury's decision and Mr. MacVeigh will still follow through on that.  But the purposes of today's hearing is to establish if the Court made any legal mistakes in regard to your sentencing, if an improper sentence was imposed accepting as fact that you were guilty based on the jury's verdict.

MR. MACVEIGH:  Your Honor, I don't wish to belittle the serious nature of the offense; but I think we should consider here if we could for a minute the lack of physical harm that was done the victim.

Arguably there was psychological harm done to her and unquestionably Mr. Roth has a maximum prior record score; but to have sentenced him to the absolute maximum that he could have received even above the aggravated range without any physical injuries to her, I think the Court failed to take that into consideration.

THE COURT:  All right.

* * *

O R D E R

The request to reconsider sentence is refused.  We'll concede Mr. MacVeigh is

2

correct in stating that there were not serious
physical injuries; however there were serious
psychological injury shown to the victim as shown by
her reactions in the courtroom. In addition, the
offense was committed at a time when the Defendant
was still technically incarcerated, and also the
Defendant's prior record such and even his conduct
after he escaped included another violent crime after
that time. So taking all those factors into account,
they clearly outweigh the lack of actual physical
injury; and we believe that the maximum sentence
imposed was appropriate. Therefore, the petition to
reconsider sentence is refused.

$$* * *$$

THE COURT: You still have the right to
appeal the jurys decision. Mr. MacVeigh will follow
through on that appeal.

aln, 10/14/93

APPENDIX G

Oct 4, 1993

IN THE SUPERIOR COURT OF PENNSYLVANIA
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA          :
                        VS.           :          DOCKET#: 2341-CA-1992
CALVIN W. ROTH, JR.                   :            OTN: C 842677-3
                        Appellant     :
                                      :

MOTION FOR JUDGMENT OF ACQUITTAL NOT WITHSTANDING
THE VERDICT OF A NEW TRIAL

TO THE HONORABLE JUDGES OF THE SUPERIOR COURT:

This Motion by the appellant, Calvin W. Roth, Jr.
respectfully represents the following:

1. That he is the appellant in the above-captioned matter.

2. The following facts are the grounds for this action by
the appellant.

I. Counsel for the appellant during the trial in
the York County Court of Common Pleas was ineffective in the
representation of the appellant, in that;

a) Counsel failed to object to the alleged victums
blantent out-burst while on the witness stand, which was a
tactic used by the prosecution to sway the jury. Alleged victum
was removed from the courtroom for a period of three minutes then
placed,immediately,placed,back on the witness stand.

b) Counsel failed to enter into evidence testimony
(written and notorized) by key witness for the appellant.

c) Counsel failed to submit a request for polygraph
testing of both the appellant and alleged victum, as requested
by the appellant.

II. Verdict was against the weight of the evidence, in that;

    a) Prosecution failed to present any documented medical reports supporting the alleged rape.

    b) Verdict, lacked any phsyical proof, scares, bruses or any other phsyical evidence to support the verdict.

    c) There were various inconsistencies in the testimony of the alleged victum.

    d) Conviction obtain through prosecutional misconduct, prosecution acted as "a vindictive seeker for vengeance."

    Wherefore, the appellant, Calvin W. Roth, Jr., moves this court to grant this appeal and render a final decision upon the review of the appellant's supporting brief.

Respectfully submitted,

Appellant Pro Se

cc: file

APPENDIX H

IN THE SUPERIOR COURT OF PENNSYLVANIA

HARRISBURG DISTRICT

Commonwealth of Pennsylvania : No. _____ Harrisburg 1993
                             : No 2341 Criminal Action 1992
          vs           : Escape
                             : Rape
   Calvin W. Roth      : Terroristic Threats

## PETITION TO REMAND TO COURT OF COMMON PLEAS

TO THE HONORABLE, THE JUDGES OF THE SAID COURT:

1.  Petitioner is J. David MacVeigh, who was appellant's counsel at trial.

2.  Following denial of post-trial motions an appeal to this court was filed September 24, 1993.

3.  On October 4, 1993 counsel learned that appellant had filed a pro se "Motion for Judgment of Acquittal Not Withstanding (sic) the Verdict of a New Trial" (sic) a copy of which is attached and marked as Exhibit "A".

4.  Appellant's pro se motion refers to three examples of alleged ineffectiveness by trial counsel.

5.  For trial counsel to continue to represent appellant would be a conflict of interest.

6.  A copy of appellant's pro se motion is attached and marked as Exhibit A.

Wherefore, counsel requests that this case be remanded to the trial court for appointment of new counsel to pursue any possible remedies deemed necessary.

Respectfully submitted,

J. David MacVeigh
Assistant Public Defender

APPENDIX I

IN THE SUPERIOR COURT OF PENNSYLVANIA

SITTING AT HARRISBURG

COMMONWEALTH OF PENNSYLVANIA     :
                                      :

            v.                     :         No. 711 Harrisburg 1993
                                        :

CALVIN W. ROTH                      :

## O R D E R

       AND NOW, to-wit, this 5th day of November, 1993, upon consideration of appellant's petition for remand filed in the above-captioned matter, the same is hereby GRANTED. IT IS HEREBY ORDERED that the matter be remanded to the Court of Common Pleas of York County for the appointment of new counsel.

                                       PER CURIAM





# The Superior Court of Pennsylvania
## Office of the Prothonotary
### 434 MAIN CAPITOL BUILDING
### HARRISBURG, PENNSYLVANIA 17108

DAVID A. SZEWCZAK, ESQUIRE
PROTHONOTARY

(717) 787-6...

M E M O R A N D U M:

DATE:    November 5, 1993

TO:      John David MacVeigh, Asst. P.D.

FROM:    Patricia A. McKeever, Chief Clerk
         Superior Court of PA – Harrisburg District

RE:      Commonwealth v Calvin W Roth, Jr
         No. 711 Harrisburg, 1993

This is to advise that the attached Order has been entered
in the above-captioned matter.

/eh
Attachment

cc:  Hon. John Chronister
     Thomas H. Kelley, Esquire
     Clerk of Court, York Co.  (2341 CA 1992)

Prothonotary's Office
Superior Court of Pennsylvania
P. O. BOX 624
HARRISBURG, PENNSYLVANIA 17108

17401-1501 B4

HBG. PA 170 1SS#1 11/08

HARRISBURG PA
NOV 5'85

U S POSTAGE
FEB 2 9 ==

Thomas H. Kelley's Office
District Attorney's Office
York County Courthouse
28 E. Market St.
York, PA  17401

APPENDIX J

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

Criminal Division

Commonwealth of Pennsylvania: No. 2341 CA. 1992

vs

Calvin W. Roth

: Escape
: Rape
: Terroristic Threats

ORDER

AND NOW, TO WIT, this *1ST* day of December, 1993, it is hereby ordered that *Frank Arcuri*, Esq., is appointed to represent the above captioned defendant, Calvin W. Roth, in all pending criminal actions with the costs to be borne by the County of York.

BY THE COURT.

*John H. Chronister*
Judge

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
Criminal Division

Commonwealth of Pennsylvania : No. 2341 CA. 1992

            vs                :

                           : Escape

Calvin W. Roth         : Rape

                           : Terroristic Threats

## PETITION TO APPOINT COUNSEL

TO THE HONORABLE, THE JUDGES OF THE SAID COURT:

The petition of J. David MacVeigh, Assistant Public Defender respectfully represents:

1. Following the trial on July 21, 1993, the defendant was convicted and on September 2, 1993 was sentenced to serve 11 to 22 years.

2. Post-trial motions were argued and denied on August 19, 1993.

3. The defendant, acting pro se, sent a document entitled "Motion For Judgement of Acquittal Not Withstanding (sic) the Verdict of a New Trial" (sic) to the court.

4. An appeal to the Superior Court was filed on September 24, 1993.

5. Counsel learned of this document on October 4, 1993.

6. The document alleges several instances of counsel's ineffective assistance.

7. The document should be treated as a petition under the PCRA and new counsel should be appointed for the defendant.

8. The Superior Court has remanded this to the Court of Common Pleas to proceed on the Post Conviction Relief Act Petition.

APPENDIX K

Commonwealth of Pennsylvania ●    }    In The Court Of Common Pleas
   YORK COUNTY, ss.                        Criminal Division Of York County

To   David MacVeigh, Esquire, York County Public Defender's Office, York, PA

   PCCR HEARING - APPEAR WITHOUT FURTHER NOTICE
      Please disregard subpoena for hearing dated 3/28/94)


ı are hereby required that setting all business and excuses aside, you be and appear in your proper p
ore the Judges of the COURT OF COMMON PLEAS - CRIMINAL DIVISION, to be held during the te
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx on Tuesday, April 12, 1994 xxxxxxxxxxxxx CR #7 at 1:30PM    to tes
   truth according to your knowledge in a certain Criminal Action No.    2341 CA 1992
our said Court before the Judges thereof, undetermined and then and there to be tried between
nmonwealth and    CALVIN W. ROTH, JR.                   , Defendant, ON PART OF THE COMMONWE
ı this YOU ARE NOT TO OMIT under the penalty of law, and you shall be and appear in said Court eac
ıl the conclusion of said case.

   WITNESS the Judges of said Court, at York,      February 24, 1994

ıN RECEIPT OF THIS SUBPOENA, YOU SHOULD IMMEDIATELY CON-
⊃T THE DISTRICT ATTORNEY'S OFFICE AT (717) 771-9600. YOU WILL BE
ıTIFIED OF THE SPECIFIC DATE ON WHICH YOUR CASE IS SCHEDULED
ı TRIAL.

                                          *Marlyn J Holtzaffe*
                              ── CLERK OF COURTS          CLERK OF COMMON PLEAS CRIMINAL DIVISION

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : No. 2341 Criminal Action 1992
                             :
                     VS      :
                             :
        Calvin Roth          :

ORDER

The Court scheduled a Post Conviction Relief Act hearing for May 31, 1994 on the defendant's Post Conviction Hearing Act Petition. However the defendant is presently serving a sentence in the State of Indiana. The Commonwealth requested temporary custody of the defendant for purposes of the hearing. The State of Indiana has refused to grant this request. Indiana contends that if they would consent, they would lose their jurisdiction under the Interstate Agreement On Detainers. Since the State of Indiana will not release the defendant, the hearing on the Post Conviction Relief Act Petition is hereby continued generally until such time as the defendant finishes serving his Indiana sentence, and can be brought back to York on the Pennsylvania detainer. That exact date is uncertain. The defendant shall advise the Court in writing at the time he is brought back to Pennsylvania so that a date for the hearing may be scheduled.

BY THE COURT,

_John H. Chro_____

JOHN H. CHRONISTER - JUDGE

DATE: _June 16, 1994_

APPENDIX M

J.S61015/95

COMMONWEALTH OF PENNSYLVANIA,  :    IN THE SUPERIOR COURT
              Appellee         :        OF PENNSYLVANIA
                               :
          v.                   :
                               :
CALVIN W. ROTH, JR.,           :
              Appellant        :    No. 711 Harrisburg 1993

          Appeal from the judgments of sentence entered
          September 2, 1993, in the Court of Common Pleas
          of York County at No. 2341 CA 1992.


                        J U D G M E N T


              ON CONSIDERATION WHEREOF, it is now here ordered and

      adjudged by this Court that the judgment of the Court of

      Common Pleas of    YORK                County be, and the same

      is hereby    AFFIRMED.



                                        BY THE COURT:



                                        _____
                                        PROTHONOTARY


      Dated:   Dec. 14, 1995  _____

J.S61015/95

COMMONWEALTH OF PENNSYLVANIA,  :    IN THE SUPERIOR COURT
        Appellee             :       OF PENNSYLVANIA
                        :
        v.                 :
                        :
CALVIN W. ROTH, JR.,        :
        Appellant           :      No. 711 Harrisburg 1993

        Appeal from the judgments of sentence entered
        September 2, 1993, in the Court of Common Pleas
        of York County at No. 2341 CA 1992.

BEFORE:

MEMORANDUM:                **F I L E D** DEC 1 4 1995

    This appeal is from the judgments of sentence entered by the
Court of Common Pleas of York County (Chronister, J., presiding).
On July 21, 1993, following a jury trial, appellant, Calvin Roth,
was convicted of rape,[1] terroristic threats,[2] and escape.[3]
Thereafter, he was sentenced to an aggregate term of eleven to
twenty-two years incarceration. Appellant now presents one issue:
whether the trial judge erred in refusing to grant a mistrial after
an emotional outburst by the victim during her testimony.

    The underlying facts of this case are not in dispute.
Appellant was charged with the rape of the victim after he allegedly
assaulted her while both were patients at an in-patient drug and
alcohol treatment center.

    At trial the Commonwealth presented the victim as its principal
witness. During her testimony the Commonwealth's attorney asked the

---

[1]  18 Pa.C.S. §3121.

[2]  18 Pa.C.S. §2706.

[3]  18 Pa.C.S. §5121.

J.S61015/95 - 2

victim to describe the incident. During that description appellant's attorney asked for a bench conference. The trial judge granted a sidebar discussion during which the following exchange occurred.

| | |
|---|---|
| MR. MACVEIGH: | Judge, I suppose the record will reflect that the witness is really now sobbing rather heavily, and Mr. Kelley gave her a glass of water. That hasn't calmed her down much. I'm going to have to ask for a recess. In fact, she's being helped out right now by the D.A. victim witness coordinator. I'd ask for a mistrial. |
| THE COURT: | We'll take a brief recess to have her compose herself. We will oppose the Defendant's request for mistrial. |

Following this exchange the judge addressed the jury thusly:

| | |
|---|---|
| THE COURT: | Ladies and gentlemen we will take a brief recess to allow the witness to compose herself. |

N.T. Trial Transcript p. 31. Thereafter, a recess was taken; after the recess the victim continued testifying. The victim finished her testimony without further incident.

It is appellant's position here that the trial judge erred in refusing his attorney's request for a mistrial. In support of this position he relies on the cases of Commonwealth v. Buzard, 365 Pa. 511, 76 A.2d 394 (1950), and Commonwealth v. Flood, 302 Pa. 190, 153 A. 152 (1930). These cases do not provide sufficient support to sustain appellant's position, and we affirm the judgments of sentence entered by the trial court.

In Buzard, supra, the appellant/defendant claimed that the trial court erred in refusing a mistrial when the victim's widow

J.S61015/95 - 3

allegedly "cried audibly before the jury" while she was identifying her husband's cap. The Supreme Court did not address the issue of jury prejudice since it concluded that the trial record did not support appellant's characterization of the widow's behavior.

In *Flood*, *supra*, the issue presented to the Court was whether the Commonwealth, in the course of a homicide prosecution, erred in calling the deceased victim's father to the stand to identify the clothing worn by the victim. The Court held that there was a legitimate reason for the introduction of this evidence. Thereafter, in *dicta*, the Court noted that while "there is no known rule of law that will prevent a relative from outbursts of grief while on the witness stand testifying in the case to material matter; courts should, when necessary, handle such situations with a stern hand, and in the interest of justice it (sic) should summarily order a new trial, *if the jury is, in the opinion of the court, swayed by such conduct. Id.* at 197, 153 A. at 154 (emphasis supplied).

This language, though in the form of *dicta*, is nonetheless an accurate summation of the law. However, it provides no relief to appellant; for it merely emphasizes that it is the trial court, in the first instance, which is charged with evaluating the seriousness of the conduct and its effect on the jury.

In the case of *Commonwealth v. Evans*, 465 Pa. 12, 348 A.2d 92 (1975), the Supreme Court was reviewing a situation which was more analogous to the case at hand. There the daughter of a homicide victim was called to testify as a Commonwealth witness. She began

561015/95 - 4

eping (described in the opinion as "very soft crying") during her

stimony. The trial court "declared a short recess in order to

rmit [the witness] to regain her composure." The Supreme Court

und no error in the manner in which the trial judge handled the

tter, or in his conclusion that the jury was not "swayed":

> We cannot say that the trial court, which of course
> observed the episode was wrong in believing that the jury
> had not been swayed because the incident was of minimal
> impact or that the Court abused its discretion in denying
> the motion for a mistrial.  [citation omitted].

1. at 18, 348 A.2d at 95.

In the present case the trial judge, when faced with the post-

rial challenge to his refusal to grant a mistrial, stated "[i]t was

ell within the court's discretion to ... take a brief recess, allow

he victim to compose herself and to return to the witness stand."

.T. Post-Trial Hearing p. 3.[4]

It is apparent from the quoted remarks that the judge did not

consider the victim's conduct to be such as to improperly influence

(or "sway") the jury. Moreover, our own review of the transcript

does not give us reason to doubt the trial judge's conclusion. A

single episode of emotion exhibited during the course of a rape

victim's testimony cannot be said to warrant a mistrial; indeed,

given the traumatic event about which the victim is called upon to

testify, and the public forum in which the testimony is offered,

some degree of emotion is to be expected. It is left to the trial

court to monitor this conduct and to evaluate its effect; and that

---

[4]  These are the only comments on the record regarding this issue.
The trial judge's opinion on appeal was addressed to clarifying the
procedural aspects of appellant's direct appeal versus a pro se
post-conviction proceeding.

Case 1:00-cv-01891-SHR-KH   Document 21   Filed 07/30/2001   Page 206 of 332

J.S61015/95 - 5

determination will not be upset unless there has been a "flagrant abuse of discretion". See Commonwealth v. Dumas, 299 Pa.Super. 335, 344, 445 A.2d 782, 787 (1982). We detect no such abuse in this case.

Accordingly, the judgments of sentence are affirmed.

APPENDIX N

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,
PENNSYLVANIA

COMMONWEALTH             :  No. 2341 C. A. 1992
                       :
    VS              :  1) Escape
                       :  2) Rape
CALVIN WILLIAM ROTH, JR.  :  3) Terroristic Threats

York, Pa., Tuesday, January 30, 1996

Before the Honorable John H. Chronister, Judge

APPEARANCES:

        THOMAS H. KELLEY, Esquire
        Assistant District Attorney
        For the Commonwealth

        FRANK C. ARCURI, Esquire
        For the Defendant

TRANSCRIPT OF PROCEEDINGS

Reported by:

Debra S. Romesberg,
Official Court Reporter

1

## INDEX TO WITNESSES

2

|  | DIRECT | CROSS | R-D | R-C |
|---|---|---|---|---|

3

FOR THE DEFENDANT:

4

| Calvin W. Roth, Jr. | 2 | 27 | -- | -- |

5

6

FOR THE COMMONWEALTH:

7

| J. David MacVeigh | 43 | 50 | -- | -- |

8

9

IN REBUTTAL:

10

| Calvin W. Roth, Jr. | 58 | 62 | -- | -- |

11

## INDEX TO EXHIBITS

12

|  | MARKED | ADMITTED |
|---|---|---|

13

FOR THE COMMONWEALTH:

14

| No. 1 - Letter | 34 | -- |

15

16

17

18

19

20

21

22

23

24

25

```
 1            (PROCEEDINGS HELD ON TUESDAY, JANUARY 30, 1996)

 2                              *  *  *

 3                 MR. KELLEY:  Good afternoon, Your

 4      Honor.

 5                 THE COURT:  Good afternoon.

 6                 MR. KELLEY:  Your Honor, this is the

 7      time scheduled for the hearing of Commonwealth versus

 8      Calvin William Roth, Jr., 2341 Criminal Action of

 9      1992.  Defendant is charged with escape, rape, and

10      terroristic threats.  We are here on Defendant's PCRA

11      allegations, Your Honor.

12                 MR. ARCURI:  Your Honor, if I could

13      have just a minute?

14                 THE COURT:  Sure.

15                 MR. ARCURI:  Your Honor, Mr. Roth --

16      if I may state for the record, Mr. Roth had been in

17      Indiana serving a sentence there.  I recently simply

18      happened upon him in the York County Prison last

19      Thursday when I requested that this particular

20      hearing be held.  I discussed the situation with him

21      then, and I went back and met with him again on

22      Sunday.

23                 He has now brought me the names and

24      phone numbers of two witnesses that he would like to

25      have testify in his behalf.  I'm going to have him
```

1

1    testify as to what he thinks they would say, after

2    which if their testimony would be relevant, I would

3    like to have some time to converse with these people

4    myself and see if their testimony would be relevant.

5              Mr. Kelley has indicated he feels he's

6    probably unprepared. I don't know how Your Honor

7    wishes to handle this. I instructed Mr. Roth as to

8    how I think the hearing should be handled at this

9    point, and that Mr. MacVeigh can then testify, and if

10   we wish to continue it to see what's going on with

11   these other witnesses --

12             THE COURT: I'll listen to what his

13   offer is and what they would say whether it's

14   relevant or not, and I'll make a decision whether to

15   grant additional time at a later date.

16             MR. ARCURI: Okay. Take your

17   paperwork.

18                  * * *

19             CALVIN WILLIAM ROTH, JR.,

20   called as a witness, having been duly sworn according

21   to law, testified as follows:

22                DIRECT EXAMINATION

23   BY MR. ARCURI:

24        Q    Will you state your name.

25        A    Calvin William Roth, Jr.

1     Q    How old are you, Mr. Roth?

2     A    Thirty-two.

3     Q    Mr. Roth, where do you now reside?

4     A    At the York County Prison.

5     Q    Okay.  And are you under sentence?

6     A    Yes, I am.

7     Q    When were you sentenced, do you recall?

8     A    July -- I think it was September 2nd.

9     Q    Of what year?

10    A    Of '93.

11    Q    And were you sentenced by Judge

12 Chronister?

13    A    Yes, I was.

14    Q    How much time were you sentenced to serve?

15    A    Ten to twenty on rape, one to two on

16 terroristic threats, and three to six on escape,

17 escape running concurrent with the ten to twenty.

18    Q    So all together you're running a sentence

19 of 11 to 22 years?

20    A    Eleven to twenty-two years.

21    Q    For a period of time you were in Indiana,

22 is that correct?

23    A    Yes.

24    Q    And why were you in Indiana?

25    A    Serving for aggravated assault.

1    Q    And are you now finished with that

2  sentence?

3    A    Yes, I am.  I still owe them two years

4  probation.

5    Q    And that's merely a preclude to get to

6  this point.  You have been out of the state

7  continuously since from that time that you were

8  sentenced until now, is that correct?

9    A    Yeah.

10    Q    And this is the first opportunity we've

11  had to conduct this hearing?

12    A    Yes.

13    Q    Who represented you at trial, Mr. Roth?

14    A    David MacVeighn (sic).

15    Q    David MacVeigh?

16    A    Yeah, David MacVeigh.

17    Q    And was he privately retained or was he a

18  Public Defender?

19    A    Public Defender.

20    Q    Do you recall meeting with Mr. MacVeigh

21  after your arrest?

22    A    Yes, I do.

23    Q    And how soon after your arrest was that?

24    A    I think it was about a month.  About a

25  month I seen him afterwards.

1      Q      Was he the only Public Defender you saw?

2      A      Yes.

3      Q      Did you indicate to him at that time that

4   you -- did you indicate to him that you were guilty

5   or not guilty?

6      A      Not guilty.

7      Q      And did you indicate to him early on that

8   you intended to take this matter to trial?

9      A      Yes, I did.

10     Q      And did you and Mr. MacVeigh meet any

11  number of times after that and before trial?

12     A      Twice.

13     Q      Twice?

14     A      That I remember I can recall twice.

15     Q      What did you tell him that your defense

16  was?

17     A      That it was consented sex with the victim.

18  That I never raped her.

19     Q      Do you admit having sex with her?

20     A      Yes.

21     Q      But the sex was consensual?

22     A      Yes, it was.

23     Q      Did you indicate to Mr. MacVeigh whether

24  or not you had any witnesses to support that?

25     A      Yes, I told him that I had three different

1 witnesses.

2   Q Okay.  Do you recall the identity of those

3 witnesses?

4   A One of them is Maureen.  You got the

5 address.  Maureen.

6   Q You just gave me this list five minutes

7 before this hearing, is that correct?

8   A Yeah.

9   Q The one name is Maureen McPartland at 7459

10 Thunderbird Road, Liverpool, New York?

11   A Yes.

12   Q Did you give Mr. MacVeigh that name prior

13 to your trial?

14   A Yes, I did.

15   Q And also the name of Walter Gladstone?

16   A Yes.

17   Q And you have here that his place of

18 employment is Colonial House?

19   A Well, at the time he was working for

20 Colonial House.  Now he's not working.  I don't know

21 where he's working at.  I couldn't tell you where

22 Maureen is at either.  I know that's her family's

23 address.  And Walter he was here in my trial last

24 time.

25   Q Now, you indicate that you sent a letter

1    to that effect to Mr. MacVeigh on August 2nd of '93?

2        A    Yes.

3        Q    Was that before or after the trial?

4        A    That was after the trial -- that was

5    before the trial.

6        Q    That was before the trial?

7        A    Excuse me.

8        Q    Did you ask him to have these people

9    subpoenaed?

10       A    Yes, I did.

11       Q    Had you spoken with them regarding what

12   their testimony might be?

13       A    I did talk to Maureen.

14       Q    When did you speak with her?

15       A    That was -- that was like after they -- a

16   week after I got here to York County when they

17   arrested me.

18       Q    How did you get to speak with her?

19       A    Talked to her on the phone.

20       Q    And did she indicate she could testify

21   favorably for you?

22       A    She told me that she would do anything

23   that she could do to help me in my trial so the truth

24   would come out.

25       Q    Did she have some kind of personal

7

1    knowledge about this sexual interlude that you had

2    with the victim?

3         A    She knew that there was a relationship

4    between me and her, me and the victim, that she

5    wasn't scared of me, that we was pretty good friends

6    at the time, and she's a witness to the fact that

7    when this incident was suppose to be taking place and

8    it was over with that the victim turned around and

9    was standing in the hallway talking to me.  And me

10   and the two -- the other two people, Maureen was one

11   of them, and another one is another person, right,

12   talking and laughing at the same time after this

13   incident was suppose to -- after it was taking -- I

14   mean over, when it was over with.  She -- I mean she

15   didn't seem like she was scared at me or anybody

16   else.

17        Q    And Mr. Gladstone, had you had any

18   discussions with him as to whether or not he would

19   testify?

20        A    Yeah, he came out here to visit me, and he

21   left me a letter with a picture that he brought in

22   that he was going to mail, but he didn't know the

23   address.

24        Q    Okay.  When you say here, where do you

25   mean?

| | | |
|---|---|---|
| 1 | A | Out to the Adams County Jail. |
| 2 | Q | Adams County? |
| 3 | A | I mean York County Prison. |
| 4 | Q | This was before trial? |
| 5 | A | Yeah. |
| 6 | Q | And did he indicate that he could somehow |

7  give testimony?

8          MR. KELLEY:  Objection, hearsay, Your

9  Honor.

10         MR. ARCURI:  Your Honor, it's not

11  presented for the purpose of hearsay.  It's simply to

12  give the Court some reason to see whether or not --

13         THE COURT:  I understand.  I'll permit

14  the matter to be gone into.

15         MR. ROTH:  He came to tell me that he

16  had pictures with me and the victim taking pictures,

17  and it states in my records that these pictures was

18  taken a week before the incident.  These pictures was

19  taken at least a month before the incident.

20    Q    And what would those pictures have shown?

21    A    It's a picture of me and her standing

22  together smiling, right, and holding each other, and

23  it says in my paperwork that it's policy that we hug

24  each other every day.  Yes, we hug each other every

25  day when I was in the Colonial House, but we hug at

1    group time, right, not all through the day.  And the

2    picture is -- I mean we are smiling.  We are friends.

3    Me and this victim was pretty close.  There's a lot

4    that wasn't said at the time of my trial.

5        Q    Now, were those the only two witnesses

6    whose names you gave to Mr. MacVeigh?

7        A    No, there's another one I gave him -- to

8    him.  His name was Christian, but I can't -- I don't

9    know -- remember his last name.  He was a client at

10   the Colonial House too.

11       Q    Was he a client there at the time --

12       A    Yes.

13       Q    -- that this matter went to trial?

14       A    Yes.

15       Q    Okay.  So again your statement is that you

16   did divulge this particular individual to Mr.

17   MacVeigh?

18       A    Yes, I did.

19       Q    From what happened at trial and your

20   discussion with Mr. MacVeigh do you know -- do you

21   recall whether or not any of these people were

22   subpoenaed and brought in to testify?

23       A    Well, to my recollection everybody was

24   subpoenaed, but only one showed up.

25       Q    So you're saying Mr. MacVeigh did issue

1    subpoenas to them?

2         A    Yes, he did.

3         Q    Who showed up to testify?

4         A    Walter Gladstone.

5         Q    And did he testify?

6         A    Yes, he did.

7         Q    Do you know why the other two didn't show?

8         A    Well, David came out to see me.  That was

9    the second time he came out to see me.  This is

10   before the trial, told me that he talked to the

11   witnesses, and he said that their testimony would be

12   irrelevant to my case, that it wouldn't really do

13   anything to help me.

14        Q    Okay.

15        A    And I figure -- to me I figured that, you

16   know, it would help me out.

17        Q    Okay.  Did you order him to have those

18   people come in?

19        A    I asked him why they wasn't here.  He said

20   that they sent a statement or a paper.  I seen the

21   paper one time.  I asked for a copy of it, and from

22   this day I ain't got no copy of it.

23        Q    What I'm asking did you order him to have

24   those people here?

25        A    Yes, I did.

11

1      Q      Do you know if any effort was made to have

2   them personally attached to be brought in after their

3   subpoenas were served?

4      A      I do not know that.

5      Q      Okay.  How was your trial conducted?

6      A      Not to my -- not the way I thought it

7   would go.  It was not -- it wasn't done the way I

8   thought it would be done.

9      Q      Were any offers to settle this matter, to

10  plead guilty to some lesser time or some lesser

11  charge, was anything like that communicated to you?

12     A      I asked Mr. David MacVeigh if everything

13  went the way it was suppose to go, right, in the

14  trial and the truth did come out; how much time would

15  I be facing.  He told me 6 and a half to 13 years.

16  Then after the trial I wind up getting 11 to 22

17  years.

18     Q      Would it have made any difference to you

19  if you would have known you were getting --

20     A      No, it wouldn't because I would have still

21  turned it around and took it to a jury trial.

22     Q      Okay.  What specifically -- you got to

23  tell the Judge this now.  What do you think that Mr.

24  MacVeigh did incorrectly in representing you?

25     A      Well, one is when they put the victim on

12

1     the stand and the victim turned around and went

2     hysterical, right, and then they turned around and

3     called for a recess, and he didn't reject.

4          Q    You mean object?

5          A    Object to it, right, and they was asking

6     the victim questions, and she turned around and acted

7     like somebody was trying to hurt her or kill her in a

8     way, and they turned around and called for a recess.

9     He didn't reject on the part that it should have been

10    recalled to the Judge's attention that after the

11    recess, they came back in.  They asked her the same

12    questions, and she's talking like I am right now like

13    nothing ever happened.

14         Q    What else do you have complaints with in

15    the way your trial was handled?

16         A    That I asked David MacVeighn (sic) to

17    do -- I asked him for why didn't I get a lineup, and

18    he said there was no call for it because at the time

19    I did not look the same as I did when I was at the

20    Colonial House.  I turned around at the Colonial

21    House.  I weighed 245 pounds in the picture that was

22    shown at the trial.  It shows you how big I was.  At

23    this time I might have weighed 160 pounds.  That's

24    how much weight I lost.  I did not look the same.  I

25    had brown hair at the Colonial House and no beard.

1    At this time I had blond hair and a red beard.

2         Q    Mr. Roth, how would a lineup have helped

3    your case if your defense was --

4         A    Because at the magistrate's office when I

5    walked in the magistrate's office, instead of the

6    victim turning around and actually know who I am, Mr.

7    Tom Kelley turned around and said, This is Mr. Roth,

8    Calvin W. Roth, Jr.

9         Q    Who did he say that to?

10        A    He turned around and pointed to me and

11   then pointed the victim -- asked the victim if it was

12   me.  The victim said, yes.  So there was no way I

13   could turn around.  The victim didn't even remember

14   what I looked like.  I don't really know if she knew

15   what I looked like or didn't know what I looked like,

16   but I didn't have that chance.

17                   It was another thing.  I asked for a

18   lie detector test, a polygraph test done on me and

19   the victim, right.  David MacVeigh said there ain't

20   no use for that to me.  I figured there was.  Even

21   though you can't use it, it just still tells the

22   truth 99 percent of the time, and I wanted it done

23   and never had it done.

24        Q    How soon after the incident occurred did

25   this scene take place at the district justice's

1    office?

2        A    Excuse me?

3        Q    Okay.  You said you had an incident at the

4    district justice's office where you were brought in

5    and Mr. Kelley pointed to you and said, That's him.

6        A    Yeah.

7        Q    Okay.  How soon after the incident at the

8    Colonial House did that take place?

9        A    Oh, this was when I was at the Colonial

10   House when this incident went down.  I turned around

11   after they told me that the victim said that I raped

12   her, I was accused, I turned around.  They took me to

13   a office.  I turned around after they told me, the

14   director, Marvin Lipscomb, I turned around and sat in

15   the rec area for about a minute, and I left.  I ran.

16       Q    How long were you gone?

17       A    From the 25th of May to January -- I mean

18   July 10th they turned around and got me in Indiana.

19       Q    And you're saying in the meantime your

20   appearance had changed?

21       A    Yeah, it did.  I mean I died my hair blond

22   so I wouldn't be mistaken, and my beard grew out by

23   that time.  And from me working in the sun, cause I

24   did have a job at the time, my beard turned red.  I

25   was in the sun almost all the time.  My hair was

1    mostly blondish red you might as well say.

2         Q    Now, you say Mr. MacVeigh did tell you

3    that the polygraph could not be used, but you wanted

4    one anyway?

5         A    Right.  He told me it wouldn't be -- he

6    said it would hurt me more than it would help me.

7         Q    Okay.  Now, what else was done incorrectly

8    during your trial, Mr. Roth?

9         A    There wasn't no doctor.  All there --

10   there was no doctor.  There should have been a doctor

11   if the victim was raped.  I did not see -- I seen --

12   like I say I did see medical report, I guess a lab

13   report of my saliva and blood test that was taken to

14   prove that it was my semen inside her.  I did see

15   that, but that's the only thing I seen.  I didn't see

16   nothing else.

17              They said they had clothes in a box.

18   I didn't see no clothes in a box.  All I seen was a

19   box.  If the victim -- any rape paper.  The victim

20   said I raped her they -- I should have the right to

21   have a doctor there to prove that she was raped, that

22   she was forcibly raped, right.  There was no such

23   thing.  There was no such doctor.  They had one

24   officer said on the stand and say this and this and

25   that about the victim, how she looked, and how she

1    acted.  Well, the victim when he turned around and

2    seen her, she just came out of -- after a shower.

3    Okay.

4                So any which way she said -- he said

5    that she looked like she was beaten, battered, and

6    she's hurt.  If that's so, there was no bruises, no

7    cuts, nothing on this victim.  And they say she said

8    that she had to loss -- I mean the victim said that

9    she had to change her jobs.  Well, she was at the

10   Colonial House.  How could she have a job.  She was

11   there going through treatment just like me.

12        Q    Did you make any -- were there any other

13   matters that you complained of with Mr. MacVeigh's

14   conduct?

15        A    They never -- I mean, okay, they said that

16   she was -- okay, she said -- I mean -- okay.  In the

17   P.F.A. that they had I guess -- not the P.F.A. but I

18   forget what they call it, it's when they have

19   investigation done on the person like if they was

20   doing it on myself to find my back history.  I forget

21   what it's called.

22        Q    Presentence report?

23        A    Yeah, that's it.  That the victim stated

24   that she was beaten, bruised, and she was badly hurt,

25   which it states here I mean that they didn't have no

1    prior report to prove of scars, burns, bruises or

2    anything like that on the victim.  I mean they never

3    showed no proof.  The victim had nothing.

4         Q    Okay.

5         A    They never showed no ripped clothes,

6    nothing.

7         Q    Did Mr. MacVeigh argue --

8         A    No, David MacVeigh didn't do nothing about

9    it.

10        Q    Did he argue that to the jury?

11        A    No, not that I recollect, nothing.

12        Q    Now, are there any other matters that you

13   wish to bring to the Court's attention?

14        A    Okay.  Now, David did bring that up to the

15   point -- I mean he did bring it up to the jury the

16   point that there was no bruise and no cuts and

17   nothing.  He did bring that up, but I mean they went

18   onto something else.  Mostly his argument was, if I

19   remember rightly, is that it was mostly about there

20   was no bruises, no side effect, nothing like that.

21        Q    Are those the only matters that you wish

22   to bring to the Court's attention?

23        A    Yeah.  There's another thing that I still

24   don't understand from this day.  If the state side

25   has a right to have the person or persons testify

1    against me to prove their case against me, I should

2    have a right to turn around and say my side of the

3    story, what happened in my defense.

4         Q    Didn't you testify during the trial?

5         A    I testified to what David MacVeigh asked

6    me, the questions that he asked me, but he didn't let

7    me -- I didn't get to say what I wanted to say about

8    what happened on my side.

9         Q    Why not?

10        A    I don't know that.  I still don't know

11   that, why.  I just -- he told me to do the questions

12   that he asked -- answer his questions.  So that's

13   what I did.  I thought I was doing it right.  I don't

14   know that much about the law.  I don't.

15        Q    Well, what would you have said

16   differently?

17        A    I would have told my side.

18        Q    Which is what?

19        A    Same as what happened that day.

20        Q    Yeah, Calvin, that's what I want to hear

21   what you would have said differently?

22        A    Okay.  What I'm trying to understand here

23   is that you will -- you want me to say what happened?

24             THE COURT:  If you had had the chance

25   to talk, what would you have said?

19

1              MR. ROTH:  What would I have said.

2    Well, on May 25th at 5 o'clock we all come down --

3    I'm saying my side of what happened at the Colonial

4    House, okay.  At 5 o'clock we all come downstairs to

5    go to eat.  At 5:45 we all got done eating cause you

6    couldn't leave the dining hall until 5:45.

7              After 5:45 that was our time in the

8    Colonial House till we have group after that.  That

9    was like 6 o'clock.  We had a group, and then by 6:30

10   we are outside.  We go out and smoke a cigarette

11   outside because you ain't allowed to smoke inside the

12   Colonial House.

13             Now, at 7:15 I was going -- they say I

14   was going to a candlelight meeting, and a candlelight

15   meeting is an A.A. meeting at nighttime.  So at this

16   time they say this incident happened around 6:30 to

17   7:30.  If that's so, we are all outside at 6

18   o'clock --  I mean at 6:30, from 6 o'clock to 6:30.

19   I can't see how any of that could have happened in

20   less than 15 minutes from what the victim said that I

21   did to her.  It would have to take a lot more longer

22   time than that.

23             So we are all outside, everybody

24   leaves except me and her.  We are sitting there all

25   alone.  Now, this is like quarter of 7, and we start

1    talking because me and Janet were pretty close, and

2    the first thing she surprised me. She asked me to

3    get her some greens, and greens is angle dust. It's

4    what -- it can be angle dust sprayed with -- it could

5    be -- it's hard to explain. Greens are homemade.

6    It's home grown, but it's sprayed with bombing fluid.

7    Can be sprayed with anything, but they call it

8    greens.

9        Q    Okay.

10       A    Or flakes. But she asked me to get her

11   some. I turned around, stood up, looked at her, and

12   told her I don't do that stuff because that's why I'm

13   here because I was there to get rehabilitated from my

14   drug problem and alcohol problem. So I left.

15            On the way when I knew I -- it was

16   time to go to the A.A. meeting, the candlelight

17   meeting because they call 15 minutes to the van. So

18   I go upstairs to turn around and get ready for this

19   meeting, and when I go upstairs, she's already

20   upstairs. I left her outside. She meet me up -- she

21   beat me upstairs to that point.

22            Now, when I got upstairs, I went to my

23   room, got my wash rag, toothbrush to clean up a

24   little bit before we went to this meeting. When I

25   come back around, she was standing at the door. She

1  called me.  I know that I was breaking the rules when

2  I went into her apartment, what I call them

3  apartments, but it's her room cause below that

4  elevator that's the girl's part, and then you got the

5  guy's part.

6          Well, she was standing there at the

7  door.  She called me to her room.  I went to her room

8  cause I thought there was something that she was

9  going to say or, you know, say that she was sorry

10  cause she done it before then.  I turned around.

11  When I got there, I didn't turn around and throw her

12  down or turn around and threaten to kill her or do

13  this and do that to her.  I mean she pulled me --

14  excuse my language.  She pulled me into the room

15          I went into the room.  She was at the

16  time -- she turned around and said -- she was sitting

17  there writing a letter -- that she had something to

18  say to me.  She opened up her jacket and pulled her

19  shirt up and showed me her tits.

20          Then after that she was on top of me

21  on top of the bed.  She said, I want you.  I want

22  you.  I want this.  I want that.  I want you to make

23  love to me.  Next thing I know she's pulling her

24  pants down.  Okay.  But after I was in jail for 17

25  months, and I was in the jail for, excuse me, for 14

1    months in Adams County Jail.  I came there for my

2    last three months on a sentence, okay.  As long as I

3    was in jail I haven't been with a woman in awhile.

4    So automatically, yeah, I'm excited, right.  I'm

5    aroused.

6                I turn and start taking my clothes off

7    too, right.  I pull my pants the same as she did,

8    right.  I turn around and starting making love to

9    her.  Only thing she said to me that she didn't want

10   me to ejaculate inside of her.  She started getting

11   off.  Next thing I'm telling her I was getting ready,

12   and she said she don't matter.  Let's go.  Next thing

13   I know she's getting off.  I'm getting off, right.

14               This woman had no bruises, nothing,

15   and she stated in -- on her behalf that I had my

16   right knee and my left hand over -- I mean my right

17   knee in her stomach, my left hand over her mouth, and

18   ripping her clothes down.  If that's so, I weigh 245

19   pounds at the time.  She weighed about 135 or 25.  If

20   that's so, the whole time that amount of weight on a

21   person on her stomach especially above her pelvis is

22   going to hurt her.  It's going to bruise her.  It's

23   going to hurt her some way, right.  She said she had

24   nothing, no bruises, nothing on her when this went

25   down.

1          When it was all over, I got up, and I

2     told her, I said, Hey, I'm -- I told her that I was

3     sorry I ejaculated.  She said, That's all right.  I'm

4     going to take a shower.  I left the room.  She looked

5     out the room to make sure there was nobody in the

6     hallway.  I went to my room after I got out of her

7     room, went to my room, and went and got the wash rag

8     and stuff cause I had left it there.  I took it back

9     to my room before I went to her room and turn around

10    and went back down to the bathroom and cleaned myself

11    back up.

12         When I came back down, Pat and

13    Maureen, two clients that were there at the rehab

14    asked me about my drawings.  At this time we had

15    about 10 minutes before we had to be at the van.  So

16    surely I went and got my drawings cause I do a lot of

17    art work.  I turned around, was showing my drawings

18    to Pat and Maureen.

19         Then that's when the victim turned

20    around and comes down the hallway drying her hair.

21    She just turned around and got out of the shower.

22    She was smiling.  She was laughing.  She come down

23    and says, So, Calvin, this is some of the work you

24    do.  I say, why, you want to see it?  And I'm showing

25    it to her the same I'm showing it to Pat and Maureen.

1          When I went to the candlelight

2     meeting, I don't understand why she didn't run

3     downstairs right after the incident happened.  She

4     said she was scared of me.  She wasn't scared of me

5     at all.  She would have ran downstairs if she was

6     that scared of me.  No sooner than the incident was

7     happened she would have ran downstairs before I went

8     to this meeting.

9          I was at this meeting over an hour

10    before we even got -- I got back, and the state's

11    witness said that George Chicona drove the van,

12    right, and drove it back, come back -- I mean that

13    he's the one that drove the van, come and picked us

14    up, and took it back.  He ain't the one.  Lee is the

15    one that drove the van, came and picked us up from

16    the candlelight meeting.

17         When I asked Lee in the van what

18    happened, right, he says, oh, Janice turned around

19    and freaked out again.  That's how we all knew that

20    Janice turned around and freaked out.

21         When we went in, we was wondering what

22    was going on with Janice.  I had no clue of ever

23    anything that she went and told them that I turned

24    around and raped her when I know that I didn't rape

25    her.

1    Q    You first found out about it about 10
2  o'clock that night?

3    A    Yeah, it was about 10 o'clock, I guess,
4  yeah, after the meeting.

5    Q    And you're saying that this took place
6  about seven?

7    A    Yeah, all this stuff is suppose to take
8  place around 7 o'clock.  In the trial they said 6:30
9  to 7 o'clock, but it wasn't.  It happened between
10  6:45 to 7 o'clock cause we had to be in the van at 5
11  after 7.  So there ain't no way -- the way they
12  talked in the trial this had to go down at least 35,
13  45 minutes, and there ain't no way, ain't no way.

14    Q    Now, are you saying that this is what you
15  would have testified to?

16    A    Yes, I would have testified to this.

17    Q    But you were not given that opportunity?

18    A    Yeah, I didn't have the opportunity to do
19  this, that this victim was lying, right.

20    Q    Had you indicated to Mr. MacVeigh that
21  this is what you wanted the -- had you told Mr.
22  MacVeigh that this is what you wanted -- this is the
23  story you wanted to tell?

24    A    Yeah, and he told me that it would -- it
25  probably would hurt me.

1    Q    Okay.  These are all the matters that you

2    complained of?

3    A    Yeah.

4         MR. ARCURI:  Okay.  No further

5    questions.

6         MR. KELLEY:  Cross-examination, Your

7    Honor?

8                       * * *

9              CROSS-EXAMINATION

10   BY MR. KELLEY:

11   Q    Mr. Roth, you met Mr. MacVeigh how long

12   after you were arrested, a month you said?

13   A    I guess it's about a month.  I don't

14   really actually don't know.  It was a month after or

15   might have been a little longer, but I think it was

16   about a month.

17   Q    Where did you meet him?

18   A    At the York County Prison.  No, the first

19   time met him was at the magistrate's office the day I

20   turned around I came in for the hearing.

21   Q    Okay.  And was it at that time that you

22   told him that consent would be your defense at trial?

23   A    Yes, yes, I did.

24   Q    Your preliminary hearing was March 24th,

25   1993.  Do you recall meeting with Attorney MacVeigh

1       at any time prior to that perhaps at the York County

2       Prison in January?

3               A       You're talking -- what hearing are you

4       talking about?

5               Q       I'm talking about the preliminary hearing?

6               A       Magistrate's hearing?

7               Q       Yeah, that was in March.  Do you recall

8       meeting with Attorney MacVeigh possibly at the York

9       County Prison in January?

10              A       No, I don't.

11              Q       Okay.  And you met him two times after

12      that preliminary hearing as well prior to trial?

13              A       The only times that I remember meeting him

14      was at the magistrate's office and one time at the

15      Adams County Prison -- I mean at the York County

16      Prison, and at that time it wasn't a very good

17      meeting at the time any way.  Me and him -- I mean he

18      was mad.  I got mad.  He got mad.  So I mean we

19      really didn't get that much to say to each other.

20              Q       Okay.  But the first time you met him was?

21              A       At the magistrate's office.

22              Q       At least you recall at the magistrate's

23      hearing at the time you discussed consent being a

24      defense?

25              A       Yes, I did.

1       Q       And how long had that been since you had

2   seen the victim in this case.  You met --

3       A       I didn't see the victim till that day.

4   That was from May 25th to that day.

5       Q       Let me rephrase my question then.  Okay.

6   So you say May 25th to March --

7       A       May 25th was the last time I seen the

8   victim.  The second time I ever seen the victim was

9   the day of that magistrate's office.

10      Q       Okay.

11      A       At the magistrate's hearing that was the

12  last time.

13      Q       So it had been, what, about 10 months?

14      A       No, I mean I was only -- yeah, I guess it

15  would have been about that.  Let's see.  Let's see.

16  May 25th.  I was caught July 10th, and they came and

17  got me.  Yeah, it's been about 10 months.

18      Q       Okay.  And you say your -- the look of you

19  had changed substantially, and you don't think that

20  the victim could have identified you?

21      A       No, I don't because I mean I was real,

22  real dark.  At the time I wasn't dark.  I had blond

23  hair, reddish blond hair, and I had red beard, almost

24  a whole full grown red beard.  So how could the

25  victim see me.  And I was even wearing glasses like I

1    am right now.

2        Q    Okay.  How much time did you spend at the

3    Colonial House with the victim?  Said you were pretty

4    close?

5        A    I had 12 days to go before I turned around

6    and ended that program.

7        Q    Okay.  But that's not the question.

8        A    The victim -- they said, okay, in the

9    trial she said that she was only there three weeks.

10       Q    Okay.  That's not my question.  The

11    question is, How much time did you spend at the

12    Colonial house with the victim?

13       A    Out of the time that I was there I'd say

14    after two weeks after she was there that she wasn't

15    doing what she was suppose to do, acting crazy, a

16    little crazy, I think after that after I started

17    talking to her I know at least two weeks, two weeks,

18    three weeks cause we was pretty close, started

19    getting pretty close.  I was the only one that could

20    talk to her.

21       Q    So you spent three weeks with her pretty

22    much every day you saw her?

23       A    Every day we seen each other.  We had to

24    cause we lived in the same place.

25       Q    Okay.  And you think after 10 months she

1    wouldn't have been able to identify you at the

2    magistrate's hearing had it not been for as you say

3    me pointing you out?

4         A    No, I don't think she could have because

5    let me -- okay, let me put it this way.  If the

6    victim could actually know who I was when they had me

7    in the magistrate's office and David MacVeigh was

8    there, she walked right past me and didn't know who I

9    was.  So I know darn well, excuse me, that she

10   couldn't have identified me cause she looked right at

11   me.

12        Q    When you asked Attorney MacVeigh to file a

13   motion for a lineup, that was obviously after the

14   preliminary hearing at the magistrate's office,

15   right?

16        A    No, that was before the magistrate's

17   hearing.  I asked him that the day that I met him at

18   the magistrate's office.  I told him I'd like to have

19   a lie detector test and turn around and have a

20   lineup.

21        Q    So you met --

22        A    And he said it wouldn't help me out any.

23   He said this ain't -- how did he say that.  Oh,

24   this -- we are not here because you killed somebody.

25   We are here because they say that you raped somebody.

```
 1        Q     Did you ask him for the lineup before the

 2   magistrate's hearing or after the magistrate's

 3   hearing?

 4        A     Before.

 5        Q     Where before, outside?

 6        A     Outside the magistrates when he first came

 7   and talked to me.

 8        Q     Okay.  And when you went inside, that's

 9   when the victim -- or I pointed you out to the

10   victim, is that right?

11        A     You turned and said, This is Calvin W.

12   Roth, Jr., and then you turned and looked at the

13   victim.  The victim looked at me and turned and

14   around and moved to the crisis lady, and she put her

15   arms around her, and she said, yes, shook her head.

16   You -- excuse me.  You don't forget things like that

17   especially when you're being accused of something

18   that ain't true.

19        Q     Okay.  Now, at that point the victim had

20   seen you?

21        A     Yes.

22        Q     And had been identified presumably by me

23   as the person who had had consensual sex with her?

24        A     You asked if that was me.  You asked if

25   this was Calvin -- I mean Calvin Roth.  You didn't
```

1   say W. Roth.  You said this is Calvin Roth.  She

2   turned, looked at the lady, looked at me, and then

3   looked at you, shook her head, and said, yes.

4        Q    At that point the victim had already seen

5   you in your, as you say, changed state with your

6   different colored hair and suntan?

7        A    Yeah.

8        Q    Wouldn't a lineup have just given her

9   another chance to take a look at you?

10       A    No, a lineup would have showed to see that

11  if she still remembered me, to see if she could

12  remember me.

13       Q    Okay.  The three witnesses who Attorney

14  MacVeigh had failed to call were Maureen McPartland,

15  is that her name?

16       A    I think that's how you say it.  I don't

17  have her address here.

18       Q    Walter Gladstone?

19       A    Yeah.

20       Q    And Christian whomever, right?

21       A    Yeah, I don't know.  He was a client.

22       Q    You don't know his last name?

23       A    I don't remember his last name.  I looked

24  for it.  I don't have it.

25       Q    Did you provide Attorney MacVeigh with

1    Christian's address?

2       A    I told him that he was a client at the

3    Colonial House, and David MacVeigh did ask Mr.

4    Lipscomb about that.  Mr. Lipscomb said he would not

5    give up confidential files of the names and addresses

6    of these people.

7       Q    And this Maureen McPartland are you aware

8    whether Mr. MacVeigh had contacted her at all?

9       A    Yes, I am.

10       Q    He had contacted her, and did he subpoena

11    her as well?

12       A    Yeah.

13       Q    As far as you are aware?

14       A    Yes, as far as I am aware of he did.

15       Q    She didn't show up?

16       A    She didn't.  He said there was a paper

17    that he got from her or from her attorney if I

18    remember right.  I only seen the paper the time when

19    he came out to the A.C.P.  I don't remember -- I mean

20    Y.C.P.  I don't remember what he said.

21                             * * *

22               (Whereupon, Commonwealth's Exhibit No.

23    1 was produced and marked for identification.)

24                             * * *

25    BY MR. KELLEY:

1       Q      Mr. Roth, I'll show you what I've had

2   marked as Commonwealth Exhibit 1 and ask you to take

3   a look at that and ask you whether that's that piece

4   of paper you were referring to earlier that you said

5   you had seen once?

6       A      Yeah, it's the same one.

7       Q      That's the piece of paper, and the

8   signature on the bottom of that piece of paper is by

9   whom, Maureen?

10      A      Maureen.

11      Q      And the date up on the right hand?

12      A      It says July 14th.

13      Q      Of 1993?

14      A      Yes.

15      Q      And that would have been prior to your

16  trial, is that correct?

17      A      Yes.

18      Q      And could you read the contents of that

19  letter, please --

20      A      What part of it?

21      Q      -- to the Court.  The whole letter.

22      A      7459 Thunderbird Road, Liverpool, New

23  York, 13088.  July 4th, 1993.  Mr. David MacVeigh,

24  Public Defender, York County Courthouse, 28 East

25  Market Street, York, Pennsylvania, 17401.  Dear Mr.

1    MacVeigh, as per to your questions during our July

2    2nd, 1993 phone call -- phone conversation, excuse

3    me, I am sending you a statement in regard to

4    Criminal Account No. 2341 C. A. 92.

5              I met the two individuals, Calvin Roth

6    and Janet -- I don't know how you say her last name.

7    I don't know how you say Janet's last name.

8         Q    Hlafka?

9         A    Hlafka.

10        Q    Approximately three weeks prior?

11        A    Yeah, three weeks prior to the actual

12   event.  During the period of weekends at the Colonial

13   House in York County Pris -- York County, York,

14   Pennsylvania, I witnessed no activities regarding to

15   the activities, actual rape --

16        Q    I witnessed no acts relevant to the

17   alleged rape, right?

18        A    Yeah.  I was merely a resident in the

19   fac --

20              THE COURT:  Excuse me, Mr. Kelley.

21   Why don't you read it.

22                        * * *

23   BY MR. KELLEY:

24        Q    I was merely a resident in the facility

25   where the alleged incident occurred.  I have no

1    relevant information for you.  Thank you.  Sincerely,

2    Miss Maureen McPartland.  That's the letter you're

3    talking about?

4          A     Yeah.

5          Q     So, in fact --

6          A     But my fact -- my recollection, I mean,

7    even though the letter was sent, I still wanted her

8    here on the stand.  I have that right because I am

9    being charged with rape.  I wanted her to say her

10   side of the story cause this is a piece of paper.

11   Don't matter if her signature is on it or not.

12         Q     In your allegations of error on the part of

13   Attorney MacVeigh, however, you refer to written and

14   notarized statement by a key witness for yourself,

15   and that would be Miss Maureen McPartland, and,

16   therefore, you're asking the Court to grant you a new

17   trial based upon him not entering this into evidence,

18   is that correct?

19         A     Let me ask you if --

20         Q     That's not the question.  The question is,

21   Isn't that correct?

22         A     Yeah -- no, I'm asking for a new trial on

23   the part that I didn't get to say my part that David

24   MacVeigh didn't do what he was suppose to do, what I

25   asked him to do.  Everything that I asked him to do I

```
 1     mean to him was a -- it's going to hurt me in my

 2     case.  David didn't ask the victim or your witnesses

 3     what I asked him to ask him -- ask them.

 4          Q     Now, regarding Mr. Gladstone, Mr. MacVeigh

 5     actually contacted him and subpoenaed him, is that

 6     correct?

 7          A     Yes, and he was here.

 8          Q     And he testified at your trial?

 9          A     Yes.

10          Q     Furthermore, he also introduced a

11     photograph that depicted yourself and the victim in

12     this case hugging, is that correct?

13          A     Right.

14          Q     So you have no problem with what he did

15     relative to Mr. Gladstone, do you?

16          A     No, cause he was here.

17          Q     Okay.

18          A     The problem about the witnesses that I

19     wanted him to do was find out from Marvin Lipscomb if

20     he could get the address and phone number of

21     Christian.

22          Q     Of Christian?

23          A     Because there was something that was said

24     in a group meeting that Christian turned around and

25     said that Maureen said to me over the phone that I
```

1    wanted to hear in trial.

2         Q    The real problem you had was just

3    regarding Christian, is that what you're saying now?

4         A    Yeah, and Maureen not being here to say

5    her part.

6         Q    Okay.  And as to the doctor, you wished

7    the victim to have an examination by a doctor?

8         A    Yeah, cause she was raped.  Wouldn't -- if

9    she was raped, she should have that, right, to prove

10   the fact that she had any bruise or forced entry,

11   anything on her.

12        Q    There was no testimony at all regarding

13   any bruises on the victim's body, do you recall that?

14        A    No, there wasn't.

15        Q    And you also recall that the victim

16   testified that she submitted to you based upon your

17   threats to her, do you remember that?

18        A    That's what she says, but that's not true.

19        Q    Therefore, a doctor wouldn't be able to

20   testify to any bruises or absence of any bruises

21   because the victim had testified that, in fact, she

22   wasn't injured at all?

23        A    You're incorrect.  If the victim turned

24   around and said that I -- if the victim turned around

25   and says that I rape her, right, and I weigh 245

1    what he's saying.

2                    DEFENDANT ROTH:  Your Honor, I believe

3    what I say.

4                    THE COURT:  I know.

5                    DEFENDANT ROTH:  When it's in black

6    and white.

7                    THE COURT:  Even whether it's true or

8    not, you believe what you're saying at this moment.

9    I'll buy that.

10                    DEFENDANT ROTH:  Yes, I do.

11                            * * *

12   BY MR. KELLEY:

13        Q    Mr. Roth, just a couple more questions

14   regarding your testimony at trial.  You, in fact,

15   took the stand and testified at trial and

16   indicated --

17        A    Yes, I did.

18        Q    -- that this was consensual sex, right?

19        A    Yes, I did.

20        Q    You testified that she helped you get out

21   of her room, and she even acted as a lookout, right?

22        A    Yes, she did.

23        Q    And you said all this at trial, didn't

24   you?

25        A    Yes, I did.

1      Q    What was it in addition to what you said

2    at trial that Mr. MacVeigh did not let you say?

3      A    The actual story from the beginning to the

4    end that if you -- if you remember, cause you got to

5    remember cause you got it in front of you, he only

6    asked actually I mean like two or three questions

7    about the actual incident and the rape.  He didn't

8    ask me exactly what actually happened from the

9    beginning to the end.

10      Q    Would it surprise you that his questions

11    took up eight pages of testimony?

12      A    No.

13      Q    And your answers?

14      A    Wouldn't surprise me.

15            MR. KELLEY:  Okay.  I have nothing

16    further, Your Honor.

17            MR. ARCURI:  I have no redirect.

18            THE COURT:  You may step down.

19            MR. ARCURI:  Your Honor, we rest.

20            MR. KELLEY:  Your Honor, the

21    Commonwealth calls Attorney David MacVeigh to the

22    stand.

23                      * * *

24            DAVID MacVEIGH,

25    called as a witness, having been duly sworn according

1    to law, testified as follows:

2                    DIRECT EXAMINATION

3    BY MR. KELLEY:

4         Q    Attorney MacVeigh, please state your full

5    name.

6         A    My name is David MacVeigh.  I'm an

7    Assistant Public Defender.

8         Q    And what is your professional address,

9    sir?

10        A    Right here in the courthouse, 28 East

11   Market Street, York.

12        Q    And how long have you been employed as an

13   assistant public defender?

14        A    Since 1984, and prior to that three years

15   in private practice.

16        Q    And you've been actively practicing

17   criminal law in the courts of York since that time,

18   1984?

19        A    Well, actually since December of 1980.

20        Q    And how did you become professionally

21   involved in the Defendant's case?

22        A    I happened to be the individual who on

23   January the 15th of 1993 was doing some interviews at

24   the York County Prison for people who had applied for

25   our office to represent them, and Mr. Roth was one of

1      those.

2              Q      That was prior to the preliminary hearing

3      in Mr. Roth's case, is that correct?

4              A      Yes, sir.

5              Q      That was, what, two months prior to that

6      time?

7              A      A little bit more than that.  Mr. Roth's

8      case had been, I believe, sent into court from the

9      District Justice's office as a fugitive case, and we

10     had had to file a petition to have the case remanded

11     for a preliminary hearing, which explains that two

12     and a half month hiatus.

13             Q      Did you discuss the substance of his case

14     with the Defendant at that time in January, January

15     15th, or was it just questions regarding his

16     inability to pay for public defender?

17             A      Well, I have some notes, but they are not

18     any really detailed notes explaining that at the time

19     he was in the Colonial Halfway House, he was serving

20     a sentence from Adams County Prison, and he left

21     before the time was up.  That the victim was also a

22     resident there.  I don't think that at that time at

23     least my notes don't reflect clearly that it was a

24     consent defense, but I'm quite certain in my mind

25     that that's what the defense would be.

1      Q    You met with the Defendant at the

2  preliminary hearing as well?

3      A    Yes.

4      Q   Do you recall meeting him outside of the

5  preliminary hearing and discussing the merits of his

6  case or any things he wished to file on his behalf?

7      A    Well, he had given me the names of the

8  people and the addresses of the people he wanted me

9  to try and track down for him, and those names have

10  already been brought up in his direct testimony this

11  afternoon.

12      Q   Were those the three names he mentioned,

13  Maureen?

14      A    Maureen McPartland is clear to me, Walter

15  Gladstone is clear to me.  The third individual I

16  can't recall his name.  He says the name Christian.

17  That might be so.  I never got a last name.

18      Q   Do you have within your notes any record

19  of him requesting you to have a lineup for him?

20      A    No, I don't.  That might have been an oral

21  request, but since the defense was consent as opposed

22  to identity, I didn't see much point in having the

23  lineup.

24      Q   Describe the general overall strategy

25  which you approached trial with, if you had any?

1          A      It was to attempt to convince the jury

2     that because there was no physical evidence showing

3     bruising and so forth that this was a matter of

4     consent.

5          Q      And did you discuss approaching the trial

6     with the Defendant from that angle?

7          A      Yes, that was his desire.

8          Q      Did you, in fact, argue that to the jury

9     in your closing or during your case?

10         A      Yes.

11         Q      Whose idea was it to use that particular

12    strategy of defense?

13         A      Well, I always follow my client's wishes

14    if they are not entirely impossible, and it was a

15    possible, feasible defense here.  So it was his --

16    that was his theory of defense from the beginning,

17    and I was not at all dissatisfied with it.

18              THE COURT:  So, in fact, it was his

19    theory, and you, in fact, concurred in his theory?

20              MR. MacVEIGH:  Yes.

21                         * * *

22    BY MR. KELLEY:

23         Q      That it was at least theoretically a

24    decent defense?

25         A      Correct.

1        Q      There have been a number of specific

2   allegations where you failed to adequately represent

3   him.  I'd like to go through them at this point with

4   you.

5        A      Okay.

6        Q      One of the first allegations in his pro se

7   motion was that you failed to object during the

8   outburst of the victim.  Do you recall that outburst?

9        A      Yes.

10       Q      And do you recall what you did in response

11  to the victim's outburst?

12       A      My notes --

13              THE COURT:  Excuse me.  We don't need

14  testimony to that.  That matter was appealed to the

15  Superior Court.  It was specifically a matter of

16  record.  That objection was made.  There was a direct

17  appeal concerning that issue.  They ruled on it.

18  It's a closed issue.

19                        *  *  *

20  BY MR. KELLEY:

21       Q      Also the Defendant had specifically

22  objected to you failing to enter a notarized

23  statement of one of the witnesses that he noted,

24  specifically, Maureen McPartland, and that has been

25  read.  Can you tell the Court why it was you didn't

1    attempt to enter the statement of Miss McPartland?

2         A    Since that's already before the Court Ms.

3    McPartland had nothing to add one way or the other,

4    and I couldn't see the point in attempting to, so to

5    speak, baffle the jury with why I would put in for

6    lack of a better word a non-statement.

7         Q    Did you speak to Ms. McPartland?

8         A    Yes, I did.  Never in person, but over the

9    telephone.

10        Q    Did you, in fact, subpoena her and attempt

11   to --

12        A    And as a result of that subpoena she

13   contacted me by telephone, and then sent the letter

14   to me at my request, which is marked as Commonwealth

15   Exhibit 1 here.

16        Q    Did you release her from the subpoena

17   after receiving that note?

18        A    Yes.

19        Q    What attempts did you make to track down

20   this Christian individual?

21        A    I recall speaking with one or two people

22   at Colonial Halfway House.  I could not mention names

23   today.  I don't remember who, and at a couple

24   different places ran into the brick wall of

25   confidentiality.  Whoever I spoke to at Colonial

1    Halfway house said -- first of all, denied knowing

2    the identity of this individual; and, second of all,

3    said even if we knew it, we wouldn't tell you.  So I

4    was at -- there was nothing I could do.

5         Q    Did you ask the Defendant for this

6    Christian's last name or any --

7         A    I can't specifically recall asking him,

8    but I'm sure I would have.

9         Q    Defendant has also objected to your

10   failure to submit a request for a polygraph?

11        A    Defense was inadmissible, served no

12   purpose, and my understanding is that we are not

13   entitled to that as a matter of right.

14        Q    He has also objected to you didn't let him

15   tell his story.  Did you hear that when he testified

16   to that?

17        A    I did.

18        Q    And why is it that you did not let him

19   tell his story?

20        A    I did let him tell his story.  I think my

21   questions on direct examination reflect that he was

22   given the opportunity to do so and exercised that

23   opportunity.

24        Q    Was there anything that you are aware of

25   before he took the stand which you may have told him

1    he couldn't testify to or you decided that you would

2    not ask him?

3        A    I might have asked him to attempt to

4    maintain as calm a demeanor in front of the jury as

5    possible.  I did not think that he would come across

6    terribly well in front of jury, and, therefore, I

7    asked him to be as natural and cool and calm as

8    possible, but I don't think that I limited his

9    testimony.  I think, in fact, the record would show

10    that my questions to him were fairly open ended.

11            MR. KELLEY:  I have nothing further at

12    this time, Your Honor.

13                   * * *

14                CROSS-EXAMINATION

15    BY MR. ARCURI

16        Q    Mr. MacVeigh, there -- I may have missed

17    this when I was writing down notes.  When did you

18    first meet with him?

19        A    My notes reflect January the 15th of that

20    year.  Now, I did not write '93 on our application

21    form.  I might have the year wrong.  I notice we have

22    a blank application form, has date of application

23    which the client fills in, and that's marked as

24    12/31/9 -- it's hard to see if that's a '92 or a '93.

25    So if I said '93, I don't know what year, but then I

1    wrote my name beside it and then 1/15.  So it would

2    have been January 15th of some year.  Suppose that's

3    probably '93.

4         Q    Okay.  Do you recall that or are you

5    just --

6         A    No, I don't recall it.

7         Q    You're not reconstructing this from your

8    notes?

9         A    Yeah.

10         Q    You don't -- would you say Mr. Roth's

11    testimony is accurate in that he asked you for a

12    lineup at the preliminary?

13         A    I don't recall him having asked for that.

14         Q    Do you recall the incident that he just

15    recounted wherein Mr. Kelley pointed out -- pointed

16    out his identity to the victim?

17         A    No, but I might not have been present for

18    that.  I can wonder in and out of the courtroom at

19    the district justice's office to speak with other

20    policeman, what have you.  It's possible.

21         Q    What would your reaction have been at that

22    point if he had asked you for a lineup?

23         A    That it would be the same as today.  Since

24    consent is the defense and identity is not the

25    defense, a lineup is pointless.

1      Q     Did you know at that point though that his

2  defense was, in fact, consent?

3      A     Well, my notes don't reflect it from my

4  interview with him from several months previous to

5  that, but lacking those written notes I still believe

6  that that's what the defense was going to be, and I

7  believed that at the time of the preliminary hearing.

8      Q     Now, you said you did have a phone

9  interview with the one witness, Maureen McPartland?

10     A     Correct.

11     Q     And do you recall what she told you about

12  this case?

13     A     One minute, please.  I did make some notes

14  of that.  Would have been on July the 2nd, series of

15  phone calls to Maureen McPartland.  My notes reflect

16  exactly as follows, quote, Knows nothing.  Can't

17  testify.  Asked for a letter to that effect, and as a

18  result of that I received this letter dated July the

19  4th, '93.

20     Q     Okay.  You don't recall that, what you

21  asked her, do you?

22     A     I'm sure that it would have been

23  open-ended questions, what if anything do you know

24  about this, do you k

1    Q    Did you know at that point though that his

2    defense was, in fact, consent?

3    A    Well, my notes don't reflect it from my

4    interview with him from several months previous to

5    that, but lacking those written notes I still believe

6    that that's what the defense was going to be, and I

7    believed that at the time of the preliminary hearing.

8    Q    Now, you said you did have a phone

9    interview with the one witness, Maureen McPartland?

10    A    Correct.

11    Q    And do you recall what she told you about

12    this case?

13    A    One minute, please.  I did make some notes

14    of that.  Would have been on July the 2nd, series of

15    phone calls to Maureen McPartland.  My notes reflect

16    exactly as follows, quote, Knows nothing.  Can't

17    testify.  Asked for a letter to that effect, and as a

18    result of that I received this letter dated July the

19    4th, '93.

20    Q    Okay.  You don't recall that, what you

21    asked her, do you?

22    A    I'm sure that it would have been

23    open-ended questions, what if anything do you know

24    about this, do you know these people, but, no, I

25    don't recall specifically.

```
 1          Q      And you released her from the subpoena?

 2          A      I would think that I did.  I probably did.

 3   It sounds like something I would have done once I

 4   knew that she was not going to be able to help.

 5          Q      Do you know how the subpoena was served on

 6   her?

 7          A      Certified mail.  I think I got the receipt

 8   for that.

 9                        THE COURT:  In New York?

10                        MR. MacVEIGH:  Yeah.

11                        THE COURT:  Is that a valid service?

12                        MR. MacVEIGH:  She responded.

13                              * * *

14   BY MR. KELLEY:

15          Q      Did you communicate with her counsel?

16          A      I don't --

17          Q      I think that was represented here at some

18   point.  I just want a clarification on that.

19          A      I think that Mr. Roth had said that I had

20   received a letter from either her or her attorney,

21   referring to Exhibit 1.  I don't believe that she had

22   an attorney, Your Honor, although I don't see the

23   return for the subpoena.  I recognize my secretary's

24   handwriting on a receipt for it.

25          Q      Let me ask you this once more without
```

1    belaboring it.  You don't recall the questions you

2    asked her surrounding this incident?

3        A    Not specifically.

4        Q    I believe Mr. Roth's testimony is that she

5    possibly could have testified to the fact that they

6    were friends before and had begun to establish at

7    least some kind of relationship prior to this?

8        A    They being?

9        Q    They being Mr. Roth and the victim.

10       A    She just basically said she didn't know

11   anything, and she sounded -- she sounded dangerous to

12   me, dangerous as far as a defense witness.

13       Q    Dangerous that she might testify against

14   you?

15       A    She could end up on the stand and turn

16   into a hostile witness.  She was clearly not very

17   happy at having, for example, me contact her at her

18   place of employment, that sort of thing.

19       Q    Okay.  Now, the other one named Christian,

20   you came up with road blocks in terms of

21   confidentiality?

22       A    Yes.

23       Q    Do you know whether or not you could have

24   possibly gotten a Court order to produce that person?

25       A    I suppose I probably could have.  My

54

1    impression was that Christian would have said much

2    the same thing, and since Mr. Gladstone had provided

3    the photograph showing my client's arm around the

4    victim, that that substantiated pretty thoroughly

5    what Mr. Roth was maintaining.

6         Q     Okay.  Do you have anything in your notes

7    or do you recall why Christian would have been a

8    relevant witness?

9         A     No.  Irrelevant?

10        Q     No, a relevant, not irrelevant?

11        A     No, sir.

12        Q     You already answered the question about

13   the polygraph.  Do you recall Mr. Roth telling you

14   that the relevance of the witness named Christian was

15   that at a group meeting Janet made the statement that

16   she had set him up?

17        A     I can't say that I recall that.  This

18   would have been -- I guess my question would be how

19   would Mr. Roth know that since he absented himself

20   posthaste.

21                  DEFENDANT ROTH:  Am I allowed to

22   answer that?

23                  THE COURT:  Yes, but not right now.

24   You get another turn.

25                            * * *

1    BY MR. KELLEY:

2        Q    Mr. MacVeigh, when you prepared Mr. Roth

3    for trial, did you know at that point prior to trial

4    whether or not he was going to testify?

5        A    Well, as a theoretical matter, it seemed

6    to me a virtual certainty that he'd have to to get

7    the defense of consent in front of the jury since the

8    victim was clearly going to claim that force was used

9    or threatened.

10        Q    Okay.  Did you go over his testimony with

11    him?

12        A    Not in great detail, no.  I do not like

13    the jurors to receive the -- or obtain the impression

14    that the testimony has been well planned out and well

15    smoothly delivered to them.  If there are some bumps

16    in the road, that's okay with me.

17        Q    And did you give Mr. Roth the ability to

18    tell all of his story?

19        A    The record would have to speak for itself.

20    I don't recall exactly the questions I asked.

21        Q    Did you caution him not to say certain

22    things?

23        A    Yes, I did.  If you want me to go into

24    that, I'm sure you don't, but if you want me to, I'll

25    be happy to.

1    Q    I think you might as well.

2    A    Mr. Roth's attitude was extremely hostile

3    at every turn, and during -- just in speaking about

4    the victim to me, he was seething, referred to her as

5    that fuckin' cunt bitch, that kind of -- that

6    constantly, and that was basically how he was going

7    to -- it struck me that he was prepared to take the

8    stand, and with her here in the courtroom having

9    broken down before the jury somewhat before to still

10   refer to her as a cunt bitch, I knew that was not

11   going to endear him to the jury, and I cautioned him

12   about that excessively perhaps.

13   Q    So you told him to modify his language?

14   A    Correct.

15   Q    Okay.  Did you caution him as to any parts

16   of his story that he should stay away from if he was

17   simply given the opportunity to kind of ramble on?

18   A    No, I don't think so.  I wanted the jury

19   to have an alternate explanation for the reason that

20   he left the halfway house.

21   Q    Mr. MacVeigh, do you have any recollection

22   of what the physical evidence was in this case?

23   A    If memory serves, there was little or

24   none.  The Commonwealth's theory was that, first of

25   all, there were no other witnesses besides the

57

1   complaining witness; and, second, that no physical

2   harm was visited upon the victim, rather that she was

3   threatened with it.

4        Q    Did you inquire of the victim perhaps

5   whether he was a much larger person than she was or

6   was that readily obvious to the jury?

7        A    I think that today is the first I've heard

8   that at the time Mr. Roth weighed 85 pounds more than

9   he did at the time of the trial, and I don't frankly

10  remember what the photograph depicts.

11       Q    There was no physical evidence introduced

12  then, clothing, torn clothing?

13       A    Record speaks for itself.  I think he's

14  probably right about that.

15            MR. ARCURI:  I have no other

16  questions, Judge.

17            THE COURT:  You may step down.  I

18  believe there was something additional Mr. Roth

19  wanted to explain.  He can stay wherever he is and

20  tell us.

21                      * * *

22            CALVIN ROTH, JR.,

23  called as a witness, having been duly sworn according

24  to law, testified as follows in rebuttal:

25            DIRECT EXAMINATION

58

BY MR. ARCURI:

Q    Mr. Roth, the question as related to Mr. MacVeigh related to the witness Christian and asked him whether or not you had informed him of what you felt Christian was going to testify to.

A    And he said he he wanted to know how I knew that Christian --

Q    Let me ask you, first of all, was the statement that I asked -- the question that I asked Mr. MacVeigh substantially correct that Christian would have testified -- in your opinion Christian would have testified to a meeting that was held where the victim admitted to setting you up, is that correct?

A    Yes.

Q    How did you know of Mr. -- or Christian?

A    From calling Christian.

Q    You called him?

A    Yeah, I called him.  I said I had his address.  I said that on the stand if I remember.  I had his address and his last name, but I don't know what I did.  I went through my notes.  I don't have it.  I don't know what happened to it, but I did have his address and his phone number cause he gave it to me when I was at Colonial House.  We had a little

1    address book.  It stated that everybody gives their

2    names and phone numbers to each other.

3         Q     You're saying you gave that to Mr.

4    MacVeigh at the time prior to the trial?

5         A     Yeah, I told him I wanted him to see if he

6    could get a hold of him, but at the time I didn't

7    have his address and phone number at the time because

8    I didn't have my address book, but they had my

9    address book in Indiana.  My wife had it cause I was

10   married at the time, and I couldn't get it, could not

11   get it from her.

12        Q     When did you get his name and address,

13   before or after trial?

14        A     I got his name when I was at the Colonial

15   House.

16        Q     And when you were arrested, you then had

17   contact with him?

18        A     Yeah, I talked to him before I was

19   arrested when I left Colonial House, and I turned

20   around and called Maureen and called him, talked to

21   them both.  Maureen -- I mean Christian is the one

22   that told me that they had a group meeting and said

23   that they got on Janice because in the group meeting

24   at the Colonial House you're suppose to bring your

25   fears out and your feelings on what the matter

1  happened.

2          So she said she was raped there.  So

3  they was trying to get her to bring her feelings out

4  and get them out in the open so they could talk about

5  them and get them over with.  They said they did

6  that.  Christian stated to me over the phone that

7  when they did that, Janet said that they actually --

8  she set me up.  So I was trying to get Christian in

9  here so he could testify to that.

10         And I tried to get the victim -- the

11  counselor that works at Colonial House because she

12  was the counselor at the time at this meeting.  If

13  anybody would know the truth, she would know the

14  truth that she said that.  I do not know if that is

15  the truth or not.  I would like to know if it is.

16     Q    Do you know Vicki's last name?

17     A    No, I do not.  I just know she was the

18  counselor.  I did know.

19     Q    Is that Vicki Bailey?

20     A    She was the counselor.  I don't know.  I

21  couldn't tell you.  I just know she was the counselor

22  out there at the Colonial House at the time that I

23  was there.

24     Q    Okay.  But go back to Christian.  What I

25  wanted you to state on the record here is whether or

61

1    not you gave that name and address or place to

2    contact him to Mr. MacVeigh?

3        A    No, I didn't give him no name.  I gave him

4    the name, but I didn't give him the address.  I told

5    him he could probably get it from Marvin Lipscomb.

6        Q    Okay.  So his statement then is accurate

7    that he probably contacted them, and he had

8    confidentiality problems?

9        A    Yeah, he probably did say that.

10            MR. ARCURI:  That's all.

11                        *  *  *

12              CROSS-EXAMINATION

13   BY MR. KELLEY:

14       Q    How about Vicki?  Did you give Vicki's

15   name to Dave?

16       A    Yes, I did.

17       Q    How come this is the first time you ever

18   mentioned that?

19       A    What do you mean the first time I ever

20   mentioned that?

21       Q    You never mentioned it on the stand or in

22   your petitions about this Vicki?

23       A    Well, Vicki is the counselor.  I mean she

24   wouldn't be able to testify against me either way.

25   If she did, she would put the whole rehab up in

                        62

1    danger at the time.  So --

2              THE COURT:  You're absolutely right

3    about that.

4              DEFENDANT ROTH:  I do not want to hurt

5    her.

6              THE COURT:  Not a matter of hurting

7    her.  She's got privileged communication.

8              DEFENDANT ROTH:  That's what I'm

9    saying.  I don't want to hurt her.  That's why I

10   didn't bring it up.

11                         * * *

12   BY MR. KELLEY:

13        Q    Did you ever give the name to Dave

14   MacVeigh though?

15        A    Yeah, I did mention it to him, yeah.  I

16   said they was in the group together, that was his

17   counselor, but see I couldn't get a hold of Vicki

18   because I wanted to talk to Vicki about this.  Vicki

19   turned around and already left the rehab.  She quit.

20   She quit her job and went to another job.  So I

21   couldn't get her.  I tried to get her name -- I mean

22   her whole name or address, everything.  I couldn't

23   get it.

24              THE COURT:  Okay.  Mr. Arcuri, after

25   hearing the testimony, I'm satisfied that there is no

1    need to take additional testimony because based on

2    what the Defendant has said about these prospective

3    witnesses, I think I am in a position to be able to

4    rule on the matter.

5                As to the Defendant's complaints about

6    Mr. MacVeigh, I will try to take them in order.  The

7    first one was the failure to object when the victim

8    broke down and acted hysterical.

9                We find that there, in fact, was an

10   objection made by Mr. MacVeigh at the time, that the

11   Defendant pursued that matter on direct appeal to the

12   Superior Court, that was the main issue that was

13   raised, and there was an opinion written by the

14   Superior Court rejecting that matter.  Therefore, Mr.

15   MacVeigh did everything possible he could do in

16   regard to that matter, and he can't be ineffective

17   for having failed to do matters which he, in fact,

18   did.

19               As to a lineup, there would be no

20   purpose in having a lineup when the defense is

21   consent.  The fact that the victim did not possibly

22   recognize the Defendant some 10 months later at the

23   time of the preliminary hearing when the Defendant's

24   appearance had changed markedly would be of no

25   significance, and the fact that the Defendant took

64

1   the stand and admitted his participation in the

2   sexual act means that a failure to have a lineup

3   would be of no legal significance.

4          The failure to have a polygraph is

5   also of no legal significance because the polygraph

6   is deemed unreliable by the courts, and had a

7   polygraph been taken, it would not have been

8   admissible into evidence.

9          The fact that Mr. MacVeigh failed to

10  obtain a doctor or obtain medical reports is of no

11  significance because the victim acknowledged at trial

12  that she had no bruises.  Therefore, the doctor would

13  have merely confirmed that which the victim herself

14  admitted.

15         As to Mr. MacVeigh's arguing the fact

16  that no bruises exist, the record is clear that he,

17  in fact, did make that argument.  In fact, it was the

18  main focus of the defense, and this is confirmed by

19  the transcript of the trial itself.

20         The fact that the Defendant was not

21  given the opportunity to tell his story his way is

22  not a matter of ineffective assistance of counsel.

23  Clearly the Defendant had the opportunity to tell his

24  story.  This was done in the form of questions and

25  the answers to the questions rather than simply

                        65

1    telling the Defendant to go ahead and tell his story

2    and letting him ramble on in a fashion that would not

3    necessarily be presented coherently as it would be

4    when proper questions are asked and answered, and, in

5    fact, if the Defendant had attempted to just tell his

6    own story without questions being presented, the

7    Commonwealth would have had the right to object and

8    require that the questions be asked and answers be

9    made to specific questions.

10              So, therefore, what the Defendant

11   wanted to do would have been legally objectionable

12   and the Commonwealth and/or the Court would have had

13   the right to require that counsel ask questions and

14   the Defendant respond to those questions.

15              Therefore, as to all of those matters,

16   the Defendant has not raised any objections that

17   might possibly even remotely be considered

18   ineffective assistance of counsel.

19              The Court next turns to the

20   allegations involving the failure to have three

21   witnesses present for trial.  The Court would note,

22   first, that Attorney MacVeigh acknowledges being

23   requested to have those three witnesses available

24   and, in fact, did contact two of the three witnesses

25   and, in fact, had one of them present.

66

1      So as to Mr. Gladstone, the Court can

2   not see how Mr. MacVeigh could have been ineffective

3   since he, in fact, did contact him, he did subpoena

4   him, he did have him here in trial, and he did give

5   the testimony that the Defendant wanted.  What more

6   the counsel could have done, I cannot imagine.

7      As to Miss McPartland, this defense

8   counsel acknowledges being requested to have her as a

9   witness, that he contacted her, that she informed him

10  that she had no personal knowledge of the events

11  which occurred specifically, and that she did not

12  wish to be a participant, and in response to that he

13  elected not to call her as a witness.

14      Counsel had the foresight to have this

15  put in writing by the potential witness so that he

16  had documented written proof that this was the case.

17  If the witness had been called to testify and had

18  given the same statement that she gave in her letter

19  to Mr. MacVeigh, there would have been nothing that

20  she could have added to the trial.  Therefore, his

21  failure to call her could hardly be deemed to be

22  ineffective.

23      We also note that the subpoena that

24  was issued to a witness who was residing in the state

25  of New York was not properly served and could not

67

1    have been enforced in any event.  So his so-called

2    decision to release her from the subpoena was of no

3    significance, the subpoena never having been properly

4    legally served in the first place.

5                We do note that the Defendant does

6    have a proper objection in one sense in that what he

7    wanted Miss McPartland to testify about was the

8    Defendant's relationship with the victim in the weeks

9    prior to the alleged rape rather than about what

10   happened at the time of the actual rape.

11               The Defendant acknowledges that

12   McPartland was not present when the sexual act

13   occurred and obviously could not have given any

14   testimony about that, and it is not clear to the

15   Court that Mr. MacVeigh did ask Miss McPartland about

16   the matters relating to the relation between the

17   parties in the three weeks prior to the alleged rape.

18               On the other hand, that testimony if

19   it had existed, would have been merely cumulative

20   given the testimony of Mr. Gladstone, and the fact

21   that he had photographic evidence showing the victim

22   with her arm around the Defendant and given that old

23   adage that a picture is worth a thousand words, we

24   feel that the testimony that the jury did hear was

25   sufficient to show the existence of a prior

                                68

1   relationship between the two of them, and that the

2   testimony of McPartland would have not offered

3   anything beyond that, and to that extent would have

4   been cumulative even if, in fact, it did actually

5   exist.

6           As to the witness who was known as

7   Chris or Christian, the Court finds that the

8   statement that he was to testify to would have been a

9   statement given by the victim in the course of

10  counseling, that the statement she gave in the course

11  of counseling to her counselor as part of her

12  therapeutic counseling session albeit a group session

13  would have been privileged, and could not have been

14  disclosed either by the counselor or anybody else who

15  participated in those sessions.

16          Further, we find that there was

17  nothing further that Mr. MacVeigh could have done

18  other than the steps he took, which were to attempt

19  to find out who the person was, and having failed to

20  do so, there was no further steps he could have

21  taken.

22          Had he applied to the Court for a

23  Court order requesting that those confidential

24  records would have been disclosed, he would not have

25  been entitled to such an order. Therefore, his

69

1   failure to make that request is of no legal

2   significance.

3          Further, we find that the Defendant

4   himself did not provide a suitable method to contact

5   Christian, and that he himself had that available.

6   He acknowledges that he himself had Christian's

7   address and phone number, and that he failed to

8   provide it to counsel.  So he can hardly blame

9   counsel when counsel was not able to obtain that

10  which, in fact, he admits he had and failed to

11  provide to counsel.

12         Therefore, we find that counsel was

13  not ineffective in failing to have those three

14  witnesses present as claimed in his testimony.

15         Finding that the Defendant has offered

16  no valid reasons why he would be entitled to

17  post-conviction relief, his petition is denied.

18                    * * *

19            (END OF PROCEEDINGS)

20                    * * *

21

22

23

24

25

C E R T I F I C A T I O N

    I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the hearing in the above cause, and that this copy is a correct transcript of the same.

_Debra S. Romesberg_

Debra S. Romesberg,
Official Court Reporter

    The foregoing record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.

_____

John H. Chronister,
Judge

APPENDIX O





# Supreme Court of Pennsylvania
## Middle District

JOAN L. STEHULAK, ESQUIRE
DEPUTY PROTHONOTARY

SHIRLEY BAILEY
CHIEF CLERK

434 MAIN CAPITOL BUILDING
P.O. BOX 624
HARRISBURG, PENNSYLVANIA 17108
(717) 787-6181

May 30, 1997

Frank C. Arcuri, Esquire

COMMONWEALTH OF PENNSYLVANIA

                RESPONDENT

           V.

CALVIN WILLIAM ROTH, JR.

                PETITIONER

No. 0775 M.D. Allocatur Docket 1996

Counsel:

This is to advise you that the attached order has been entered on the Petition for ance of Appeal filed in the above-captioned matter.

                Very truly yours,
                Office of the Prothonotary
                Supreme Court of Pennsylvania

on. John H. Chronister, J.
ork; 2341 CA 1992; Criminal
om Kelly, Esquire

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

COMMONWEALTH OF PENNSYLVANIA,    : No. 775 M.D. Alloc. Dkt. 1996
                                 :
            Respondent           : Petition for Allowance of
                                 : Appeal from Order of the
                                 : Superior Court
        v.                       :
                                 :
                                 :
ALVIN WILLIAM ROTH, JR.,         :
                                 :
            Petitioner           :

## ORDER

PER CURIAM

    AND NOW, this 29th day of May, 1997, the Petition for
Allowance of Appeal is denied.

TRUE & CORRECT COPY

ATTEST: MAY 3 0 1997

*Joan L. Stehulak* (signature)

JOAN L. STEHULAK, ESQUIRE
DEPUTY PROTHONOTARY

APPENDIX P

07/27/01  10:54 FAX 215 871 8477        NATIONAL ARCHIVES - PHL

# 1: CV 97 - 1773

RECEIVED
SCRANTON
NOV 1 7 1997

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District Middle | |
|---|---|---|
| Name Calvin William Roth, Jr. | Prisoner No. CY-1623 | Case No. 2341 CA 1992 |

Place of Confinement
S.C.I. Houtzdale, PA 16698, Box 1000

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| Calvin William Roth Jr. | v. John M. McCullough (superintendant) |

FILED
SCRANTON
NOV 1 - 1997

PER _____
DEPUTY CLERK

The Attorney General of the State of:
Pennsylvania

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  Court of Common pleas, York County, Pennsylvania

2. Date of judgment of conviction  July 21, 1993

3. Length of sentence  11 years to 22 years

4. Nature of offense involved (all counts)  Escape, Rape, and terroristic Threats.

5. What was your plea? (Check one)
   (a) Not guilty        ☒
   (b) Guilty            ☐
   (c) Nolo contendere   ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:
   Plead guilty to escape- went to jury trial on Rape and

   Terroristic Threats.

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury         ☒
   (b) Judge only   ☐

7. Did you testify at the trial?
   Yes ☒ No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

(2)

AO 241 (Rev. 5/65)

9. If you did appeal, answer the following:

(a) Name of court  Superior Court

(b) Result  Remanded for P.C.R.A Hearing

(c) Date of result and citation, if known  11-5-93

(d) Grounds raised _____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

    (1) Name of court  Common pleas York County, PA

    (2) Result  P.C.R.A. denied

    (3) Date of result and citation, if known  1-30-96

    (4) Grounds raised  Ineffective counsel

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

    (1) Name of court _____

    (2) Result _____

    (3) Date of result and citation, if known _____

    (4) Grounds raised _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court  Common pleas Court York County, PA

    (2) Nature of proceeding  P.C.R.A.

    (3) Grounds raised  Ineffective counsel

(5)

07/27/01  10:55 FAX 215 871 8477          NATIONAL ARCHIVES - PHI                    00

AO 241 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
    Yes ☒  No ☐

(5) Result  P.C.R.A. Denied

(6) Date of result  1-30-96

(b)  As to any second petition, application or motion give the same information:

(1) Name of court  Superior Court

(2) Nature of proceeding  Appeal P.C.R.A.

(3) Grounds raised  Ineffective Counsel

(4) Did you receive an evidentiary hearing on your petition, application or motion?
    Yes ☐  No ☒

(5) Result  Lower Court Affirmed

(6) Date of result  1-31-96

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
    (1) First petition, etc.        Yes ☒  No ☐
    (2) Second petition, etc.       Yes ☒  No ☐

(d)  If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

     Appealed Superior Court ruling to the Supreme court- Supreme

     court denied on allowance of appeal on 5-29-97

12. State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.
    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

A.  Ground one:  (I) Ineffective counsel

Supporting FACTS (state *briefly* without citing cases or law) 1) Failure of counsel to object when victim broke down & acted hysterical at trial.

2) Failure of trial counsel to have a line up after appellant notified counsel before hearing. 3) Failure of counsel to procedure a polygraph test. 4) Failure to obtain doctor or medical reports. 5) Failure to no physical evidence existed.

6) Failure to allow appellant to relate his story at trial. 7) Failure to call three witnesses at trial.

B.  Ground two:

(H) Jury was unconstitutionally selected and impaneled.

Supporting FACTS (state *briefly* without citing cases or law):

There were ten women and two men on my jury, which I feel prejudiced against me in a trial of Rape.

(5)

07/27/01  10:55 FAX 215 671 8477        NATIONAL ARCHIVES - PHL

AO 241 (Rev. 5/85)

C. Ground three: Failure to have compulsory process for obtaining
witness in defandants favor.

Supporting FACTS (state *briefly* without citing cases or law):

(3) three witnesses were not called on behalf of the defendant
in this case- All testimony against an acused person must be
presented publicly in court.

D. Ground four

Supporting FACTS (state *briefly* without citing cases or law):

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly*
what grounds were not so presented, and give your reasons for not presenting them:

(H) Jury was unconstitutionally selected and impaneled- unlettered
at the law and ineffective counsel before and at trial.

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked
herein:
(a) At preliminary hearing  J. David MacVeigh- Public defender

(b) At arraignment and plea  J. David MacVeigh- Public defender

(6)

AO 241 (Rev. 5/85)

(c) At trial ___J. David MacVeigh- Public defender_____

(d) At sentencing ___J. David MacVeigh- Public defender_____

(e) On appeal _____

(f) In any post-conviction proceeding ___Frank C. Arcuri Esquire_____
___P.O. Box 429 York, PA 17405_____

(g) On appeal from any adverse ruling in a post-conviction proceeding ___Frank C. Arcuri Esquire___
___P.O. Box 429 York, PA 17405_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☒  No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐  No ☒
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐  No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

__11 - 12 - 99_____
(date)

_____
Signature of Petitioner

(7)

APPENDIX Q

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CALVIN WILLIAM ROTH,          : CIVIL ACTION NO. 1:CV-97-1773
                              :
          Petitioner          :
                              :
     v.                       :
                              :                    FILED
                              :              HARRISBURG PA
JOHN M. McCULLOUGH, et al.,   : (Chief Judge Rambo)
                              :                  JUL 17 1998
          Respondents         :
                              :            MARY E. D'ANDREA, CLERK
                              :            Per _____
                                               Deputy Clerk

                    O R D E R

     In accordance with the accompanying memorandum, IT IS HEREBY

ORDERED THAT:

          1.   The petition for writ of habeas corpus is dismissed,

without prejudice, for failure to fully exhaust state remedies.

          2.   The Clerk of Court is directed to close the case.

          3.   Based on the court's conclusion herein, there is no

basis for the issuance of a certificate of appealability.



                              SYLVIA H. RAMBO, Chief Judge
                              Middle District of Pennsylvania

Dated:   July   17  , 1998.

SR:jvw

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CALVIN WILLIAM ROTH,                    :       CIVIL ACTION NO. 1:CV-97-1773
                                        :
              Petitioner                :
                                        :
       v.                               :
                                        :
JOHN M. McCULLOUGH, et al.,             :       (Chief Judge Rambo)
                                        :
              Respondents               :

                                                FILED
                                                HARRISBURG PA

              M E M O R A N D U M               JUL 17 1998

Background                                      MARY E. D'ANDREA, CLERK
                                                Per _____
                                                      Deputy Clerk

       Calvin William Roth Jr., an inmate presently confined at

the State Correctional Institution, Houtzdale, Pennsylvania (SCI-

Houtzdale), initiated this petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  Petitioner was previously granted

leave to proceed in forma pauperis.  Named as Respondents are SCI-

Houtzdale Superintendent John M. McCullough and the Attorney

General of Pennsylvania.

       Roth states that he was convicted of rape and terroristic

threats following a jury trial in the York County, Pennsylvania

Court of Common Pleas.  He also entered a plea of guilty to a

charge of escape.  Petitioner was thereafter sentenced to an

eleven (11) to twenty-two (22) year term of confinement.  His

petition initially asserts that he received ineffective assistance

from his trial counsel.  Specifically, he maintains that his trial

attorney failed to:  request a line up; obtain medical reports;

call three witnesses; object when the victim broke down and acted hysterically during trial; have petitioner undergo a polygraph test; permit petitioner to testify in his own behalf; and did not note the absence of physical evidence. Roth's second alleged basis for relief is that his jury was unconstitutionally selected and impaneled. He states that his jury was prejudicial because it consisted of ten (10) women and two (2) men. His final claim asserts "failure to have compulsory process for obtaining witness in defendants (sic) favor". (Doc. 1, ¶ 12(c) of rec.) Petitioner is apparently alleging that the failure to have three (3) witnesses testify on his behalf also violated his constitutional rights.

Respondents have filed a response arguing that the petition should be dismissed because it includes claims that have not been exhausted in state court. Although granted an opportunity to do so, petitioner has not submitted a reply. Consequently, this matter is now ripe for consideration.

As a general rule, a state prisoner must exhaust available state court remedies before seeking habeas relief in federal court. See 28 U.S.C. §§ 2254(b),(c); Rose v. Lundy, 455 U.S. 509, 515-20 (1982). "Unless it would be patently futile to do so, [a state prisoner] must seek relief in state court before filing a federal habeas petition . . . ." Santana v. Fenton, 685 F.2d 71,

77 (3d Cir. 1982).[1]  The exhaustion requirement "is not a mere formality.  It serves the interests of comity between the federal and state systems by allowing the state an initial opportunity to determine and correct any violations of a prisoner's federal rights." Gibson v. Scheidemantel, 805 F.2d 135, 138 (3d Cir. 1986).

A habeas corpus petitioner bears the burden of demonstrating that he has satisfied the exhaustion requirement. See Gonce v. Redman, 780 F.2d 333, 336 (3d Cir. 1985).  Exhaustion is not complete unless the trial court, a state intermediate appellate court (if applicable), and the highest state court, here the Supreme Court of Pennsylvania, have been presented with the substance of petitioner's claims.  See Evans v. Court of Common Pleas, 959 F.2d 1227, 1230 (3d Cir. 1992).  The threshold inquiry in the exhaustion analysis is whether the claims asserted in the habeas corpus petition have been "fairly presented" to the state court.  Picard v. Connor, 404 U.S. 270, 275 (1971).  In Duncan v. Henry, 513 U.S. 364, 366 (1995), which concerned exhaustion of an evidentiary issue, the Supreme Court relied, inter alia, on Picard and held:  "If a habeas petitioner wishes to claim that an

---

1.  Exceptions to the exhaustion requirement are made when:  (1) the state corrective process is so deficient as to render any effort to obtain relief futile, 28 U.S.C. § 2254(b); (2) acts of state officials have, in effect, made state remedies unavailable to the petitioner, Mayberry v. Petsock, 821 F.2d 179, 184 (3d Cir. 1987); or (3) "inordinate delay" in state proceedings has rendered state remedies ineffective.  Story v. Kindt, 26 F.3d 402, 405 (3d Cir. 1994).

3

evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."

One of the avenues for relief in the Pennsylvania legal system is collateral relief under the Post Conviction Relief Act (P.C.R.A.). 42 Pa. Cons. Stat. Ann. §§ 9541-46 (West Supp. 1997). "P.C.R.A. permits motions for post-conviction collateral relief for allegations of error, including ineffective assistance of counsel, unlawfully induced guilty pleas, improper obstruction of rights to appeal by Commonwealth officials, and violation of constitutional provisions." Hankins v. Fulcomer, 941 F.2d 246, 251 (3d Cir. 1991).[2]

This court recognizes that the exhaustion requirement is not jurisdictional and nonexhaustion is not "an absolute bar to consideration of the merits of a habeas corpus [petition] . . . ." Granberry v. Greer, 481 U.S. 129, 131 (1987). The Supreme Court in Granberry favored an "intermediate approach" whereby the appellate courts may "exercise discretion in each case to decide whether the administration of justice would be better served by insisting on exhaustion or by reaching the merits of the petition

---

2. To exhaust one's claims, they may be presented to the state courts directly on appeal from the judgment of conviction and sentence or through a collateral proceeding under the P.C.R.A. It is not necessary, however, to present federal claims to state courts both on direct appeal and in a P.C.R.A. proceeding. Evans, 959 F.2d at 1230; Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984).

forthwith." Id. Similarly, our Court of Appeals in Evans has stated that the district courts reviewing habeas petitions may deny plainly meritless claims which have not been exhausted. 959 F.2d at 1231.

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") was signed into law on April 24, 1996. Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. §§ 2244 and 2254). Section 2254(b), as amended by the AEDPA, provides as follows:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that --
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>>
>> (B)(i) there is an absence of available State corrective process; or
>>
>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the state, through counsel, expressly waives the requirement.

The AEDPA modified the exhaustion requirement in two respects. First, it provides that a state must expressly waive the exhaustion requirement; mere failure to raise the issue is not a waiver. Additionally, the AEDPA adopted the Evans rule which

permits a court to <u>deny</u> a habeas petition on the merits even if a prisoner failed to exhaust all of his state court remedies and even if the state had not explicitly waived the exhaustion requirement.  Thus, "if a question exists as to whether the petitioner has stated a colorable federal claim, the district court may not consider the merits of the claim if the petitioner has failed to exhaust state remedies and none of the exceptions set forth in Sections 2254(b)(1)(B)(i) and (ii) applies."  <u>Lambert</u> <u>v. Blackwell</u>, 134 F.3d 506, 515 (3d Cir. 1997) as amended (Jan. 16, 1998).

A review of the record provides that following his conviction, Roth filed a direct appeal to Pennsylvania's Superior Court, which solely asserted that the trial court abused its discretion by denying trial counsel's request for a mistrial following a display of emotion by the victim during her testimony. By order dated December 14, 1995, the Superior Court affirmed the judgment of sentence.  An allowance of appeal to Pennsylvania's Supreme Court was denied by order dated May 29, 1997.

Petitioner then sought collateral relief via a P.C.R.A. petition.  His petition asserted the same allegations of ineffective assistance of counsel which are raised herein. Following a hearing, the trial court denied the P.C.R.A. petition by order dated January 30, 1996.  However, there is no indication that petitioner's remaining jury-related allegations were raised in that proceeding.  Roth appealed the denial of his P.C.R.A.

6

petition to both Pennsylvania's Superior and Supreme Courts and his instant petition indicates that said appeals were also unsuccessful.

Roth acknowledges that he did not previously raise his allegation of an unconstitutionally selected and impaneled jury in state court. See Doc. 1, ¶ 13 of rec. Consequently, it is undisputed that Roth's instant petition contains at least one unexhausted claim. Pursuant to 28 U.S.C. § 2254(b), this court, if appropriate, could exercise discretion to hear and deny any plainly meritless unexhausted claims. However, since no Pennsylvania state appellate court has been afforded the opportunity to review Roth's jury related allegations, this court declines to exercise its discretion because the administration of justice would be better served by insisting on complete exhaustion. See Duarte v. Hershberger, 947 F. Supp. 146, 149-50 (D.N.J. 1996).

Habeas petitions containing unexhausted claims are normally dismissed so that the petitioner can exhaust his state remedies. See Peoples v. Fulcomer, 882 F.2d 828, 832 (3d Cir. 1989). Prior to dismissing his petition as premature, this court must determine if it would be futile for Roth to file another P.C.R.A. petition. See Doctor v. Walters, 96 F. 3d 675, 681 (3d Cir. 1996). In light of Roth's assertion that his failure to previously attack the constitutionality of his jury was due to ineffective assistance of counsel and the failure of any state

court to hold that said claim is procedurally barred, it cannot be
concluded at this juncture that it would be futile for Roth to
assert his unexhausted claim in state court.  See Toulson v.
Beyer, 987 F. 2d 984, 987 (3d Cir. 1993).  For the foregoing
reasons, the petition will be dismissed, without prejudice, for
failure of petitioner to fully exhaust his state remedies.  An
appropriate order will be issued.


SYLVIA H. RAMBO, Chief Judge
Middle District of Pennsylvania

Dated:   July  /7 , 1998.

SR:jvw

8

APPENDIX R

# MOTION FOR POST CONVICTION COLLATERAL RELIEF

C-198
. 7-89

| COMMONWEALTH OF PENNSYLVANIA | COURT AND DOCKET NUMBERS |
|---|---|
| VS | |
| Calvin William Roth JR. | |
| (Name of Defendant) | To be filled in by Clerk of Court |

NOTE: List below those informations or indictments & offenses for which you have not completed your sentence.

INFORMATION OR INDICTMENT NUMBERS:

No. 2341 CA 1992

I WAS CHARGED WITH THE FOLLOWING CRIMES:

Escape, Rape, Terroristic Threats

1. MY NAME IS:

Calvin William Roth Jr.

2. I AM NOW

(A) ☐ On Parole   (B) ☐ On Probation   (C) ☒ Confined in S.C.I. Houtzdale

3.

I WAS SENTENCED ON September 2, , 19 93 TO A TOTAL TERM

OF 11-to-22 years , COMMENCING ON December 30 , 19 92 BY

JUDGE(S) John R. Chronister

FOLLOWING A:     ☒ Trial by jury              ☐ Plea of guilty

☐ Trial by a judge without a jury       ☐ Plea of nolo contendere

4. I AM ELIGIBLE FOR RELIEF BECAUSE OF:

☒ (I)   A violation of the constitution of Pennsylvania or laws of this Commonwealth or the constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

☒ (II)  Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

☐ (III) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

☐ (IV)  The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

☒ (V)   A violation of the provisions of the constitution, law or treaties of the United States which would require the granting of federal habeas corpus relief to a state prisoner.

☐ (VI)  The unavailability at the time of trial of exculpatory evidence that has subsequently become available and that would have affected the outcome of the trial if it had been introduced.

☐ (VII) The imposition of a sentence greater than the lawful maximum.

☐ (VIII) A proceeding in a tribunal without jurisdiction.

5. THE FACTS IN SUPPORT OF THE ALLEGED ERROR(S) UPON WHICH THIS MOTION IS BASED ARE AS FOLLOWS: (State facts clearly and fully; argument, citations, or discussions of authorities shall not be included.)

(A) I know the following facts to be true of my own personal knowledge:

Ineffective assistance of Counsel; Failure to call at trial,expert witness as to the extent, or non-existence of bruises, abraisions or other signs of a forced sexual assault. Violation of the (14th) Amendment, due process, in which trial counsel allowed an uncon-stitutionally selected and impaneled prejudice jury consisting of (10-woman and two men), photographs, taken by staff, at rehab center, should have been entered as evidence for the defence.

(2). Inconsistent statements; Marvin Lipscomb erred in trial testimony, inconsistent with statement to police.

(3). Inappropriate comments; (DA) in closing refers to the Defen-dants state of mind.

(B) The following facts were made known to me by means other than my own personal knowledge (Explain how and by whom you are informed):

(C) In the event my appeal is allowed as requested under #4, the following are the matters which I intend to ass on that appeal (Specify the matters to be asserted if appeal is allowed)

(1) Ineffective Assistance of Counsel.

(2) Violation of the Constitution of the United States and/or constitution of Pennsylvania.

(3) Inconsistent Statements of State Witness.

(4) Inappropriate comments by the (DA) in closing.

6. SUPPORTING EXHIBITS

(A) In support of this motion I have attached as exhibits:

    ☒ Affidavits      ✗      [Exhibit(s) No. B-1-B-2      ]

    ☒ Records      [Exhibit(s) No. A-1-A-9 D-1-D-3

    ☒ Other Supporting Evidence      [Exhibit(s) No. C-1      ]

(B) I have not attached any affidavits, records or other supporting evidence because

_____

_____

_____

_____

7. I HAVE TAKEN THE FOLLOWING ACTION(S) TO SECURE RELIEF FROM MY CONVICTION(S) OR SENTENCE(S):

(A) Direct Appeal      (IF "YES," name the court(s) to which appeal(s) was/were taken, date, term and number, and result.)

[X] YES    [ ] NO

Superior Court, 11-5-93, HBG93, 00711, Remanded for P.C.R.A.

hearing 12-14-95, Judgment Affirmed.

Superior Court, 11-25-96, HBG96, 158, Judgment Affirmed.

Supreme Court, Middle District, 5-29-97, No. 775 M.D. 1996 Appeal Denied.

(B) Previous proceedings in the courts of the Commonwealth of Pennsylvania

[X] YES    [ ] NO      (IF "YES," name the type of proceedings (such as habeas corpus, etc.) — including former proceedings under the Post Conviction Hearing Act the Court(s) in which petition(s) was/were filed, date, term and number, and result, including all appeals.)

P.C.R.A. Hearing, relief denied. 1-30-96

_____

_____

(C) Habeas Corpus or other petitions in Federal Courts

[X] YES    [ ] NO      (IF "YES," name the district in which petition(s) was/were filed, date(s), Court Number—civil action or miscellaneous, and result, including all appeals.)

Middle District of PA filed on July-17-1998 1:CV-97-1773

Civil Action. Resulted in the petition being dismissed without

prejudice.

(D) Other legal proceedings

[ ] YES    [ ] NO      (IF "YES," give complete details—type of action, court in which filed, date, term and number, and result, including all appeals.)

_____

_____

8. FOLLOWING MY ARREST, I WAS REPRESENTED BY THE FOLLOWING LAWYER(S):   (Give the lawyer's
name and the proceeding at which he represented you.)

J. David Macveige, Trial Attorney

Frank R. Arcuri, Esquire, P.C.R.A. Hearing, all Appeals

9. THE ISSUES WHICH I HAVE RAISED IN THIS MOTION HAVE NOT BEEN PREVIOUSLY LITIGATED AND
ONE OF THE FOLLOWING APPLIES:

- [X]    (I)    The allegation of error has not been waived.

- [X]    (II)    If the allegation of error has been waived, the alleged error has resulted in the conviction or
affirmance of sentence of an innocent individual."

- [ ]    "(III)    If the allegation of error has been waived, the waiver of the allegation of error during pretrial,
trial, post-trial or direct appeal proceedings does not constitute a state procedural default barring
federal habeas corpus relief."

The failure to litigate this issue(s) prior to or during trial or on direct appeal could not have been the
result of any rational strategic or tactical decision by counsel.

10. BECAUSE OF THE FOREGOING REASONS, THE RELIEF WHICH I DESIRE IS:

(A) [X]  Release from custody and discharge

(B) [X]  A new trial

(C) [X]  Correction of sentence

(D) [ ]  Other relief (specify): _____

11.    (A) I am [ ] ABLE      [X] NOT ABLE to pay the costs of this proceeding.

I have $ _____ in my prison account.

(B) My other financial resources are:  NONE

12. (A) [X] I do not have a lawyer and I am without financial resources or otherwise unable to obtain a lawyer

    (1) [X] I request the court to appoint a lawyer to represent me.

    (2) [ ] I do not want a lawyer to represent me.

  (B) [ ] I am represented by a lawyer. (Give name and address of your lawyer.)

_____

_____

_____
                                        (Signature of Defendant)

# UNSWORN DECLARATION

I Calvin William Roth Jr. do hereby verify that
            Your Name

the facts set forth in the above motion are true and correct

to the best of my personal knowledge or information and

belief, and that any false statements herein are made sub-

ject to the penalties of Section 4904 of the Crimes Code

(18 Pa. C.S. § 4904), relating to unsworn falsification to

authorities.

_____
                             Signature of Defendant

No Notary
Required

| COMMONWEALTH OF PENNSYLVANIA | IN THE CRIMINAL COURTS OF THE COUNTY OF |
|---|---|
| VS | |

_____
(Name of Defendant)

Criminal
Action No. _____ of _____ 19_____

## ORDER

AND NOW this _____ day of _____, 19_____ Upon consideration of the foregoing motion

1. ☐ The motion is returned to defendant for amendment as follows, such amendment to be made on or before

_____, 19 _____

2. ☐ A rule is granted upon the Commonwealth of Pennsylvania to show cause why a hearing should not be granted. The

rule is returnable on or before _____ 19 _____

3. ☐ The request to proceed as a poor person, without the payment of costs, is  ☐ granted  ☐ denied.

4. ☐ Upon finding that defendant is unable to obtain a lawyer _____ Esq., is appoint-
ed to represent him.

5. ☐ The Clerk of this Court is ordered and directed to do the following forthwith:

    (a) To serve a copy of this motion and this order upon the District Attorney of _____ County.

    (b) To send a copy of this motion and this order to _____ Esq., the lawyer for the defendant.

    (c) To send a copy of this order to the defendant.

6. ☐



# Commonwealth of Pennsylvania

**COUNTY OF** York

SS: **SEARCH WARRANT**
AND AFFIDAVIT

WARRANT CONTROL

D 26087

DATE OF APPLICATION

INVENTORY NO.

G 20913

| Cst. Jeffrey S. Snell | West Manchester Twp. Police | 792-9514 |
|---|---|---|
| *(Name of Affiant)* | *(Police Department or address of private Affiant)* | *(Phone No.)* |

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

**IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED** *(be as specific as possible)*:

Human blood from one Calvin W. Roth Jr., D.O.B. 7-2-63, who is a current inmate at York County Prison - Also a human saliva sample from Calvin W. Roth Jr.

**SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED** *(Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)*:

Calvin W. Roth Jr., D.O.B. 7-2-63, white male, 6', aprox. 172 lbs., brown hair, and brown eyes, who is a current inmate at York County Prison

**NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED** *(If proper name is unknown, give alias and/or description)*:

Calvin W. Roth Jr. / Richard Hahn (Warden of York County Prison)

**VIOLATION OF** *(Describe conduct or specify statute)*:

Pa. Crimes code. Sec. 3121, Rape

**DATE OF VIOLATION**

5-25-92

**PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

On 5-25-92 Janet M. Velte, a resident of Colonial Halfway House, 3600 W. Market St., York, Pa., reported that she was raped on 5-25-92 by another resident of Colonial Halfway house. She stated that the resident who committed this rape against her was Calvin W. Roth Jr. Janet related this information to another resident and staff personnel at Colonial Halfway House within an hour of the rape. She was then immediately transported to York Hospital for an examination. At York Hospital Dr. Joe Caldwell performed an examination on Janet Velte. A wet mount of her vaghial discharge revealed non-motile sperm. Additional vaginal swabs and smears were taken along with her clothing for future lab examinations into this matter.

Marvin T. Lipscomb who is the Executive Director of the Colonial Halfway House stated that he confronted Calvin at approximately 2200 hrs. on 5-25-92 in regards to the fact that a female resident was claiming that she was raped by him. Mr. Lipscomb stated that he told Calvin to remain in the recreation room and not to move. He stated that he further told calvin that Janet was going to the hospital for an examination. Mr. Lipscomb stated that he left the recreation room for approximately one minute, and

ATTACH ADDITIONAL PAPER (S) COPIES IF NECESSARY  ☑ CHECK HERE IF ADDITIONAL PAPER IS USED.

| RESULT OF SEARCH GIVE BRIEF NARRATIVE OF WHAT HAPPENED | DATE AND TIME OF SEARCH 4/2/93 ; 10:04 ☑ A.M. ☐ P.M. | ARREST ☐ YES ☑ NO. | JUDGE'S DISPOSITION ☐ DISC. ☐ HELD FOR COURT ☐ FURTHER HEARING ☐ FINED OR COMMITT |
|---|---|---|---|
| | PROPERTY SEIZED ☑ YES ☐ NO *(If "yes" list inventory on separate form, R2008 and enter control number(s) here* G 20913 | | |

| SIGNATURE OF PERSON SEIZING PROPERTY *Jeffrey S. Snell* | BADGE NO. 10 | OTHER OFFICERS PARTICIPATING IN SEARCH: |
|---|---|---|

| *Signature of Affiant* | 2501 Catherine St., York, Pa. *Address of Private Affiant* | 10 *Badge No.* | West Manchester *District/Unit* |
|---|---|---|---|

Sworn to and subscribed before me this **2ND** day of **APRIL** 19 **93**, Office

APPENDIX S

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

vs

CALVIN WILLIAM ROTH, JR.

No. 2341 Criminal Action 1992

### O R D E R

Defendant has filed a second Petition for post conviction relief.  The conviction in this matter has been final for a period in excess of one year.  Therefore no further appeals or post conviction proceedings would be possible.  Defendant's Petition is refused.

BY THE COURT,

JOHN H. CHRONISTER
JUDGE

APPENDIX T

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

:

COMMONWEALTH OF PENNSYLVANIA

:

VS.                                        CASE NO. 2341 C.A. 1992

:

CALVIN WILLIAM ROTH, JR.

:

NOTICE OF MOTION TO SET ASIDE SENTENCE AS STATED ABOVE

PLEASE TAKE NOTICE THAT upon the annexed affidavit of Calvin
William Roth, Jr., sworn to this __18__ day of __FEB__ ,1999,and
Any supporting information and or documents attached hereto, and
Upon the accusatory instrument and all other papers filed herein,
The defendant will move this court, at the Courthouse located at
York County, York, PA. 17401,for a date of April 1999, or as soon
Thereafter as counsel may be heard for:

(1) An order, pursuant to criminal procedure Law, of state govern-
ing sections, and united states Code §2255,R. Crim. P. 35(b)(1)and
All additions as the defendant is proceeding PRO-SE. setting aside
The sentence heretofore imposed upon the above named defendant on
The 21st day of July, 1993, or in the alternative, order a hearing
To determine whether such sentence should be set aside on the ground
That:

The defendant asserts that the present sentence is [invalid], the
Defendant was not properly informed or reprasented by counsel, nor
Was he allowed to challenge this sentence due to contradicted
Testimony which is in violation of Rule 108.3 ¶SEE:Com VS. Riley
326 A.2d 384,466 pa. 339/Comm VS. Mosteller 284 A.2d 786,446 pa.
339/.Comm VS. Coleman 264 A.2d 649,438 pa. 373. the defendant has
Additional information that will be available for hearing in this
Matter, along with additional arguments.
The defendant informed counsel of the unconstitutionally selected
And impaneled Jury. the defendant being prejudiced by out burst if
The Jury was given proper instructions after said out-burst. counsel
Failure to raise this argument on appeal as was my request counsel

Failure to communicate with me. Counsel is not amicus curiae but
Has an duty to perform reasonable care and duty/. and violations
Of the defendant's rights guaranteed him under the United States
Constitution. (how the trial should have been handled),391 F.2d 971

(2) If counsel failed to establish in-Camira hearing and the prob-
ative need for the same. trial counsel deficient performance has
Prejudiced the defendant resulting in an unreliablie and unfaire
Outcome of these proceedings SEE¶Lockhart,VS. Fretwell,506 U.S.__
,122 Led 2d 180;113 S.ct 838 (1993).

(3) If the jury had been tainted due to the outburst during trial
The defendant being denied the right to a cross section of his
Peers, there were Ten(10) woman and two(2) men on my jury(prejudicing
The defendant and the out-come of his trial).NOTE:(on trial of Rape
Of a woman complainant).

·(4) Fact that the defendant objects to Juror who stated "she had
a friend who experienced this" counsel failed to challenge this
Juror as was my wish (paremptory).

(5) Failure of counsel to secure witnesses that would have changed
The out-come of the trial. witnesses that could have testified to
Fact concerning this case. and there being probative value in the
Calling of said witnesses.

(6) Defendant being prejudiced due to tainted and contradicted
Testimony as made by commonwealths witnesses, that is contradicted
From police reports and preliminary trial.

(7) Fact that the defendant contacted counsel with instructions
Of his wishes how-ever counsel fail to honor thoughs wishes.also
Through various family members attempted to contact counsel
Regarding this matter to no avail,SEE ¶ Media Corp VS. Murphy &
P Allison,773 F Supp 1047.

(8)  The defendant seeks all discovery in this matter(which tran-
script and discovery go hand in hand in order to argue any appea-
lable issue's¶SEE: Comm VS. Lawson 549 A2d 107.

(9) The united States District Court having established that certain
Arguments in this matter have not been exhausted,please SEE; ¶
Exhibit attached marked(A) and incorperated by reference.

(10) The above arguments are a violation of the defendant's rights
Guaranted him under the United States Constitution. this is an ongoing
Matter that needs to be heard. all of the arguments as set forth
Above in the new matter are appealable. immediate and final disposition
Of this matter is essential because;

The defendant is incarcerated and continues to suffer financial loss;
The deprivation of gainful employment; severe anxiety within his
Family life; deprivation of the opportunity to gather evidence,
Contact witnesses, or to otherwise prepare his defense.

(11) The defendant request an order pursuant to this NOTICE TO SET

ASIDE SENTENCE, to produce the defendant at any hearing conducted to
Determine this motion; and

(12) Such other and further relief as this honorable court may deem
Just and proper. (in the alternative the defendant would be prohibited
From Exhausting state remedies in this matter please SEE: (Mayberry VS.
Petsock 821 F.2d 179,184 (3rd Circ 1987).


PLEASE TAKE FURTHER NOTICE that answering affidavits if any, are to
Be served upon the undersigned at least 60 days prior to the return
Of this motion.


DATE: this 18 day of Feb .1999
Executed in Houtzdale, Pennsylvania.


RESPECTFULLY SUBMITTED

*[signature]*

CALVIN WILLIAM ROTH, JR.
Inst # CY-1623
P.O. BOX 1000
Houtzdale, PA. 16698-
1000.

TO: Thomas H. Kelley/District Attorney
    District Attorneys Office
    York County Courthouse
    York, PA. 17401

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
                    CRIMINAL    :    DIVISION

COMMONWEALTH OF PENNSYLVANIA
                                   :
                VS.                        CASE NO. 2341 C.A. 1992
                                   :

CALVIN WILLIAM ROTH, JR.           :


A F F I D A V I T

Executed this day in the State of Pennsylvania, clearfield county
Houtzdale. Being duly sworn, deposes and states under penalty of
Perjury pa. C.S.A. sec 4904. do hereby state the following:

1. I am the defendant in the above- entitled proceeding. I rake this
Affidavit in support of my NOTICE OF MOTION TO SET ASIDE SENTENCE
Upon the grounds that improperly impaneled jury failure of counsel
To honor wishes, also failure to secure witnesses and the probative
Value of said witnesses, also the sentence is invalid, based upon
All arguments stated herein and in the said motion.

2. I was Convicted by Jury for Rape Terroristic Threats.

3. The defendant has been continually incarcerated since December 2nd,
1993

4. I was sentenced to these charges by the Hon, Judge, John H. Chronist
To serve 11years to 22years concurrently for a total of 22years.

5. The defendant has filed numerous motions, post convictios, and
Petitions to no avail. the defendant has been proceeding PRO-SE and

Has not been able to properly to present his argument as he has not
Been given a complete copy of all discovery in this matter.

6. This sentence is invalid, and Illegal. the defendant at the least
Should be allowed allowance of appeal. the defendant has never waived
Any of his rights, nor the right to argue the new matters in this
Motion or to present any evidence in this matter, or to argue case
Law or any other arguments that would prove his case.

7. The grounds for relief described by this affidavit has (have)

Or Proceeding in a court of this State, except as presented herein
Or that would be presented in any subsequent motions that may be
Filed as a result of this action.

WHEREFORE, I the Defendant respectfully request that this honorable
Court enter an order, pursuant to applicable state law and all the
Information presented in this foregoing matter, setting Aside the
Sentence imposed upon me and granting the defendant the relief that
He seeks.  ( in the alternative that this motion is accepted as a
Collateral attack motion).

DATE:_____2____, __15$__.1999

RESPECTFULLY SUBMITTED

_(signature)_

CALVIN WILLIAM ROTH, JR.
Inst # CY-1623
P.O. BOX 1000
Houtzdale,   PA.16698-
1000

Sworn to before me this

18th day of Feb ,19 99

_(signature)_

NOTARY  PUBLIC

NOTARIAL SEAL
THOMAS A. SHORTS, Notary Public
Houtzdale Boro, Clearfield Co., PA
My Commission Expires Oct. 5, 2002

CC: File

AFFIDAVIT OR DECLARATION
IN SUPPORT OF MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

I, CALVIN WILLIAM ROTH, JR. , am the petitioner in the above-entitled case. In support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of this case or to give security therefor; and I believe I am entitled to redress.

I further swear that the responses I have made to the questions and instructions below relating to my ability to pay the cost of proceeding in this Court are true.

1.    Are you presently employed?   Yes _X_  No ____
   a. If the answer is yes, state the amount of your salary or wages per month and give the name and address of your employer.   SCI-Houtzdale Correctional Instituti

   P.O. Box 1000

   Houtzdale, PA 16698-1000

   b. If the answer is no, state the date of your last employment and the amount of salary or wages per month which you received. Menial Jail-house labor 42¢ per hou

2.    Have you received within the past twelve months any income from a business, profession or other form of self-employment, or in the form of rent payments, interest, dividends, or other sources?  Yes ____  No _X_

   a. If the answer is yes, describe each source of income and state the amount received from each during the past twelve months.
   N/A

3.    Do you own any cash or have a checking or savings account?  Yes ____  No _X_

   a. If the answer is yes, state the total value of the items owned.

   N/A

4.    Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)  Yes ____  No _x_

   a. If the answer is yes, describe the property and state its approximate value.

   N/A

5.    List the persons who are dependent upon you for support and state your relationship to those persons.  . . I HAVE ___0___ THAT I am not able to Support at this time.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on: _FEB 18_ , 19 99

WHEREFORE, due to the above statements
That this honorable court grant IN FORMA
PAUPERIS, with the right to proceed,and
The Appointment of counsel, irreparable harm

_(Signature)_        PRO-SE

## V E R I F I C A T I O N

CALVIN WILLIAM ROTH, JR. defendant, PRO-SE, do hereby verify that the
    Facts set forth in this NOTICE TO VACATE JUDGEMENT/SET ASIDE ¶ IS
True and correct to the best of my knowledge, information, and belief.
Any false statements made herein is made subject to the penalties under
18 pa. C.S.A. section 4904 relating to unswoorn falsification to Authorities.


DATE: _FEB_ , ___18___ .1999

_____
CALVIN WILLIAM ROTH, JR.


### PROOF   OF   SERVICE

NAME:                                           SERVICE TYPE

Hon Judge, John H. Chronister
Court of common pleas                           Distribution
York,  PA. 17401


Marlyn L. Holtiapple, Clerk of Court
York county courthouse                          first class mail
York,    PA, 17401


Thomas H. Kelley, District Attorney
York County Courthouse
York, PA, 17401                                 Distribution


I, hereby certify that I am serving one oreginal and three copies upon
The clerk of court of York county , for filing and Distribution NOTICE
TO VACATE JUDGEMENT/SET ASIDE.   THIS PROOF OF SERVICE SATISFIES
The requirements  under 18 pa. C.S.A. section 4904.


                                           RESPECTFULLY SUBMITTED

DATE: _FEB_ , ___18___ .1999

                                           _____
                                           CALVIN WILLIAM ROTH, JR.

APPENDIX U

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA                    :No. 2341 Criminal Action 1992
                                                :
              vs                                :
                                                :
CALVIN WILLIAM ROTH, JR.                        :

## O R D E R

Defendant has filed a Motion To Set Aside Sentence. This Motion is essentially a petition for post conviction relief.

Defendant had filed a Habeas Corpus in federal court. However because Roth stated he had not previously raised an allegation of an unconstitutionally selected jury in state court, the federal petition was dismissed as premature. Therefore Roth now files this Motion in state court.

This Court would note that Roth has filed two previous Post Conviction Relief Act Petitions alleging the ineffective assistance of counsel. All of the issues raised by Roth in the current Motion were either raised in his direct appeal or in the previous post convictions, or are considered waived because of the failure to raise them in the previous Post Conviction Relief Act Petitions. Therefore Roth is not entitled to state court relief and his Motion is hereby dismissed.

BY THE COURT,

JOHN H. CHRONISTER
JUDGE

DATED: _March 2, 1993_

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

CRIMINAL   DIVISION


COMMONWEALTH  OF  PENNSYLVANIA        :

              VS.                     :        NO. 2341 Criminal Action 1992

CALVIN WILLIAM ROTH, JR.

                                     :


## NOTICE     OF    APPEAL


Notice is hereby given that Calvin William Roth, Jr., PRO-SE, the
Defendant above named, hereby appeals to the <u>Superior Court</u>, of
Pennsylvania from the order Entered denying <u>Motion to set Aside</u>
<u>Sentence</u> and <u>motion to Set Aside Judgement</u>, with <u>Collateral Attack</u>
In this case on MARCH 2nd, 1999.


                                RESPECTFULLY  SUBMITTED

                                _Calvin W. Roth Jr._

                                CALVIN WILLIAM ROTH, JR.

                                Inst # CY-1623

                                P.O. BOX 1000

                                Houtzdale,   PA.16698-
                                1000

IN THE COURT OF COMMON PLEAS OF YORK COUNTY.    PENNSYLVANIA

CRIMINAL    DIVISION

COMMONWEALTH OF PENNSYLVANIA          :

            VS.                       :    NO. 2341 Criminal Action 1992

CALVIN WILLIAM ROTH, JR.              :

VERIFIED  STATEMENT  UNDER  PENNSYLVANIA  RULE  OF  APPELLATE
                      PROCEDURE # 551

1. the defendant was previously granted counsel by the court after
Establishing that he could not afford the appointment of counsel or
The cost for said action by the lower Court.

2. There has been no substantial change in the financial condition
Of the appellant since such date.

3. The appellant is unable to pay the fees and cost on appeal, nor
Is he able to re-produce the original record in this matter.

4. All of these facts are true to the best of my Knowledge understa-
nding, and belief.


                                      RESPECTFULLY SUBMITTED

                                      _Calvin W Roth Jr_

                                      CALVIN WILLIAM ROTH, JR.

                                      Inst # CY-1623

                                      P.O. BOX 1000

                                      Houtzdale,  PA. 16698-

DATE: _MARCH_ , _26_ .1999       1000

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA          :

                    VS.              : NO. 2341 Criminal Action 1992

CALVIN WILLIAM ROTH, JR.
                                     :

### certificate of service

I, do hereby certify that I am this day serving the original and

    Six copies of the attached Notice Of Appeal to the Appeals
Unit for filing and distribution in the manner indicated, which
Satisfies-complies with the Rules of Appellate procedure governing
Service of documents to the following persons:

Hon Judge, John H. Chronister          Court Reporter/Administrator
Court of common pleas                  York County Courthouse
York County Courthouse                 York, PA. 17401
York, PA. 17401                        [first class mail]
[first class mail]


District Attorneys Office              Court Stenographer
Thomas H. Kelley                       York County Courthouse
York County Courthouse                 York, PA. 17401
York, PA. 17401                        [first class mail]
[first class mail]

**NOTE:** a notice of appeal having been filed in this matter pursuant
To Rules of Appellant Procedure 1911-1922 the defendant do hereby
Request copies of all Discovery in this matter, in conformity with
Rules of appellant procedure.

DATE: _MARCH_ , _26_ .1999            _____
                                      CALVIN WILLIAM ROTH, JR. PRO-SE

J. S90030/99

COMMONWEALTH OF PENNSYLVANIA,    :    IN THE SUPERIOR COURT OF
                                                        :         PENNSYLVANIA
                        Appellee                     :
                                                        :
            v.                                          :
                                                        :
CALVIN WILLIAM ROTH, JR.,               :
                                                        :
                        Appellant                   :         No. 745 MDA 1999

Appeal from the Order Entered March 3, 1999,
In the Court of Common Pleas of York County
Criminal Division at No. 2341 C A 1992.

BEFORE:    POPOVICH, MUSMANNO and BROSKY, JJ.

MEMORANDUM:                              **F I L E D** FEB 0 8 2000

        This is a *pro se* appeal from the order of the Court of Common Pleas of

York County on March 2, 1999, which denied without a hearing appellant's

third petition for relief pursuant to the Post Conviction Relief Act. 42

Pa.C.S.A. § 9541 *et seq*. Herein, appellant raises various claims of trial

counsel's and PCRA counsel's ineffectiveness. However, given the untimely

nature of appellant's PCRA petition, we affirm.

        Following a jury trial, appellant was convicted of rape, terroristic

threats and escape, and on September 2, 1993, appellant was sentenced.

Appellant filed a motion to modify sentence which was scheduled for a

hearing on September 30, 1993. However, before resolution of his motion,

J. S90030/99

appellant, through counsel, filed a notice of appeal on September 24, 1993.[1] Despite the filing of the notice of appeal, the lower court conducted a hearing and denied appellant's motion for reconsideration of sentence on September 30, 1993.

Apparently, appellant petitioned this court to remand the matter to the lower court, and on November 5, 1993, the case was remanded. Appellant then filed a *pro se* "Motion For Judgment Of Acquittal Not Withstanding The Verdict Of A New Trial," which alleged, *inter alia*, ineffective assistance of trial counsel. On December 6, 1993, the lower court entered an order appointing new counsel and directing that appellant's *pro se* motion be considered a PCRA petition.

A hearing on appellant's PCRA petition had to be repeatedly rescheduled because appellant had been returned to the State of Indiana to serve a sentence in that state and Indiana authorities refused to release him into the custody of York County. Eventually, on December 20, 1994, this court ordered the lower court to return the record in this case to the Superior Court for resolution of appellant's direct appeal. Apparently, the original remand order from this court was intended to be a remand for the appointment of new counsel only. Consequently, the lower court forwarded the record to the Superior Court, and on December 14, 1995, in an unpublished memorandum, we affirmed appellant's judgment of sentence.

---

[1] Appellant also filed a *pro se* notice of appeal on September 27, 1993.

- 2 -

J. S90030/99

*See **Commonwealth v. Roth**, 674 A.2d 319 (Pa.Super. 1996) (table).*
Appellant did not file a petition for allowance of appeal to our Supreme Court
from our affirmance of his judgment of sentence.

   Upon return of the record to York County, the lower court conducted a
hearing on appellant's outstanding PCRA petition, and on January 30, 1996,
the lower court denied appellant's requested relief.  Appellant then appealed
this decision, and on November 25, 1996, we affirmed the order which
denied appellant's request for post conviction relief.   On May 29, 1997,
appellant's petition for allowance of appeal to our Supreme Court was
denied.

   Upon return of the record to York County, appellant filed his second
PCRA petition on December 1, 1998.  On December 9, 1998, the PCRA court
denied the petition as untimely filed.  *See* 42 Pa.C.S.A. § 9545.  Appellant
did not file an appeal from this order.   However, on February 23, 1999,
appellant filed a "NOTICE OF MOTION TO SET ASIDE SENTENCE AS STATED
ABOVE" and a "NOTICE OF MOTION TO VACATE JUDGMENT OF TO SET
ASIDE THE ABOVE [SENTENCE]."   On March 2, 1999, the lower court,
considering these motions as appellant's third PCRA petition, denied relief
after finding that the issues raised were either previously litigated, waived or
untimely filed.  This appeal followed.

   On November 17, 1995, the Post Conviction Relief Act was amended
(effective in 60 days), and 42 Pa.C.S.A. § 9545(b)(1) now provides:

- 3 -

J. S90030/99

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States of the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

Appellant filed a direct appeal from his judgment of sentence, and we affirmed on December 14, 1995. Appellant did not file a petition for allowance of appeal to our Supreme Court. Thus, appellant's judgment of sentence became final on January 13, 1996, upon expiration of the thirty-day period for filing a petition for allowance of appeal. 42 Pa.C.S.A. § 9545(b)(3); Pa.R.A.P. 1113. On February 23, 1999, appellant filed the PCRA petition now before us, his third request for relief under the PCRA.

Because of the filing date of appellant's PCRA petition *sub judice*, the PCRA, as amended on November 17, 1995 (effective in sixty days), applies. Clearly, appellant's third PCRA petition is untimely since it was filed well in excess of one year after his judgment of sentence became final on January 13, 1996. Further, our review of appellant's allegations reveals that they do

- 4 -

J. S90030/99

not fall within any of the exceptions to 42 Pa.C.S.A. § 9545(b)(1). **Commonwealth v. Peterkin**, ___ Pa. ___, ___, 722 A.2d 638, 641(1998).

Accordingly, we hold that the lower court properly dismissed his petition without a hearing since appellant's third petition for post conviction relief was untimely. **Peterkin, supra**; **Commonwealth v. Alcorn**, 703 A.2d 1054 (Pa.Super. 1997); 42 Pa.C.S.A. § 9545.

Order of March 2, 1999, affirmed.

Judgment Entered:

Prothonotary

FEB - 8 2000

Date:_____

APPENDIX W

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

COMMONWEALTH OF PENNSYLVANIA, : No. 0232 M.D. Alloc. Dkt. 2000
:
             Respondent : Petition for Allowance of Appeal from
: Superior Court
:
       v. :
:
:
    CALVIN WILLIAM ROTH, JR., :
:
         Petitioner :
:
:

ORDER

PER CURIAM

    **AND NOW**, this  25th day of  July, 2000, the petition for allowance of appeal is
denied.

TRUE & CORRECT COPY

ATTEST: JUL 2 5 2000

*Shirley J. Phipps*
SHIRLEY J. PHIPPS
APPELLATE CLERK